# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

## CASE NO. 20-13278

_____

JOHN "BURT" MCALPIN,

*Plaintiff/Appellant*,

v.

TOWN OF SNEADS, et al.,

*Defendants/Appellees*.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
T. KENT WETHERELL, II
(5:19-cv-00292-TKW-MJF)

_____

## APPELLANT'S CORRECTED INITIAL BRIEF
_____

Marie A. Mattox
Ashley N. Richardson
Marie A. Mattox, P.A.
203 North Gadsden Street
Tallahassee, FL 32301
(850) 383-4800
(850) 383-4801 (facsimile)
marie@mattoxlaw.com
ashley@mattoxlaw.com

**C-1**

**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT**

Appellant/Plaintiff John "Burt" McAlpin, pursuant to FRAP 26.1 and 11th Cir. R. 26.1-1, 26.1-2 and 26.1-3, hereby files her Certificate of Interested Persons and Corporate Disclosure Statement:

1. Gwendolyn Palmer Adkins (Counsel for Appellee)

2. Lynda Bell (Appellee)

3. Coppins Monroe Adkins Etc P A (Law Firm for Appellee)

4. Helen Grice (Appellee)

5. Sherri Griffin (Appellee)

6. Daryl Johnson (Appellee)

7. Marie A. Mattox (Counsel for Appellant)

8. Marie A. Mattox, P.A. (Law Firm for Appellant)

9. John "Burt" McAlpin (Appellant)

10. Christopher Todd Owen (Attorney for Appellee)

11. Danny Pettis (Appellee)

12. Town of Sneads Florida (Appellee)

13. T. Kent Wetherell II (District Judge)

**C-2**

## STATEMENT REGARDING ORAL ARGUMENT

Appellant believes oral argument will assist the Court's disposition of this case. Oral argument will assist in focus and will test the basis and validity of the contentions of the parties.

## **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PARTIES AND
CORPORATE DISCLOSURE STATEMENT ......................................C-1

STATEMENT REGARDING ORAL ARGUMENT ...........................C-2

TABLE OF CONTENTS............................................................................i

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF JURISDICTION.........................................................vi

STATEMENT OF THE ISSUES..............................................................1

STATEMENT OF THE FACTS ..............................................................2

STANDARD OF REVIEW ....................................................................20

SUMMARY OF ARGUMENT ..............................................................20

ARGUMENT .........................................................................................21

    I.    THE DISTRICT COURT ERRED BY FINDING THAT
        MCALPIN'S DISCLOSURES WERE NOT PROTECTED
        DISCLOSURES PURSUANT TO § 112.3187, FLA. STAT.............22

        A.    McAlpin engaged in statutorily protected activity. .................24

        B.    McAlpin established a causal connection between his
              protected activity and his termination.......................................33

    II.    THE DISTRICT COURT ERRED BY GRANTING
        SUMMARY JUDGMENT ON MCALPIN'S CLAIMS OF
        FMLA INTERFERENCE AND RETALIATION..............................35

    III.    THE DISTRICT COURT ERRED BY FINDING THAT
        MCALPIN DID NOT MEET HIS BURDEN TO ESTABLISH
        THAT THE TOWN'S ALLEGED JUSTIFICATIONS FOR ITS
        ACTIONS WERE MERELY A PRETEXT. ......................................35

IV.  THE DISTRICT COURT ERRED BY FINDING THAT MCALPIN'S SPEECH WAS NOT PROTECTED BY THE FIRST AMENDMENT, AND NOT A SUBSTANTIAL FACTOR IN HIS TERMINATION ...................................................... 42

   A.   McAlpin spoke on matters of public concern. ........................... 43

   B.   McAlpin spoke as a citizen about those matters of public concern. ...................................................................................... 48

   C.   McAlpin's speech played a substantial role in his termination and Appellees would not have made the same decision absent his protected speech. ........................................ 51

   D.   The Town of Sneads is liable. ................................................... 53

   E.   The individual Appellees are not entitled to qualified immunity. .................................................................................... 53

   F.   Appellees Bell and Griffin are also liable. ................................ 54

CONCLUSION ........................................................................................................ 56

CERTIFICATE OF COMPLIANCE ....................................................................... 57

CERTIFICATE OF SERVICE ................................................................................ 57

## TABLE OF AUTHORITIES

Anderson v. Burke County, Ga., 239 F.3d 1216 (11th Cir. 2001) ..........................46

Anderson v. Valdez, 845 F.3d 580 (5th Cir. 2016) ..................................................50

Bass v. Bd. of County Com'rs, Orange County, Fla., 256 F.3d 1095
 (11th Cir. 2001) ...............................................................................................41

Beckwith v. City of Daytona Beach Shores, Fla., 58 F.3d 1554 (11th Cir.
 1995) ................................................................................................................46

Boyce v. Andrew, 510 F.3d 1333 (11th Cir. 2007) ...........................................44, 54

Brugart v. BellSouth Telecommunication, Inc., 231 F. 3d 791 (11th Cir. 2000)....34

Bryson v. Waycross, 888 F.2d 1562 (11th Cir. 1989).......................................43, 44

Carollo v. Boria, 833 F.3d 1322 (11th Cir. 2016) ........................................... 48-51

Connick v. Myers, 461 U.S. 138 (1983)...............................................44, 45, 47, 54

Cook v. Gwinnett Cty. Sch. Dist., 414 F.3d 1313 (11th Cir. 2005) ............45, 46, 54

Crouch v. Public Service Com'n, 913 So. 2d 111 (Fla. 1st DCA 2005)..................32

Dahlia v. Rodriguez, 735 F.3d 1060 (9th Cir. 2013) ..............................................51

Davis v. Phenix City, 513 F. Supp. 2d 1241 (M.D. Ala. 2007)...............................46

Donnellon v. Fruehauf Corp., 794 F.2d 598 (11th Cir. 1986)................................34

Ezell v. Darr, 951 F. Supp. 2d 1316 (M.D. Ga. 2013), aff'd sub nom.
 Ezell v. Wynn, 802 F.3d 1217 (11th Cir. 2015)...............................................22

Farley v. Nationwide Mutual Ins. Co., 197 F. 3d 1322 (11th Cir. 1999)...............34

Fikes v. City of Daphne, 79 F.3d 1079 (11th Cir. 1996).........................................46

Finch v. City of Vernon, 877 F.2d 1497 (11th Cir. 1989).......................................46

Garcetti v. Ceballos, 547 U.S. 410 (2006)..............................................45, 47, 49, 50

Goldsmith v. City of Atmore, 996 F. 2d 1155 (11th Cir. 1993)..............................34

Gresham v. City of Atlanta, 542 F. App'x 817 (11th Cir. 2013) ...........................42

Guster v. Hamilton Cty. Dept. of Educ., 2004 WL 1854181 (E.D. Tenn. 2004)....47

Handy-Clay v. City of Memphis, Tenn., 695 F.3d 531 (6th Cir. 2012).................50

Hartwell v. City of Montgomery, 487 F. Supp. 2d 1313 (M.D. Ala. 2007)...........46

Howard v. BP Oil Co., 32 F.3d 520 (11th Cir. 1994)..............................................36

Hunter v. Town of Mocksville, N.C., 780 F.3d 389 (4th Cir. 2015)......................50

Hussey v. City of Marianna, Florida, 2011 WL 3294827 (N.D. Fla. 2011) .....29, 31

Hutchison v. Prudential Ins. Co., 645 So. 2d 1047 (Fla. 3d DCA 1994) ...............29

Irven v. Dep't of Health and Rehab. Serv., 790 So.2d 403 (Fla. 2001) .................23

Jones v. Sch. Bd. of Orange County, Fla., 2005 WL 1705504 (M.D. Fla.
     2005) ......................................................................................27, 28, 32, 41

Jones v. UPS Ground Freight, 683 F.3d 1283 (11th Cir. 2012) .............................20

King v. State of Fla., 650 F.Supp.2d 1157 (N.D. Fla. 2009)...................................30

Kurtz v. Vickrey, 855 F.2d 723 (11th Cir. 1988) ...................................................44

Lane v. Franks, 134 S.Ct. 2369 (2014).............................................................. 48-51

Lindamood v. Office of State Attorney, 731 So. 2d 829 (Fla. 5th DCA 1999) ......30

Maggio v. Sipple, 211 F.3d 1346 (11th Cir. 2000)..................................................44

Martin County v. Edenfield, 609 So.2d 27 (Fla. 1992) ...................................passim

Mason v. Village of El Portal, 240 F.3d 1337 (11th Cir. 2001) ..............................53

Mitchell v. Hillsborough, County, 468 F.3d 1276 (11th Cir. 2006)........................44

Moss v. City of Pembroke Pines, 782 F.3d 613 (11th Cir. 2015) ...........................51

Pattee v. Georgia Ports Authority, 477 F. Supp. 2d 1253 (S.D. Ga. 2006).............46

Phillips v. City of Dawsonville, 499 F.3d 1239 (11th Cir. 2007) ...........................47

Pickering v. Bd. of Educ., 391 U.S. 563 (1968) ..........................................43, 44, 49

Polion v. City of Greensboro, 614 Fed.Appx. 396 (11th Cir. 2015) ......................50

Rankin v. McPherson, 483 U.S. 378 (1987)............................................................44

Rice-Lamar v. City of Ft. Lauderdale, 853 So.2d 1125 (Fla. 4th DCA 2003)........25

Rodin v. City of Coral Springs, Fla., 229 Fed. Appx. 849 (11th Cir. 2007) ...........46

Rosa v. Dep't of Child. and Fam., 915 So. 2d 210 (Fla. 1st DCA 2005)..........24, 30

Russell v. KSL Hotel Corp., 887 So. 2d 372 (Fla. 3d DCA 2004).........................24

Saunders v. Don Hunter, et al., 980 F. Supp. 1236 (M.D. Fla. 1997) ....................30

Scheirich v. Town of Hillsboro Beach, 2008 WL 186621 (S.D. Fla.
    Jan. 18, 2008).................................................................................................27

Shotz v. City of Plantation, 344 F. 3d 1161 (11th Cir. 2003)..................................34

Shuck v. Clark, 2007 WL 676198 (M.D. Fla. 2007) ...............................................27

Slane v. City of Sanibel, 2015 U.S. Dist. Lexis 93157 (M.D. Fla. 2015) ..............51

Swilley v. Alexander, 629 F.2d 1018 (5th Cir. 1980) .............................................46

Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981) ............................36

Tidwell v. Carter Products, 135 F.3d 1422 (11th Cir. 1998)..................................41

Ujcic v. City of Apopka, 581 So.2d 218 (Fla. 5th DCA 1991) ...............................23

White v. City of Athens, 169 F.Supp.3d 1254 (N.D. Ala. 2016) ...........................51

Wideman v. Wal-Mart Stores, Inc., 141 F. 3d 1453 (11th Cir. 1998)....................34

Wilbourne v. Forsyth County Sch. Dist., 306 Fed.Appx. 473 (11th Cir. 2009)......45

**Statutes:**

28 U.S.C. § 1291 ..................................................................................... vii

§ 112.3187(2), Fla. Stat..............................................................24, 25, 26

§ 112.3187(5), Fla. Stat..............................................................24, 25, 26

§ 112.3187(7), Fla. Stat...........................................................................32

Fed. R. Civ. P. 56 ...................................................................................21

## STATEMENT OF JURISDICTION

This case is a plenary appeal of a final decision of a district court of the United States, specifically, the United States District Court for the Northern District of Florida, Tallahassee Division. Accordingly, jurisdiction lies under 28 U.S.C. § 1291. Appellant timely filed his Notice of Appeal on July 23, 2020, following entry of the District Court's Order Granting Summary Judgment on July 10, 2020. [Doc. 69].

## STATEMENT OF THE ISSUES

I.    Whether the District Court erred by finding that McAlpin did not make disclosures protected by § 112.3187, Fla. Stat.

II.    Whether the District Court erred by dismissing McAlpin's FMLA claims for his alleged failure to establish that Appellees' actions were pretextual.

III.    Whether the District Court erred by finding that McAlpin did not proffer evidence of pretext to rebut Appellees' allegedly legitimate, non- retaliatory reasons for taking adverse actions against McAlpin.

IV.    Whether the District Court erred by finding that McAlpin did not engage in speech protected by the First Amendment.

V.    Whether the District Court erred by finding that McAlpin's protected speech was not a "substantial part" of the decision to terminate him.

VI.    Whether the District Court erred by finding that McAlpin's constitutional rights were violated.

VII.    Whether the District Court erred by finding that Appellee the Town of Sneads was not liable for McAlpin's constitutional deprivations.

VIII.    Whether the District Court erred by finding that the individual Appellees were not liable for McAlpin's constitutional deprivations.

IX.    Whether the District Court erred by viewing the facts in a light more favorable to Appellee and by weighing the evidence.

1

## STATEMENT OF THE FACTS

Plaintiff/Appellant, John "Burt" McAlpin became the Chief of Police for the Town of Sneads in 2006. [Doc. 63-41, 12:17-13:2]. In the twelve years that he served as the Chief of Police, McAlpin was never disciplined. [Doc. 63-41, 14:3-5]. Throughout his entire time as Chief, McAlpin reported directly to the Town Council, not the Town Manager. [Doc. 63-61, ¶ 6]. Throughout this tenure, the Chief of Police reported directly to the Town Council. [Id.].

Despite allegations below, there was no "constant battle" between City Hall and the Police Department, and tensions did not escalate between the two entities until Daryl Johnson and Danny Pettis were elected to the Town Council, Pettis in April 2017, and Johnson in April 2018. [Doc. 63-61, ¶ 7]. Particularly under the leadership of Butts, the police department and Town Council were always able to work together for the citizens of Sneads. [Id.]. It was not until McAlpin began to object to and report improper, illegal, and unethical conduct that the relationship soured, leading to McAlpin's termination in October 2018. [Doc. 63-42, 5:12-7:1; Doc. 63-45, 45:14-22; Doc. 63-55, 8:1-15; Doc. 63-58, 6:1-24; Doc. 63-61, ¶ 7].

Butts testified that McAlpin was a great officer and leader and worked with her on the serious budget shortfalls facing the Town, including securing his own grants to acquire additional police vehicles. [Doc. 63-44, 5:17-7:8]. She further testified that because there was no money to hire additional officers, compensatory

time was necessary to ensure the department was staffed twenty-four hours a day. [Id.].

After the 2018 election, resulting in Pettis taking a seat on the Town Council, McAlpin made a request for public records from DOC regarding the newest Town Council members, both Pettis and Johnson. [Doc. 63-41, 30:2-11; Doc. 63-61, ¶ 9]. Pettis and Johnson had prior criminal convictions for assaulting a mentally handicapped inmate when both worked for DOC, and for failing to report the use of force in that instance. [Doc. 62-29; Doc. 62-32; Doc. 63-45, 6:9-22, 14:3-15:12; Doc. 63-51, 6:17-25, 7:4-12; Doc. 63-61, ¶ 9]. McAlpin wanted to provide Council President Helen Grice with that information to keep criminals from serving as the police liaison. [Doc. 63-41, 31:6-19]. McAlpin felt that having a convicted criminal or perjurer serve as the police department liaison would present an ethical issue. [Doc. 63-41, 35:8-36:18].

McAlpin reported the results of his public records request to Grice on June 11, 2018. [Doc. 61-1; Doc. 63-41, 37:10-17, 39:2-19; Doc. 63-42, 12:24-13:24]. She was very concerned about their criminal convictions during their meeting, and McAlpin felt confident that she would honor his request to have a different member of the Town Council serve as the department liaison. [Doc. 63-42, 15:10-16:14; Doc. 63-61, ¶ 11].

However, on June 12, 2018, Grice appointed Pettis as the liaison to the police department. [Doc. 62-34; Doc. 63-41, 45:7-18; Doc. 63-45, 20:2-7]. McAlpin confronted Grice about the decision, and later documented their conversation in a written memorandum on June 13, 2018. [Doc. 63-41, 45:19-46:11]. Pettis and Bell each knew that McAlpin reported his criminal convictions to Grice. [Doc. 62-29; Doc. 63-45, 11:22-13:10; Doc. 63-47, 19:2-19, 22:23-23:23].

Butts actually left her position in early June 2018 because, after Pettis was elected, she learned that he was talking with citizens around town about "getting rid of" both her and McAlpin. [Doc. 63-44, 20:14-21:24, 23:14-22, 27:8-20]. Pettis spoke with Sgt. Bowen, and hostilely told Sgt. Bowen that the department was poorly managed and did not live up to his expectations, that officers needed to work twelve hour shifts and be more visible, but simultaneously needed to further reduce the number of overall officers, which was impossible. [Doc. 63-42, 23:12-25:22]. As Sgt. Bowen attempted to explain the staffing situation, Pettis told Sgt. Bowen to "remember, [he] always come[s] out on top." [Id.]. Sgt. Bowen's further testified that every act the department took was met with "major resistance" from Town Hall, and that only intensified after Pettis became the department liaison. [Doc. 63-42, 12:24-13:24, 16:18-17:4].

Compensatory time was a necessary evil for effectively running the Sneads Police Department. [Doc. 63-61, ¶ 13]. The department had been consistently

understaffed but expected to maintain police and dispatch coverage twenty-four hours each day. [Id.]. McAlpin was prevented from hiring additional police officers, and often, officers would have to stay well beyond their assigned shift hours to complete investigations and reports. [Id.]. This resulted in the accumulation of compensatory time, which the department was unable to work off as quickly as it accrued, again due to serious staffing shortages. [Id.]. This problem was years in the making and well known by Butts and all current and former members of the Town Council. [Id.]. This problem was exacerbated because the Town would not hire additional officers to cover shifts and help prevent the accrual of additional compensatory time. [Id.]. Effectively manning the police department presented a "lose lose" situation. [Id.]. Either the Town would not have adequate police coverage but would maintain its budgetary goals, or the Town would have proper and adequate police coverage but struggle with accrued compensatory time. [Id.].

During the June 12, 2018, Town Council meeting, Pettis made a motion to remove a disciplinary memorandum from employee Brad Allen's personnel file. [Doc. 63-61, ¶ 14]. McAlpin was in attendance at this meeting and spoke on the issue of twenty-four hour a day police coverage. [Id.]. Pettis then came to McAlpin's office on July 2, 2018, at which point McAlpin informed Pettis that the removal of the memorandum from Allen's personnel file was in violation of Florida's Public Records Laws, found in Chapter 119. [Doc. 53-13, Ex. G (video file); Doc. 63-61, ¶

5

15]. This meeting was hostile, as were many of the interactions that followed, and thus McAlpin prepared a memorandum over several weeks, adding to it the day following each incident. [Doc. 61-12; Doc. 63-41, 114:10-23]. Although it predated her employment, Pettis later informed Lynda Bell about McAlpin's issue with the removal of the public record from Allen's file. [Doc. 62-33; Doc. 62-34; Doc. 63-47, 34:10-35:5]. During this same July 2, 2018, meeting with Pettis, McAlpin informed Pettis that he had provided Pettis' criminal convictions, along with Johnson's convictions, to Grice prior to the June 12, 2018 meeting. [Doc. 53-13, Ex. G (video file); Doc. 61-12]. Pettis responded that his area of expertise was in maintenance anyway. [Id.].

During the very next Town Council meeting, on July 10, 2018, Pettis stated that he asked Town Attorney Guy Green for his opinion regarding removing the memorandum from Allen's personnel file, and that Green advised the memorandum should stay in the file. [Doc. 63-61, ¶ 18]. Pettis then moved to rescind the motion from the June 12, 2018 meeting, which Johnson seconded, and the Council ultimately passed. [Id.].

In or around July 2018, dispatcher Connie Wright provided McAlpin with a signed statement about her concern of theft committed by Town Clerk, Sherri Griffin, and discussed the events she witnessed with him in person. [Doc. 61-9]. Wright stated that she had concerns about misappropriated funds from the proceeds

of a ball tournament. [Doc. 62-41; Doc. 63-41, 80:3-81:13; Doc. 63-42, 11:16-12:12. 30:3-20]. She also described Griffin's conduct, stating that the collected ticket money was not counted or properly accounted for, and that Griffin weighed the stack of cash and said "vacay" before putting the money in her purse, instead of a proper money bag. [Id.].

McAlpin thereafter contacted Travis Lawson with FDLE. [Doc. 63-41, 78:23-79:16]. He met with Lawson and agent Chad Dickson in his office, providing them with Wright's statement and verbally informing them of the events and Griffin's conduct. [Doc. 63-61, ¶ 20].

McAlpin then prepared a memorandum following the August 2 budget meeting, noting Griffin's disclosure of the budget shortfall. [Doc. 62-17; Doc. 63-41, 260:5-15]. McAlpin took further action to publicly express his concerns about public safety. [Doc. 62-40]. In that Facebook post, he addressed the Sneads' citizens, stating that he had attended the August 2, 2019 closed door budget workshop meeting, and that during that meeting, Lewis suggested once again that the Town eliminate the midnight dispatch position. [Id.]. McAlpin explained that this position was critical to public safety, and further called for an increase in the number of officers and dispatchers, as he had done on numerous prior occasions, again with policing and public safety as his primary concerns. [Id.]. Both Bell and Lewis

testified that they were aware of this public Facebook post prior to terminating McAlpin. [Doc. 63-46, 34:5-35:5; Doc. 63-47, 50:7-24].

During his second meeting with agents Lawson and Dickson on August 3, McAlpin also relayed concerns about the twenty-thousand-dollar shortage Griffin reported to the Town's general fund during the August 2, 2018 budget meeting. [Doc. 62-18; Doc. 63-41, 82:13-84:18, 85:6-86:6; Doc. 63-61, ¶ 22-23]. Following Wright's reports, he was extremely concerned that Griffin may also be responsible for that budgetary shortfall and intended to trigger an investigation and audit by FDLE. [Doc. 63-61, ¶ 23].

Prior to the council meeting on August 9, 2018, McAlpin prepared a memorandum to the council members. [Doc. 61-3]. He identified himself as a whistleblower, said that he reported criminal conduct by a Town official to FDLE and requested that FDLE conduct an investigation. [Doc. 63-41, 52:2-53:24]. He knew his reports of Griffin's misconduct would generate an investigation by FDLE and did not want the council members taken by surprise. [Doc. 63-41, 53:3-54:10]. He had provided information to FDLE about Town Clerk Griffin and evidence of theft. [Id.].

McAlpin hand-delivered this memorandum immediately prior to the August 9 meeting. [Doc. 62-44; Doc. 63-41, 55:5-9; Doc. 63-45, 25:20-26:1, 62:9-18]. McAlpin explained that he could not provide specific details, as that would

compromise the investigation by FDLE. [Doc. 63-41, 55:10-13]. While the councilmembers ignored the letter, Bell testified that she knew about the FDLE report. [Doc. 63-46, 47:5-20; Doc. 63-47, 54:6-55:18; Doc. 63-51, 16:1-17:10]. Also, during the August 9 meeting, McAlpin again spoke out about the council's insistence that the police department cut its overnight dispatcher position. [Doc. 63-61, ¶ 27].

The Council hired Bell in August 2018 to replace Butts. [Doc. 63-47, 7:3-12]. She immediately sent out emails stating that all overtime must be approved by her in advance, which was a serious issue for the department, as overtime needs arose at all hours and without warning. [Doc. 62-3; Doc. 63-41, 189:21-191:9; Doc. 63-61, ¶ 29]. Moreover, Bell did not provide any way to contact her after hours, for example, in the middle of the night if an officer's shift had ended but he was working a scene or a case, necessitating overtime and thus the accrual of compensatory time. [Id.].

Bell was extremely hostile towards McAlpin from the outset, and during their initial meeting on August 22, 2018, she was rude and demeaning. [Doc. 63-41, 142:9-22, 146:3-147:7; Doc. 63-61, ¶ 30]. She indicated that the police department was poorly managed and needed fewer officers, and demanded all sorts of records and dispatch logs, none of which were automated or easy to gather. [Doc. 63-41,

142:23-143:15]. Although McAlpin was angry about some of the things Bell said, he did not slam the door or leave in a hostile manner. [Doc. 63-41, 147:14-22].

On August 28, 2018, Bell emailed McAlpin claiming there was "extreme" overtime use the previous weekend. [Doc. 62-4]. McAlpin responded on August 31, 2018, his first available time due to a recent shooting, and again explained the critical need of having an employee present at the station at all hours of the day. [Doc. 62-6; Doc. 63-41, 200:16-201:2]. He also noted the difficulty and time involved in responding to her request for documents, and asked that if it was critical, she discuss the issue with him further. [Id.]. Importantly, McAlpin asked if his was the only department being targeted, and Bell confirmed that it was. [Doc. 62-6; Doc. 63-41, 199:7-200:4; Doc. 62-52; Doc. 63-47, 72:8-73:4].

Despite their best efforts, there was simply no way to staff the police department without accruing compensatory time. [Doc. 63-42, 17:20-19:3]. The department was short-staffed, with Sgt. Bowen and McAlpin, two salaried employees, working well over forty hours each week. [Id.]. Once Johnson and Pettis joined the Town Council, they spoke often of reducing staff even further. [Id.]. McAlpin told Bell that there were issues balancing cuts to hours and night dispatch issues, and Bell was well aware of McAlpin's concerns about cutting hours and staffing. [Doc. 63-47, 47:25-48:3, 49:2-18].

10

Butts testified that compensatory time was necessary, and that McAlpin was doing "what [she] wanted" him to do with respect to keeping the department staffed twenty-four hours a day, seven days a week. [Doc. 63-44, 18:11-19:10]. Even Pettis admitted that it was impossible to staff the police department without using compensatory time. [Doc. 63-45, 43:22-44:7]. He also admitted that as Chief of Police, McAlpin would be in the best position to determine how many hours and officers were necessary to provide police coverage for the Town. [Doc. 63-45, 23:2-11].

Even Bell testified that the whole idea of compensatory time is to flex the schedule and work the comp time off as soon as possible. [Doc. 63-47, 63:3-64:10]. She claimed that she did not expect McAlpin to forgo compensatory time altogether, and that compensatory time could continue to be accumulated as needed. [Id.]. This, however, did not stop her from harassing McAlpin about compensatory time to the point that he required medical leave for stress and anxiety. [Doc. 63-41, 68:13-69:25]. Yet curiously, Johnson testified that he believed McAlpin was insubordinate because McAlpin refused to cut back the police department staff and officers to accommodate budget concerns. [Doc. 63-51, 20:5-23:12]. Importantly, although the police department was over budget in 2018, many years it was operating under budget, and McAlpin's savings were used to fix other buildings. [Doc. 63-41, 186:2-8].

11

Within two weeks of Bell's hire, her harassment had become so severe that McAlpin began to have physical symptoms of anxiety that necessitated medical leave. [Doc. 63-41, 68:13-69:25]. He visited his medical provider on September 5, 2018, due to chest pains, cardiac issues, and stress. [Id.]. ARNP Abby Strickland, prepared medical documentation about his need to miss work. [Doc. 61-5; Doc. 63-41, 72:4-25]. Strickland excused McAlpin from work for two weeks to allow his anxiety medication time to stabilize his blood levels and give him time to hopefully recuperate from the stress. [Doc. 63-57, 26:1-27:10]. She never disclosed the actual underlying cause of the need for leave for any patient, as that would violate HIPAA. [Id.]. Moreover, pursuant to clinic procedure, assistant Caroline Odom prepared the work excuse note. [Doc. 63-57, 25:1-13].

During his leave, McAlpin remained available via phone, and had never previously had to notify Appellees of his absences or seek approval for time off. [Doc. 63-41, 75:1-22; Doc. 63-44, 7:10-8:11]. Following Bell's hire, McAlpin was prescribed Lexapro and Klonopin for anxiety and depression, and also took nitro, and medication for blood pressure and cholesterol. [Doc. 63-41, 160:3-23]. Prior to September 5, 2018, McAlpin had never taken nor was he prescribed medication for anxiety and depression. [Id.].

Bell was extremely rude and hostile towards McAlpin about his leave, making comments such as "enjoy your vacation." [Doc. 63-41, 153:16-154:2]. She was also

dissatisfied with his excuse note, claiming on repeated occasions that it was "medically insufficient." [Doc. 63-57, 28:19-29:10]. McAlpin had to return to the clinic for additional documentation about his leave on September 10, 2018, again excusing him through September 20. [Doc. 61-15; Doc. 63-41, 151:12-152:12]. Bell did not approve of this note either, and sent McAlpin an email stating, "I'm in receipt of the second note from Chipola Clinic. Sneads office's notice is still medically insufficient. No worries. You'll be continued to be paid from your vacation pay." [Doc. 63-4; Doc. 63-47, 77:12-78:9]. McAlpin responded in writing, questioning her actions. [Doc. 63-12].

Bell repeatedly contacted the clinic, demanding to know the specific information about McAlpin's medical condition. [Doc. 63-41, 246:3-22]. She further refused to draw from McAlpin's sick leave balance and continued to draw from his vacation leave balance. [Doc. 63-41, 168:7-17; Doc. 63-47, 89:19-90:3]. According to Bell, and not supported by any written policy, after three days, the medical excuse must contain a reason and disclose the medical condition. [Doc. 63-47, 90:11-91:13].

On September 19, 2018, McAlpin again saw Strickland, and she excused him from work until October 3, 2018. [Doc. 61-16]. Despite her continued insistence that McAlpin's medical notes were not up to par, Bell did not have the authority to tell McAlpin his documentation was medically insufficient. [Doc. 63-45, 46:16-21; Doc. 63-46, 50:15-24].

At some point during the time Bell and McAlpin both worked for the Town, attorney Annabelle Dias made a public records request that involved police records. [Doc. 63-61, ¶ 42]. McAlpin spoke with Dias on the phone, and explained to her that because those records were part of an ongoing and open investigation, the records were exempt from Chapter 119. [Id.]. Regardless of his conversation with Dias, Bell continued to harass McAlpin and demand that he respond to the request, even though responding to public records requests was the Town Clerk's responsibility, and he had already done so via phone. [Doc. 63-47, 30:7-33:7, 38:2-20, 40:2-17; Doc. 63-61, ¶ 42].

During the September 11, 2018, Town Council meeting, the council attempted to place Bell into a direct supervisory position over McAlpin. [Doc. 63-45, 29:10-15, 48:11-22]. The council actually did so on or about September 26, 2018, even though the council did not pass the new ordinance allowing Bell to supervise McAlpin until after his termination. [Doc. 63-46, 9:11-13:20]. Bell thus could not have had supervisory authority over McAlpin until that ordinance passed. [Doc. 63-46, 14:8-14].

McAlpin was not present at this meeting, but learned of the proposed action and corresponding motions in a September 25, 2018, letter from Grice. [Doc. 61-6]. He believed that this violated policy and thus contacted Town Attorney Guy Green to report the issue and his concerns. [Doc. 63-49, 5:25-6:5]. The council members

were all aware that McAlpin reported to Green the improper and illegal Bell supervision issue. [Doc. 63-29; Doc. 63-45, 64:2-66:4].

Green ultimately agreed with McAlpin, and prepared a letter dated September 26, 2018, informing the council that their actions were improper and violated the Town charter. [Doc. 61-4; Doc. 63-41, 58:19-59: 24; Doc. 63-49, 9:21-10:10]. Grice received the letter, and responded hostilely the following day, stating that it was "reprehensible" for McAlpin to speak to the City Attorney about his concerns over the council's potentially improper action. [Doc. 61-7; Doc. 63-41, 66:6-67:16; Doc. 63-42, 14:1-15:16; Doc. 63-44, 34:7-36:11; Doc. 63-49, 8:4-16; Doc. 63-58, 22:2-6].

Without question, McAlpin was allowed to consult with the Town attorney, and such conduct would not be "reprehensible." [Doc. 63-46, 26:5-27:2; Doc. 63-49, 5:25-6:5]. Unfortunately for Green, his objection to the council's action led to his termination during the same council meeting in which McAlpin was terminated. [Doc. 63-49, 7:5-9]. Johnson testified that Green's correspondence in support of McAlpin's position was the council's catalyst and justification for his termination. [Doc. 63-49, 8:23-9:12; Doc. 63-51, 43:5-11, 44:3-47:8].

During this same time period, while he was on leave, Bell repeatedly demanded that McAlpin return his work truck to its parking space near the office. Grice and Bell both harassed McAlpin about returning the truck, even though he was

on leave, they threatened to report the truck as stolen. [Doc. 61-7; Doc. 63-41, 171:21-172:13]. He did not inform anyone that he was not coming back to work. [Doc. 63-41, 172:15-21]. However, while McAlpin was on leave, Bell told Preston that McAlpin was not coming back and told him he needed to stand up and run the show. [Doc. 63-55, 17:18-18:19, 19:12-25].

Bell's harassment and hostility continued, and she continued to demand that he return the truck while he was out of town. [Doc. 62-10; Doc. 63-41, 213:20-215:6]. Importantly, his actual supervisor, the Town Council, did not request that McAlpin return his work vehicle while on leave. [Doc. 63-45, 53:5-9]. McAlpin reminded Bell that the truck was his work vehicle and was secure, and that he had every intention of returning to work as soon as he was medically able. [Doc. 62-11; Doc. 62-12; Doc. 63-41, 215:25-216:25, 218:22-219:14].

Ultimately, on or about September 29, 2018, McAlpin asked Officer Ren Stewart to come to his home, pick up the truck, take it to his regular parking space, park it, and secure it. [Doc. 63-41, 169:5-171:13; Doc. 63-46, 59:4-20; Doc. 63-61, ¶ 47]. Stewart returned the keys to McAlpin, because McAlpin was still on leave. [Id.]. No one at the city or the police department needed that vehicle, as each officer had an assigned vehicle for their own use. [Id.].

McAlpin's medical conditions did not improve, and thus after consultation with his provider, McAlpin requested FMLA leave on October 4, 2019. [Doc. 61-

16

17; Doc. 63-41, 156:15-158:18]. Strickland indicated that he would need leave between October 3 and November 3, 2018. [Id.]. Although her assistant, Caroline Odom, faxed the FMLA paperwork to the Town, McAlpin provided former Sgt. Bowen with a copy to hand deliver as well. [Doc. 61-17; Doc. 63-41, 286:6-19].

Despite no policy supporting her, Bell testified that regardless of the emergent nature of his condition, he was required to submit the request in advance and that the Council must approve it. [Doc. 63-47, 95:4-15]. However, she never sent the Council his request following the receipt of his paperwork. [Doc. 63-22; Doc. 63-47, 93:18-94:6, 96:22-97:6]. Griffin similarly testified that for all prior FMLA requests, the leave requests was placed on the Town Council's agenda for approval, but this was not done for McAlpin. [Doc. 63-48, 42:9-44:4].

The very day he submitted his FMLA paperwork, Bell ordered that McAlpin's office be forcibly opened with power tools. [Doc. 62-8; Doc. 62-9; Doc. 63-41, 206:22-207:18, 211:9-25]. Preston witnessed the entry and contacted McAlpin about it. [Doc. 63-41, 209:10-210:11]. Importantly, evidence was stored in McAlpin's locked office, and the break in compromised critical investigations. [Id.].

The following Monday, October 8, 2018, Bell sent an email to FDLE making three false accusations against McAlpin, without council approval. [Doc. 63-30; Doc. 63-45, 71:1-3]. Unsurprisingly, despite the serious nature of Bell's accusations to FDLE, and despite the Town's well-known progressive discipline policy,

17

McAlpin was never subjected to any discipline, from a verbal or written warning, to probation or suspension. [Doc. 62-27; Doc. 63-45, 19:8-24; Doc. 63-47, 42:21-23; Doc. 63-51, 24:2-25:1].

During the council meeting on October 9, 2018, despite being Council President and unable to make motions, Grice moved to terminate McAlpin. [Doc. 63-25; Doc. 63-41, 49:23-25, 224:19-225:9; Doc. 63-61, ¶ 51]. Johnson seconded that motion. [Doc. 63-41, 102:18-103:9; Doc. 63-45, 10:13-11:6]. Pettis and Lewis also voted in favor of McAlpin's termination. [Doc. 63-41, 127:6-21]. Grice made numerous false accusations and misstatements during the meeting. [Doc. 63-42, 7:16-8:22, 9:10-24; Doc. 63-46, 62:16-63:25; Doc. 63-55, 15:22-16:21; Doc. 63-61, ¶ 52-53].

Curiously, Pettis testified that he did not fire McAlpin for insubordination, although Grice brought it up during the council meeting, but because McAlpin's office was cleaned out, and it appeared he had quit and was not going to return. [Doc. 63-45, 30:23-31:14, 33:17-23]. He later testified that insubordination played a role, because McAlpin never "turned over papers" to a lawyer pursuant to a public records request, but admitted that he did not know if McAlpin had failed to do so because those records were protected from disclosure by Chapter 119. [Doc. 63-45, 74:3-76:3]. Ultimately, Pettis continued to reiterate that while he thought McAlpin was insubordinate, he never wrote him up for insubordination and that was not the reason

the council fired him. [Doc. 63-45, 78:1-21]. Moreover, Pettis testified that he was unaware of any policies that McAlpin actually violated, other than alleged insubordination. [Doc. 63-45, 11:7-21].

With a similar lack of knowledge about any actual insubordination, Lewis testified that he voted to terminate McAlpin because McAlpin was allegedly insubordinate, but also testified that the council did not utilize the progressive discipline policy applicable to insubordination. [Doc. 63-46, 32:8-34:3].

Importantly, at no point did McAlpin clean out his office. [Doc. 63-41, 148:15-149:15; Doc. 63-61, ¶ 35]. He had no intention of leaving his employment. [Doc. 63-41, 95:3-5]. He did later learn that his office was broken into, and the locks removed, during the time he was out on medical leave prior to his termination. [Doc. 63-61, ¶ 35]. Appellees' accusations that McAlpin's office contained unmarked and unsecured evidence is completely false. [Id.; Doc. 63-42, 7:16-8:22].

Following his termination, Howell prepared an ATMS form for FDLE regarding McAlpin's termination. [Doc. 63-31; Doc. 63-50, 13:12-15:12]. Bell provided the reason for his termination, which resulted in Howell checked the "violation of agency policy" box on the form. [Doc. 63-50, 13:12-15:12; Doc. 63-55, 5:1-20]. Even Pettis testified that the ATMS form was false, and McAlpin was not terminated for violating any policies. [Doc. 63-45, 17:18-18:2].

Critically, Bell has a very poor reputation for truthfulness and honesty in her prior employment. [Doc. 63-42, 10:3-11:15]. Bell is described by the community as unethical, unfair, and one who does not play by the rules. [Id.]. Although she was given a raise following McAlpin's termination (and the department acquired new vehicles, despite the serious budget issues), Bell has since been terminated from her position. [Doc. 63-46, 38:20-39:13; Doc. 63-61, ¶ 57].

## STANDARD OF REVIEW

The standard of review of an entry of summary judgment is de novo. See Jones v. UPS Ground Freight, 683 F.3d 1283, 1291 (11th Cir. 2012).

## SUMMARY OF ARGUMENT

In June 2018, McAlpin began to engage in protected activity, specifically engaging in whistleblower activities and speech protected by the First Amendment. He persisted in bringing to light issues of public safety, budgeting, the provision of police services, overtime issues, potential theft of public funds, among other matters identified above. Once Bell came on board, McAlpin continued to engaged in his protected conduct, and she and those on the Town Council began a campaign of harassment and hostilities that resulted in McAlpin requiring extended medical leave to manage the physical side effects of the serious stress they placed him under. He was then terminated.

The District Court found that McAlpin's disclosures were not protected by the Florida Public Whistleblower Act, and were not protected by the First Amendment. This was error. With regards to his First Amendment claims, the District Court erred again by finding that in the few instances it felt his speech may have been protected, he was unable to establish that the speech was a "substantial part" of his termination. The court held that because McAlpin's First Amendment rights were not violated, neither the Town nor the individual Appellees were liable. Similarly, it did not evaluate whether the individual Appellees were thus entitled to qualified immunity. Finally, the District Court erred by finding that he did not offer evidence to rebut Appellees' allegedly legitimate, non-retaliatory reasons for terminating his employment, and thus establishing pretext. As fully set forth below, the District Court erred. Accordingly, summary judgment must be reversed.

## **ARGUMENT**

Summary judgment is proper only when "the movant shows that there is no genuine dispute as to any material fact *and* the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added). In deciding whether a genuine issue of material fact exists, courts must accept the truth of an appellant's allegations and evidence and "must draw all reasonable inferences in [an a]ppellant's favor." Cottrell v. Caldwell, 85 F.3d 1480, 1486 n.3 (11th Cir. 1996).

The District Court erred by granting summary judgment despite considerable

material fact disputes. Critically, the District Court made a noteworthy – and

shocking – declaration about the nature of retaliation cases in general, in a footnote

near the end of its Order. [Doc. 69, pg. 26, n.14]. This small aside is worth reviewing

in full:

> Likewise, it is not for the Court to say whether it was a
> smart decision for [McAlpin] to go out of his way to dig
> up dirt on Pettis or Johnson (who made up two-fifths of
> the council at whose pleasure [McAlpin] served) and share
> it with Grice. However, in hindsight, it seems that
> [McAlpin] would have been better served if he considered
> Ralph Waldo Emmerson's famous observation that you
> should "[n]ever strike a king unless you are sure you shall
> kill him." See Ezell v. Darr, 951 F. Supp. 2d 1316, 1320
> (M.D. Ga. 2013), aff'd sub nom. Ezell v. Wynn, 802 F.3d
> 1217 (11th Cir. 2015) (quoting Ralph Waldo Emerson,
> Journal U, in IX The Journals and Miscellaneous
> Notebooks of Ralph Waldo Emerson: 1843–1847, at 15
> (William Henry Gilman et al. eds., Belknap Press of
> Harvard University Press 1971)).

[Id.]. The District Court accuses McAlpin of "digging up dirt" on Councilmembers,

and then cautions that an employee would be better served to remain silent absent

evidence that would guarantee his success. This attitude towards engaging in

protected disclosures and reporting is the exact reason protections – those such as

the Florida Public Whistleblower Act and the First Amendment itself – exist. It is

precisely this attitude that inspires employees to remain silent, and the courts to hold

that laws protecting employees, like the Florida Public Whistleblower Act, must be

liberally construed. With the District Court's perception in mind, and for the reasons set forth below, summary judgment should thus be reversed.

## I.    THE DISTRICT COURT ERRED BY FINDING THAT MCALPIN'S DISCLOSURES WERE NOT PROTECTED DISCLOSURES PURSUANT TO § 112.3187, FLA. STAT.

The District Court reviewed McAlpin's seven instances of whistleblowing, but found that none qualified for protection under the Florida Public Whistleblower's Act ("the Act"), § 112.3187, Fla. Stat., because "most were oral" and "the ones that were in writing were not made to an appropriate local official and/or did not report the type of information described in" the Act. [Doc. 69, pg. 16].

The intent of the Florida Legislature in enacting the Whistleblower Act was to prevent the government from retaliating against employees who report *any* abuse or neglect of duty by a public employee. See Ujcic v. City of Apopka, 581 So.2d 218, 219 (Fla. 5th DCA 1991) (emphasis added). The Florida Supreme Court made it clear that the Act should be interpreted liberally, holding that it is a "remedial statute designed to encourage the elimination of public corruption by protecting public employees who 'blow the whistle' ... the statute should be construed liberally in favor of granting access to the remedy." Irven v. Dep't of Health and Rehab. Serv., 790 So.2d 403, 405-06 (Fla. 2001) (quoting Martin County v. Edenfield, 609 So.2d 27, 29 (Fla. 1992)). McAlpin, having made seven protected disclosures during the

final months of his employment, was terminated in retaliation for his conduct, and is entitled to protection pursuant to the Act. Simply put, the District Court erred.

To establish a *prima facie* case of whistleblower retaliation, McAlpin must show that (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) there existed a causal connection between the two events. Russell v. KSL Hotel Corp., 887 So. 2d 372 (Fla. 3d DCA 2004). The District Court only ruled on the first element, but in its Motion below, Appellees disputed the third as well.

### A.    McAlpin engaged in statutorily protected activity.

The Act requires that McAlpin disclose one or more of the following in order to have whistle-blower protection:

> (a) Any violation or suspected violation of any federal, state, or local law, rule, or regulation committed by an employee or agent of an agency or independent contractor which creates and presents a substantial and specific danger to the public's health, safety, or welfare.
>
> (b) Any act or suspected act of gross mismanagement, malfeasance, misfeasance, gross waste of public funds, suspected or actual Medicaid fraud or abuse, or gross neglect of duty committed by an employee or agent of an agency or independent contractor.

§ 112.3187(5), Fla. Stat.; Rosa v. Dep't of Child. and Fam., 915 So. 2d 210 (Fla. 1st DCA 2005). The Act is broadly worded, and protection is also given if a public employee discloses "any other abuse." § 112.3187(2), Fla. Stat. Critically, the

"nature of information disclosed" is a question of fact. <u>Rice-Lamar v. City of Ft. Lauderdale</u>, 853 So.2d 1125, 1133 (Fla. 4th DCA 2003) (reversing order of summary judgment on basis of, among other things, whether plaintiff disclosed any item required under §112.3187(5)).

McAlpin made numerous protected reports and disclosures, beginning in June 2018. First, after conducting an investigation, he disclosed – both verbally and in writing – the criminal records of Pettis and Johnson, asking Grice not to appoint either as police department liaison because of anticipated ethical conflicts. Bowen was present during the meeting, and confirmed that McAlpin made these disclosures, and further testified, as McAlpin did, that Grice appeared to understand the gravity of his disclosures. She appointed Pettis anyway. This disclosure was both in writing and regarding "any other abuse." § 112.3187(2), Fla. Stat.

Second, in late July and again on August 2, 2018, McAlpin reported to FDLE that, based on information provided by Wright, Griffin had likely stolen money collected on behalf of the Town at the local ballpark. He provided Wright's written statement to Lawson and Dickson during this first meeting. The investigation continued, and he again contacted Lawson and Dickson following the August 2, 2018 budget meeting, reporting his own independent concerns that Griffin might also be personally responsible for the twenty thousand dollar budget shortfall she reported to the Council. In this instance, he verbally disclosed both a suspected

violation of law and gross misfeasance and malfeasance, as well as "any other abuse." § 112.3187(5), Fla. Stat. His verbal disclosures were part of an FDLE investigation, and are protected. Edenfield, 609 So.2d at 29.

Third, McAlpin disclosed – on numerous occasions as reflected in Council meeting minutes – his concerns about eliminating the midnight dispatch position and the need for additional officers, to preserve and maintain the provision of police services and overall public safety within the Town. Although he spoke publicly on this issue numerous times and during numerous council meetings, on August 31, 2018, McAlpin specifically responded to Bell's email regarding "issues and concerns" and articulated the recurring public safety concerns that would follow any reduction in dispatch staff or officers. In that same email, he specifically asked if he alone was targeted for this hostile scrutiny, or if other department heads encountered the same treatment. His email satisfies the writing requirement, and discloses gross mismanagement and "any other abuse" as provided for in the Act. § 112.3187(2), (5), Fla. Stat.

Fourth, on July 2, 2018, McAlpin notified Pettis that removing Allen's disciplinary memorandum from his personnel file violated Chapter 119. Green was also involved in this process, advising Pettis that the action was improper, resulting in Pettis moving to rescind his prior action at the following Council meeting. Green served as the Town Attorney, and this meeting is one of "troubleshooting" or an

investigation, in which a written, signed complaint is not required to satisfy the Act. Shuck v. Clark, 2007 WL 676198 (M.D. Fla. 2007); Jones v. School Bd. of Orange County, Fla., 2005 WL 1705504 (M.D. Fla. 2005).

Fifth, on August 9, 2018, following his reports to FDLE and participation in their investigation of Griffin's suspected theft, McAlpin provided written notice to the Council that he had engaging in whistleblowing activities by providing information to FDLE. As several council members testified, despite specifically referencing criminal conduct by a Town official, they simply ignored his notice. This was a written, signed complaint, and satisfies the basic requirements of the Act. Importantly, the District Court's reliance on Scheirich v. Town of Hillsboro Beach, 2008 WL 186621, at *5 (S.D. Fla. Jan. 18, 2008), was misplaced. There, the Southern District ruled on a Motion to Dismiss, not summary judgment, and merely held that a written complaint must document what information was disclosed and to whom it was disclosed. [Id.]. Here, McAlpin's correspondence to the Council is clear: he disclosed suspected criminal conduct by a Town official to FDLE. [Doc. 62-44]. He further stated that he requested that FDLE conduct an investigation. Scheirich in no way holds that this information is insufficient to meet the liberal construction of the Act. See Rosa, 915 So. 2d at 212 (holding that the sufficiency of the plaintiff's written letter was a matter for the jury).

27

Sixth, in a series of emails in and around September 13, 2018, McAlpin informed Bell that she was improperly deducting leave from his vacation leave bank, despite being out on sick leave. Again, his emails provide the requisite writing, and disclose gross mismanagement, misfeasance, and any other abuse.

Seventh, in late September 2018, McAlpin reported to Green that the Council had improperly and illegally placed Bell over him as his direct supervisor. Green investigated the matter further, and prepared written correspondence, in his position as an attorney, on McAlpin's behalf. Grice was furious, and told McAlpin that his report to Green was "reprehensible." The Council terminated McAlpin less than two weeks later. Moreover, the Council terminated Green because of his correspondence on McAlpin behalf, siding with McAlpin in his interpretation of the applicable law. By contacting the Town Attorney with his concerns about the procedural legality of a Council action, McAlpin participated in an investigation in which his verbal disclosures satisfy the requirements of the Act, and are protected. <u>Shuck</u>, 2007 WL 676198 (M.D. Fla. 2007); <u>Jones v. School Bd. of Orange County, Fla.</u>, 2005 WL 1705504 (M.D. Fla. 2005).

The District Court erred by finding that none of McAlpin's disclosures were protected because most were made verbally, and the written disclosures were not made to an appropriate local official and or did not disclose the sort of information the Act protects. [Doc. 69, pg. 16]. As described above, McAlpin's written

28

disclosures are certainly actionable and make this case materially indistinguishable from <u>Hussey v. City of Marianna, Florida</u>, 2011 WL 3294827 (N.D. Fla. 2011). In <u>Hussey</u>, the court held that an agency's violation of *its own policies* is "gross mismanagement" under § 112.3187. "At a minimum, a [governmental entity's] personnel policies guide [its] personnel decisions. Straying from those policies may be an indication of managerial abuse and because of the [Whistle-blower's Act] policy in favor of a broad interpretation of the statute, employees are afforded protection for reporting suspected violations of those policies." <u>Id.</u> at * 1. Thus, McAlpin's written emails to Bell about denying him the use of his sick leave and deducting from his vacation balance are protected.

In addition, his provision of Pettis and Johnson's criminal records, and the ethical conflicts their records presented, are protected. The appointment of Pettis to the position of police liaison concerned a matter of gross mismanagement or "any other abuse." His written, signed letter to the Council was also protected, as he identified himself clearly as a whistleblower and alerted the Council that an FDLE investigation was forthcoming.

Moreover, a reported disclosure does not have to have ramifications exterior to Appellee to qualify for protection under the Act. They include the disclosure of conflicts internal to the agency. <u>See</u> <u>Rosa</u>, 915 So. 2d at 212; <u>see also</u>, <u>Hutchison v. Prudential Ins. Co.</u>, 645 So. 2d 1047, 1050 n.4 (Fla. 3d DCA 1994). The First District

Court of Appeal in <u>Rosa</u> held that the issue of whether a letter sent by a state employee to her supervisor was a whistle-blower complaint was for the jury, even though the letter largely described the employee's personal conflicts with a colleague and allocation of job responsibilities. <u>Id.</u> at 212. The court specifically held that Rosa's letter was sufficient to raise a jury issue as to "misfeasance." <u>Id.</u>

Still other courts have accepted as protected disclosures acts which fall further on the fringe of the Act than those McAlpin reported. In <u>Shuck</u>, 2007 WL 676198 at *4, the plaintiff complained that a supervisor refused to permit him and coworkers from recording compensatory time. Notwithstanding that these minor complaints of a personal nature regarded a law that in no way affected the public, the court found the disclosures viable. <u>Id.</u>; <u>see also</u> <u>King v. State of Fla.</u>, 650 F.Supp.2d 1157, 1164 (N.D. Fla. 2009) (holding that the plaintiff's complaint about a supervisor's alleged bias in defendant's hiring process for law enforcement officers was a protected whistle-blower disclosure); <u>Lindamood v. Office of State Attorney</u>, 731 So. 2d 829, 832 (Fla. 5th DCA 1999) (finding that plaintiff's complaints about gender-based disparities in pay and work distribution were protected whistle-blower disclosures); <u>Saunders v. Don Hunter, et al.</u>, 980 F. Supp. 1236, 1245 (M.D. Fla. 1997) (plaintiff's complaint she was not paid overtime wages that were due her and that she was retaliated against by not receiving any pay increases when she complained were protected whistle-blower disclosures).

Here, although many of McAlpin's disclosures concerned what could be described as "minor" or "personal" complaints, the Act still provides protection. While he did make reports about conduct that had external ramifications, such as Griffin's theft and proper staffing of the police department, he also made reports about improper workplace conduct in violation of the Town's workplace policies and procedures, such as deducting leave from McAlpin's vacation time while he was on sick leave. Such disclosures are actionable under § 112.3187, Fla. Sta.. The fact that McAlpin reported violations of the Town's personnel policy manual and/or procedures, rather than a violation of law, is of no moment. The Act protects reports of "gross mismanagement" which includes "a continuous pattern of managerial abuses, wrongful or arbitrary and capricious actions." § 112.3187(3)(e) and (5)(b), Fla. Stat. At a minimum, the Town's personnel policies guide its personnel decisions and supervisor conduct. Straying from those policies may be an indication of managerial abuse and because of the policy in favor of a broad interpretation of the statute, employees are afforded protection for reporting suspected violations of those policies. Hussey, 2011 WL 3294837, at *1 (N.D. Fla. Aug. 1, 2011).

Critically, and glossed over by the District Court, the fact that some of McAlpin's disclosures occurred verbally, does not matter. See. Edenfield, 609 So. 2d 27 (Fla. 1992) (disclosures made in discussions with County Commissioners qualify under the statute as protected activity). Other courts have also recognized the

protected nature of verbal disclosures. <u>Shuck</u>, 2007 WL 676198 (M.D. Fla. 2007) (holding that verbally disclosing actual or suspected violations of laws or rules during an investigation constitutes protected whistle-blowing activity); <u>Jones v. School Bd. of Orange County, Fla.</u>, 2005 WL 1705504 (M.D. Fla. 2005) (finding a protected disclosure where the plaintiff made her report verbally during a "troubleshooting" meeting).

Thus, in addition to those who make written complaints, the Act protects employees who disclose protected information when they have been "requested to participate in an investigation, hearing, or other inquiry conducted by any agency or federal government entity." § 112.3187(7); <u>see also</u> <u>Crouch v. Public Service Com'n</u>, 913 So. 2d 111, 111-12 (Fla. 1st DCA 2005) (holding that no writing is required if disclosure is made during participation in an investigation). The cases cited above support a finding that the circumstances under which McAlpin made his protected disclosures also qualify as an "investigation" or "other inquiry." <u>See</u> <u>Edenfield</u>, 609 So. 2d 27 (finding that disclosures made during questioning by a County Commissioner constituted participation in an "investigation"). Thus, Plaintiff's disclosures to FDLE and to Grice regarding Pettis and Johnson's criminal backgrounds are verbal inquiries that are sufficient to trigger whistleblower protections. Similarly, his disclosures to Town Attorney Green about the removal of Allen's disciplinary action from his personnel file and the improper appointment of

Bell as police department supervisor both triggered an investigation and opinion by Green, in which McAlpin participated.

The District Court erred by finding that McAlpin's disclosures were not protected because they were made verbally. The Court ignored that his verbal disclosures were made as part of "troubleshooting" meetings or investigations, and are thus protected. The Court further erred by finding that McAlpin's written complaints did not disclosure information protected by the Act. The Act is to be construed liberally, and McAlpin's disclosures need only report "any other abuse," which case law is clear can relate to interval violations of policies and procedures, as well as complaints of a personal nature. Finally, as to his written, signed "whistleblower" letter, whether the Council knew that he reported Griffin's theft to FDLE is one of fact, and should not be determined at this stage in the litigation. Rice-Lamar, 853 So. 2d at 1133 (holding that the "nature of information disclosed" is a question of fact). Accordingly, this Court should reverse the District Court's order granting summary judgment.

**B.     McAlpin established a causal connection between his protected activity and his termination.**

The District Court did not analyze the issue of causation, and did not rule on whether McAlpin established causation. However, Appellees alleged that McAlpin could not establish a causal connection, despite his termination occurring within five months of his initial disclosure about Pettis and Johnson, and a mere two weeks

between his final disclosures about the improper use of his vacation time and the illegal manner in which the Council voted to make Bell the supervisor of the police department.

Briefly, the general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection where the decisionmaker is aware of the protected conduct. <u>Brugart v. BellSouth Telecommunication, Inc.</u>, 231 F. 3d 791 (11th Cir. 2000). To determine whether a plaintiff has produced *prima facie* evidence of causation, the courts have generally focused on two indicia: timing and evidence of ongoing antagonism. <u>See e.g.</u> <u>Wideman v. Wal-Mart Stores, Inc.</u>, 141 F. 3d 1453 (11th Cir. 1998).

Importantly, to prove a causal connection, this Court has stated:

> "We have plainly held that a plaintiff satisfies this element if he provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action."

<u>Farley v. Nationwide Mutual Ins. Co.</u>, 197 F. 3d 1322, 1337 (11th Cir. 1999). McAlpin satisfied this burden. <u>Id</u>.; <u>Shotz v. City of Plantation</u>, 344 F. 3d 1161, 1180 n. 30 (11th Cir. 2003); <u>Goldsmith v. City of Atmore</u>, 996 F. 2d 1155, 1163-64 (11th Cir. 1993); <u>Donnellon v. Fruehauf Corp.</u>, 794 F.2d 598, 600-01 (11th Cir. 1986).

34

In addition to the timing of his termination, there is additional evidence that McAlpin's protected reporting resulted in his termination, including that Green was also terminated for investigating the Bell takeover, and siding with McAlpin in his interpretation of the governing law. Grice called McAlpin's report to Green "reprehensible." Once McAlpin began to make his protected disclosures in mid-2018, the Council and its appointed Manager took action to rid itself of McAlpin within a few short months. The record establishes causation, and summary judgment was granted in error.

## II.    THE DISTRICT COURT ERRED BY GRANTING SUMMARY JUDGMENT ON MCALPIN'S CLAIMS OF FMLA INTERFERENCE AND RETALIATION.

Here, the District Court correctly held that McAlpin met his *prima facie* obligations with regards to both his interference and retaliation claims. [Doc. 69, pgs. 18-19]. However, the District Court erred by finding McAlpin did not proffer sufficient evidence of pretext. As pretext is common to both his whistleblower and FMLA claims, it is discussed separately, below, at section III.

## III.    THE DISTRICT COURT ERRED BY FINDING THAT MCALPIN DID NOT MEET HIS BURDEN TO ESTABLISH THAT THE TOWN'S ALLEGED JUSTIFICATIONS FOR ITS ACTIONS WERE MERELY A PRETEXT.

The District Court found that McAlpin was unable to establish that the Town's allegedly non-retaliatory, legitimate reasons for terminating his employment after twelve successful years as Chief of Police. [Doc. 69, pgs. 19-21]. In reaching this

erroneous conclusion, the District Court focused on four allegedly legitimate justifications: that McAlpin would not return his truck; that the Town Council expressly gave Bell authority over the Police Department; that the failure to comply with the progressive disciplinary policy was not required; and that the decisionmaker's disagreement over why McAlpin was fired is not evidence of pretext in this case. [Doc 69, pgs. 19-21]. McAlpin rebutted each of these alleged justifications head on, and provided additional evidence from which a reasonable jury could find that the Town's justifications were a pretext for retaliation.

To show pretext, a plaintiff must "demonstrate that the proffered reason was not the true reason for the employment decision... [Plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981); Howard v. BP Oil Co., 32 F.3d 520, 526 (11th Cir. 1994).

Here, there is an immediate cause and effect following McAlpin's reports about Pettis and Johnson and his request that neither serve as police liaison, and the downward spiral of harassment, hostile treatment, and retaliation that continued to his termination especially after he requested whistle blower protection because of his reports to FDLE about Griffin. Despite rumors around town that the two wanted to terminate McAlpin and disband the police department, McAlpin continued to

advocate on behalf of the police department, insisting that the midnight dispatch position remain intact, and requesting additional officers, both with the goal of maintaining adequate police services for the Town.

McAlpin reported and participated in the FDLE investigation of Griffin's suspected theft – both from the ball field proceeds and potentially from the Town itself. He notified the Council of his whistleblower reports, and all agreed that they were aware of his reports, even if they chose to ignore them. He also reported the Council's violation of Chapter 119, Fla. Stat., when it voted to remove the disciplinary memorandum from Allen's file.

After Bell's hire, she immediately began to target McAlpin – and admittedly, only McAlpin – insisting that he not allow the department to accrue compensatory time, despite the fact that compensatory time was the only way to allow the department to provide full police coverage given the current number of officers. He responded as thoroughly as possible, that although he understood budget dilemmas, he continued to do his best to balance those concerns with the necessary provision of police services. She demanded difficult-to-acquire records, and harassed him about responding to a public records request that he had already responded to, about records that were exempt from disclosure. Appellees allege his conduct was insubordinate, but the record reflects that McAlpin did his best to comply with the nearly impossible to meet demands.

Bell's harassment became so severe that McAlpin sought medical attention, and was placed on medical leave. True to form, Bell repeatedly claimed that McAlpin's documentation was "medically insufficient," and despite his protests, she refused to allow him to use sick leave, instead deducting from his vacation leave balance. She also repeatedly contacted his medical providers, demanding to know the nature of his medical condition, and told Griffin she did not believe McAlpin's condition was valid.

While on leave, Bell and the Council attempted to violate the Town Charter and amend a Town ordinance, which would result in Bell becoming McAlpin's direct supervisor. McAlpin reported the illegal manner in which this change was made to Green, who investigated the matter and prepared a letter to the Council siding with McAlpin's interpretation. Grice responded that his report was "reprehensible." The District Court found that it was "undisputed that the Town Council expressly gave her authority over the Police Department" [Doc. 69, pg. 18], despite considerable testimony to the contrary, and the legal opinion of Town Attorney Green, who agreed with McAlpin's analysis and disclosure. Green himself was terminated for expressing that legal opinion, and the District Court erred by accepting Appellees' view of the facts.

During this same time, despite simply being on medical leave, Bell had McAlpin's office forcibly opened with power tools, and she and Grice repeatedly

demanded that he return his work vehicle. Bell falsely claimed that the vehicle was needed, despite the fact that no one else used that vehicle and there was an additional, unused and unassigned vehicle available for use. When McAlpin responded that he was out on leave, intended to return, and had been out of town, Grice and Bell threatened to report the vehicle as stolen, despite knowing full well that it was secured at his residence. Ultimately, he had the vehicle returned. The District Court did not take this view of the facts, however, and relied on Appellees' allegations that McAlpin simply refused to bring back the truck and was purposefully insubordinate.

The constant harassment and retaliation continued to affect McAlpin, and his medical provider prepared FMLA paperwork, which Appellees received on October 4, 2018. Clerk Griffin testified that she did not care for the manner in which McAlpin applied for leave, and ignored his request completely. Four days later, without Council authorization, Bell sent an email to FDLE containing vague and false accusations about McAlpin's work performance, none of which were supported by the testimony of any witness in this case. The following day, the council terminated his employment.

Appellees claim that the Council would have made the same decision absent any retaliation is undermined by the record, as the allegations of insubordination do not pass muster. Grice stated during the Council meeting that McAlpin engaged in insubordination, for example, by failing to return his work vehicle, when he in fact,

still worked for the Town, had every intention of returning following his medical leave which he fully expressed to the Town, and actually returned the vehicle as requested. Grice also referenced expenditures despite budget issues, but those expenses were for small, inexpensive office supplies such as coffee and creamer, which were purchased by another employee at Preston's request, not McAlpin's.

Perhaps most important, the individual Council members could not agree on the reasons for McAlpin's termination. Pettis stated that he terminated McAlpin because he thought he had already quit, because McAlpin's office was empty. Then he testified that the insubordination was related to Dias' records request. Johnson referenced vague insubordination. All agreed that McAlpin was never disciplined. The District Court, however, concluded that while that failure to agree can sometimes be evidence of pretext, it was "not the case here because the only differences in the reasons for [McAlpin's] termination are the specific examples of insubordination particular to each Councilmember." [Doc. 69, pg. 19]. Respectfully, the District Court was wrong. The fact that each Councilmember simply pointed to something about McAlpin he or she did not particularly care for, most of which were blatantly false accusations and that this record has proven to be false, absolutely supports McAlpin's proffer of pretext. Each one simply calling McAlpin insubordinate does not fix the issue. If anything, the bullet-point lists of the Councilmembers' alleged issues and McAlpin's alleged poor conduct [Doc. 65, pgs.

7-23], contrasted by the very different picture McAlpin's factual proffer paints, should have resulted in a denial of summary judgment, as the material facts are fully in dispute.

Moreover, a deviation from its own standard procedures may serve as evidence of pretext. Bass v. Bd. of County Com'rs, Orange County, Fla., 256 F.3d 1095, 1108 (11th Cir. 2001). Here, there is no dispute that Appellees did not avail themselves of the Town's progressive discipline policy, instead moving to terminate McAlpin while he was on leave. "Insubordination" is the generic term used, yet Bell and Howell informed FDLE that McAlpin was terminated for violating policies, and once again, the individual Appellees each testified that this was false. Here, the District Court claimed that following the policy was not required and that immediate termination was authorized for insubordination. [Doc. 69, pgs. 18-19]. However, Appellees have also advanced the notion that McAlpin's alleged insubordination was ongoing, including the continued accrual of compensatory time, yet he was not terminated or even threatened with termination or discipline at any point prior to September 2018, following his protected activity.

A reasonable jury could certainly find that these excuses were crafted as pretext for the Council's discriminatory conduct, and that this timeline of events and Bell's increasing hostility was put into motion to remove McAlpin, as rumors around town had long suggested would occur. See Tidwell v. Carter Products, 135 F.3d

1422, 1428 (11th Cir. 1998) (observing that identification of inconsistencies can be evidence of pretext). Summary judgment should have been denied, and the matter submitted to the jury to resolve the numerous disputes of material fact. This Court should reverse the order granting summary judgment.

## IV.    THE DISTRICT COURT ERRED BY FINDING THAT MCALPIN'S SPEECH WAS NOT PROTECTED BY THE FIRST AMENDMENT, AND NOT A SUBSTANTIAL FACTOR IN HIS TERMINATION.

The District Court granted summary judgment on McAlpin's First Amendment retaliation claims, finding that his speech was not constitutionally protected because it involved matters of public concern, not private; was made to private individuals and not the public at large; and was motivated by his own self-interest or as part of his job duties. [Doc. 69, pg. 23]. This holding was error. The District Court further – and correctly – held that McAlpin's Facebook post and concerns voiced at Town Council meetings about the midnight dispatch position were protected because it sought to "bring[] the matter to the attention of the public to prompt public discussion to generate pressure for such changes." Doc. 69, pg. 23, quoting Gresham v. City of Atlanta, 542 F. App'x 817, 819 (11th Cir. 2013)]. However, it erred again when it concluded that McAlpin did not show that his speech was a "substantial part" of the termination decision. [Doc. 69, pgs. 24-25].

It is well established that a public employee's interests are limited by the state's need to preserve efficient governmental functions. Bryson v. Waycross, 888

F.2d 1562, 1565 (11th Cir. 1989); <u>Pickering v. Bd. of Educ.</u>, 391 U.S. 563 (1968). However, critical to the matter at hand, some employee speech, including McAlpin's, is protected by the First Amendment. To prevail on his First Amendment retaliation claim, McAlpin must show that: (1) the speech involved a matter of public concern; (2) the employee's free speech interests outweighed the employer's interest in effective and efficient fulfillment of its responsibilities; and (3) the speech played a substantial part in the adverse employment action. <u>Bryson</u>, 888 F.2d at 1565-66. As noted above, only the first and third elements are presently at issue, based on the District Court's ruling.

As shown below, McAlpin engaged in numerous acts of protected speech. He spoke as a citizen on these matters of public concern, was terminated in retaliation for his speech, and Appellees are liable. The District Court erred by granting summary judgment, and this Court should reverse that order.

### A.    McAlpin spoke on matters of public concern.

Below, Appellees conceded that McAlpin's speech was protected First Amendment speech, however, Appellees only described a portion of McAlpin's protected speech in their Motion. [Doc. 54, pgs. 60-61]. As noted above, there were numerous additional instances of protected speech, and despite Appellees' concessions as to some of that speech, and the District Court's findings below, all of it is protected.

During this first stage of the <u>Pickering</u> analysis, the Court must determine whether McAlpin's speech may be "fairly characterized as constituting speech on a matter of public concern." <u>Rankin v. McPherson</u>, 483 U.S. 378, 384 (1987) (quoting <u>Connick v. Myers</u>, 461 U.S. 138, 146 (1983)). The Court examines the content, form, and context of the employee's speech to determine whether it addresses a matter of public concern. <u>Bryson</u>, 888 F.2d at 1565; <u>Rankin</u>, 483 U.S. at 384-85; <u>see</u> generally <u>Kurtz v. Vickrey</u>, 855 F.2d 723 (11th Cir. 1988). In doing so, the Court must ask "whether the main thrust of the speech in question is essentially public in nature or private, whether the speech was communicated to the public at large or privately to an individual, and what the speaker's motivation in speaking was." <u>Mitchell v. Hillsborough, County</u>, 468 F.3d 1276, 1282 (11th Cir. 2006) (internal quotation marks and citations omitted).

"[T]he relevant inquiry . . . is 'whether the purpose of the [the plaintiff's] speech was <u>to raise issues of public concern</u>.'" <u>Boyce v. Andrew</u>, 510 F.3d 1333, 1344 (11th Cir. 2007) (quoting <u>Maggio v. Sipple</u>, 211 F.3d 1346, 1353 (11th Cir. 2000) (internal citations omitted, emphasis added)). Here, the evidence shows that McAlpin was concerned about public safety and the continued provision of twenty-four hour a day police and dispatch coverage for the Town, as well as potential theft, abuse of power, unethical conduct, improper amending of Town ordinances, and the denial of leave time in violation of law. Undoubtedly, these are issues of public

concern, and the District Court correctly agreed. See Cook v. Gwinnett Cty. Sch. Dist., 414 F.3d 1313, 1319 (11th Cir. 2005) (". . . speech relating to the safety of the public involves a matter of public concern."); see also Garcetti v. Ceballos, 547 U.S. 410, 425 (2006) ("Exposing governmental inefficiency and misconduct is a matter of considerable significance.").

Importantly, "[e]xposing governmental inefficiency and misconduct is a matter of considerable significance," and here, McAlpin's speech was, as noted above, related to considerable matters that would concern the public. Garcetti, 547 U.S. at 425. To fall within the realm of the "public concern," an employee's speech must "relat[e] to a[ ] matter of political, social, or other concern to the community." Connick, 461 U.S. at 146. "In determining whether the speech touches on a matter of public concern, courts look to the 'content, form, and context of a given statement, as revealed by the whole record, and determine whether the 'main thrust' of the speech in question is essentially public in nature or private.'" Wilbourne v. Forsyth County School Dist., 306 Fed.Appx. 473, 477 (11th Cir. 2009).

Moreover, in the few instances where McAlpin's speech was made privately and not during a Council meeting, the private nature of the communication is not determinative on the issue of whether McAlpin's speech related to a matter of public concern. See Cook, 414 F.3d at 1319 (holding that the mere fact that his speech was made to coworkers or to supervisors rather than directed at the general public does

45

not remove the speech from the category of public concern); <u>Anderson v. Burke County, Ga.</u>, 239 F.3d 1216, 1220; <u>Hartwell v. City of Montgomery</u>, 487 F. Supp. 2d 1313, 1323 (M.D. Ala. 2007) <u>Rodin v. City of Coral Springs, Florida</u>, 229 Fed. Appx. 849, 856–57 (11th Cir. 2007). Despite considerable case law finding that speech made privately may be protected by the First Amendment, the District Court erred and concluded otherwise.

Of even greater importance, this Court has made it clear that speech relating to the safety of the public involves a matter of public concern. The Eleventh Circuit stated that "[f]ew subjects are of more public concern to the average citizen than the provision of basic fire and rescue services." <u>Beckwith v. City of Daytona Beach Shores, Fla.</u>, 58 F.3d 1554, 1564 (11th Cir. 1995); <u>see</u> <u>also</u> <u>Anderson</u>, 239 F.3d at 1220; <u>Fikes v. City of Daphne</u>, 79 F.3d 1079, 1084 (11th Cir. 1996); <u>Finch v. City of Vernon</u>, 877 F.2d 1497, 1502 (11th Cir. 1989); <u>Swilley v. Alexander</u>, 629 F.2d 1018, 1021 (5th Cir. 1980); <u>Davis v. Phenix City,</u> 513 F. Supp. 2d 1241, 1248 (M.D. Ala. 2007); <u>Pattee v. Georgia Ports Authority</u>, 477 F. Supp. 2d 1253, 1263 (S.D. Ga. 2006); <u>Cook</u>, 414 F.3d at 1319. Not only was McAlpin's speech self-evidently related to public safety, he outright states that these are his concerns in a number of instances, including his personal Facebook post, email correspondences, and Council meetings. The District Court erred by failing to find that the email

correspondences contained protected First Amendment speech, but did currently conclude that his Facebook post and speech at Council meetings was protected.

Similarly, the law is clear that the reporting of official wrongdoing and misconduct constitutes a matter of public concern. See also Guster v. Hamilton County Dept. of Educ., 2004 WL 1854181, *10 (E.D. Tenn. 2004) ("Statements criticizing public policy and the implementation of it are protected by the First Amendment."); Connick, 461 U.S. at 148; Garcetti, 547 U.S. at 415-416. Moreover, this Court has made clear that, putting aside the question of speech as a citizen or as an employee, a government employee's reporting of co-employee misconduct constituted speech on a matter of public concern. Phillips v. City of Dawsonville, 499 F.3d 1239 (11th Cir. 2007). Thus, on the present record, McAlpin's speech about Griffin's potential theft, as well as his speech about the Council's illegal and improper change to Town ordinances regarding supervision of the police department, are also matters of public concern.

Appellees conceded below that the speech they identify is protected by the First Amendment. McAlpin has identified additional instances of speech that are also protected by the First Amendment. The District Court erred by finding only that the Facebook post and Council meeting speeches were protected, and this Court should reverse that judgment.

**B.    McAlpin spoke as a citizen about those matters of public concern.**

Appellees similarly conceded that McAlpin spoke as a citizen when he made his protected speeches, at least as far as the few events Appellees identified as speech. [Doc. 54, pgs. 60-61]. Despite the concession, the District Court held that McAlpin did not speak as a citizen or that he spoke for his own personal interest or as part of his job duties. [Doc. 69, pg. 23].

Public employees do not relinquish their First Amendment rights simply by accepting public employment. See Lane v. Franks, 134 S.Ct. 2369, 2377 (2014). Instructive here, in Carollo v. Boria, this Court affirmed in pertinent part the lower court's denial of the dismissal of a city manager's First Amendment retaliation lawsuit which arose out of his reports of the mayor's and two city councilwomen's unlawful actions. 833 F.3d 1322, 1329 (11th Cir. 2016). As the city manager, Carollo was responsible for directing and supervising the administration of all city departments and offices; attending all council meetings and participating in discussions but without the right to vote; and "[e]nsur[ing] that all laws, provisions of this Charter and acts of the Council, subject to enforcement and/or administration by him [and the officers he supervises and directs], are faithfully executed[.]" Id. The Court noted that Carollo had "'reported to local and federal agencies violations of state and [f]ederal law' by the appellants 'that were personally communicated to him,' and 'made public disclosures at those City Council meetings about those

violations.'" Id. at 1326. The allegations included violations of campaign finance and financial disclosure laws, as well as corrupt acts engaged in by the mayor. Id.

The City Council voted to terminate Carollo, who then filed suit in the district court, raising claims of retaliation in violation of the First Amendment and the Florida Whistleblower's Act, as well as the City Charter. Carollo, 833 F.3d at 1326-27. Importantly, the district court held that when Carollo aired and exposed the violations, he had *acted as a citizen*, and not pursuant to his official duties. Id. This was because his ordinary job duties did not include enforcing campaign finance, financial disclosure, and corruption laws. Id. The trial court also rejected the defendants' argument that the city manager's rights were not clearly established, after finding that Pickering had put the parties on notice "'that a public employee may be protected under the First Amendment when the employee learns of matters of public concern through his or her employment and the employee speaks out as a citizen on those matters.'" Id. (quoting the district court's order, which also noted that Garcetti had reaffirmed Pickering).

This Court reviewed the interlocutory appeal, and analyzed the merits of Carollo's First Amendment claim. Carollo, 833 F.3d at 1328. Referencing Lane, the Court explained that just because an employee speaks about information gleaned while acting in her public duty, this does *no*t mean the speech is unquestionably integrated within the employee's job duties. Instead, it is possible that the speech has

49

actually been made by the employee while he or she was acting in the capacity of a citizen, who was speaking on matters of public concern. Thus, "[t]he critical question under <u>Garcetti</u> is whether the speech at issue is itself ordinarily within the scope of the employee's duties, not whether it *merely concerns* those duties." <u>Id</u>. (quoting <u>Lane</u>, 134 S.Ct. at 2379). The District Court did not properly apply this critical test.

Just as in <u>Carollo</u>, McAlpin spoke as a citizen on matters of public concern, including proper police and dispatch staffing, fiscal and budget concerns related to the continued provision of public safety services, potential theft by a public official, improper amending of ordinances or violations of the Town charter, violations of Chapter 119, potential ethical conflicts, and the improper denial of sick leave. <u>See Polion v. City of Greensboro</u>, 614 Fed.Appx. 396 (11th Cir. 2015) (noting that the district court concluded, and the parties did not dispute, that police officer acted as a private citizen when he complained to the mayor and city council members that the chief and assistant chief of the police department had obstructed justice, mishandled contraband, and used excessive force); <u>Hunter v. Town of Mocksville, N.C.</u>, 780 F.3d 389, 399 (4th Cir. 2015) (rejecting defendants' claims that police officers who report criminal conduct are acting within their regular duties because they are law enforcement officers sworn to uphold the law); <u>Anderson v. Valdez</u>, 845 F.3d 580, 599 (5th Cir. 2016); <u>Handy-Clay v. City of Memphis, Tenn.</u>, 695 F.3d

531, 543 (6th Cir. 2012); <u>Dahlia v. Rodriguez</u>, 735 F.3d 1060, 1077 (9th Cir. 2013);

<u>see</u> <u>Slane v. City of Sanibel</u>, 2015 U.S. Dist. Lexis 93157 at *16 (M.D. Fla. 2015);

<u>White v. City of Athens</u>, 169 F.Supp.3d 1254, 1263 (N.D. Ala. 2016) That some of

the information he utilized may have been gathered during his employment is of no

consequence, and summary judgment should be denied.

McAlpin's speech was not itself ordinarily within the scope of his duties, it,

at most, merely concerned those duties. <u>Carollo</u>, 833 F.3d at 1328. The District Court

erred by concluding the opposite, and this Court should reverse the order granting

summary judgment.

> **C.** **McAlpin's speech played a substantial role in his termination and Appellees would not have made the same decision absent his protected speech.**

"[T]he third stage of the analysis requires [Plaintiff] to show that it was a

substantial motivating factor in his termination." <u>Moss v. City of Pembroke Pines,</u>

782 F.3d 613, 618 (11th Cir. 2015) (citation omitted). Once he makes this showing,

as he has done, "the burden shifts to [Defendant] to prove that it would have

terminated [Plaintiff] even in the absence of his speech." <u>Id.</u> Importantly, "[b]ecause

these final two issues, which address the causal link between [Plaintiff's] speech and

his termination, are questions of fact, a jury resolves them unless the evidence is

undisputed." <u>Id.</u> Below, the District Court analyzed only McAlpin's Facebook post

and his speech at Town Council meetings, concluding in error that neither was a substantial factor in his termination.

The District Court first held that because only Lewis and Bell were aware of McAlpin's critical Facebook post, their improper motives could not be imputed to the Town Council or the majority who voted to terminate him. [Doc. 69, pg. 24]. As to McAlpin's speech at Council meetings about the midnight dispatch changes, the District Court concluded that there was no evidence from which a reasonable jury could find that his speech played a substantial part in his termination, and even if there was, the "undisputed evidence establishes that the Town would have made the same decision even in the absences of the protected speech" because of McAlpin's alleged insubordination. [Doc. 69, pgs. 24-25]. This holding is, respectfully, wrong. As shown in McAlpin's proffer of pretext, *supra* at Section III, there are considerable issues of disputed material fact regarding the legitimacy of Appellees' claims that McAlpin was insubordinate. Moreover, McAlpin served as the Chief of Police for twelve years without issue. He began to engage in protected speech in June 2018, continued to voice his concerns over the coming months, and was terminated in September 2018 while performing his duties in exactly the same manner as he had for twelve years, without discipline or issue.

52

**D.**    **The Town of Sneads is liable.**

Although not specifically addressed by the District Court, in its Motion below, the Town asserted that "[b]ecause the Town of Sneads is governed by a five-member council, Plaintiff must prove that "all three members of the council who voted [in favor of terminating him] shared the illegal motive." [Doc. 54, pg. 63, citing Mason v. Village of El Portal, 240 F.3d 1337, 1339 (11th Cir. 2001)]. This contention is undermined by the record, as it is clear that each – Pettis, Johnson, and Grice – were all fully aware of each of McAlpin's acts of protected speech, having attended the very Council meetings where most of the speech was made. They admitted to receiving his letters and emails, having knowledge of his opinions and reports, and even that they terminated Green at the same meeting in which they terminated McAlpin, admitting that Green was terminated for his conduct in reviewing McAlpin's report about improperly making Bell his supervisor, and opining in favor of McAlpin's position. A reasonable jury could easily conclude that Pettis, Johnson, and Grice together terminated McAlpin for his speech, and the Town of Sneads is, accordingly, liable. Following this proffer, the Court need not evaluate any other method for establishing municipal liability.

**E.**    **The individual Appellees are not entitled to qualified immunity.**

The District Court declined to rule on the issue of qualified immunity, finding that because there was no constitutional deprivation, it need not determine whether

the individual Appellees were entitled to qualified immunity. As shown above, there was such a deprivation. Briefly, the individual Appellees are not entitled to qualified immunity because the law is clearly established, and was in 2018, that a public employer may not retaliate against an employee for an employee's exercise of constitutionally protected speech. <u>Boyce</u>, 510 F.3d at 1341; <u>Cook</u>, 414 F.3d at 1318; <u>Rankin</u>, 483 U.S. at 383; <u>Connick</u>, 461 U.S. at 140-42.

### F.    Appellees Bell and Griffin are also liable.

The District Court finally found that the claims against Appellees Bell and Griffin failed because it is undisputed that the Town Council made the decision to terminate McAlpin, and there is "no evidence that Bell ever even recommended that the Councilmembers remove [McAlpin] from his position." [Doc. 69, pg. 25]. However, Bell's actions to undermine McAlpin in the wake of his protected expressions – which contrary to Appellees' assertions occurred well into her tenure and up to the two weeks predating his termination – show that she was the catalyst for numerous retaliatory acts against McAlpin. Bell claimed during the October 9, 2018 Council Meeting that resulted in McAlpin's termination that "she had tried working with" Plaintiff, but that he was unwilling to work with her. [Doc. 53-12, pgs. 61-62]. This was not her only false accusation that resulted in McAlpin's termination as she informed Grice that McAlpin was continuously insubordinate about compensatory time, returning his police vehicle, and responding to public

records requests. Simply put: she lied, and Grice moved to terminate McAlpin because of it.

Similarly, because of McAlpin's protected expressions, some of which were specifically about Griffin herself, Griffin aided Bell in retaliating against McAlpin. Although responding to public records requests was her responsibility, she and Bell informed Grice and other members of the Council that McAlpin was insubordinate and failed to respond to Dias' records request.

While the Council members actually voted to terminate McAlpin's employment and had the authority to do so, the Council did everything in its power – and well outside of their power – to give Bell the authority to control and ultimately terminate McAlpin. Whether she had actual control is irrelevant, Bell in particular used her position and lied about McAlpin, taking action against him for his numerous instances of protected speech. She was well aware of those that occurred prior to her hire, and certainly involved in those that occurred after. Acting under color of state law, Bell and Griffin are thus liable for the constitutional deprivations McAlpin suffered at their hands in retaliation for his exercise of his free speech rights pursuant to the First Amendment.

## <u>CONCLUSION</u>

The District Court may have recommended that McAlpin not "dig up dirt" on Councilmembers until he was sure he would "kill the king" and not just wound him, but the law says otherwise. For the reasons set forth herein, summary judgment must be reversed Accordingly, this requires reversal and remand for a trial on the merits.

Respectfully submitted,

<u>s/ Ashley N. Richardson</u>
Marie A. Mattox
Florida Bar No. 739685
Ashley N. Richardson
Florida Bar No. 42003
Marie A. Mattox, P.A.
203 North Gadsden Street
Tallahassee, FL 32301
(850) 383-4800 (telephone)
(850) 383-4801 (facsimile)

ATTORNEYS FOR APPELLANT

## **CERTIFICATE OF COMPLIANCE**

I hereby certify in accordance with FRAP 32(a)(7)(c) that this brief complies with the type-volume limitation specified in Rule 32(a)(7)(B). Specifically, the portions of this brief required to be counted, excluding those found in FRAP 32(f), total 12987 words.

s/ Ashley N. Richardson
Marie A. Mattox

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been sent via electronic filing to all attorneys of record, this 24th day of December 2020.

s/ Ashley N. Richardson
Marie A. Mattox
