# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

CASE NO.: 20-13278-BB

JOHN "BURT" MCALPIN,

Plaintiff/Appellant,

v.

TOWN OF SNEADS, FLORIDA,
LYNDA BELL, DANNY PETTIS, DARYL JOHNSON,
HELEN GRICE, AND SHERRI GRIFFIN,

Defendants/Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION
CASE NO.: 5:19-cv-00292-TKW-MJF

## ANSWER BRIEF OF DEFENDANTS/APPELLEES

COPPINS MONROE, P.A.

BY:    */s/ Gwendolyn P. Adkins*
       Gwendolyn P. Adkins, FBN: 0949566
       1319 Thomaswood Drive
       Tallahassee, Florida 32308
       Telephone: (850) 422-2420
       Facsimile:  (850) 422-2730
       gadkins@coppinsmonroe.com

       ATTORNEYS FOR APPELLEES

CASE NO.: 20-13278-BB

JOHN "BURT" MCALPIN v. TOWN OF SNEADS, FLORIDA, et al.

## <u>CERTIFICATE OF INTERESTED PERSONS AND<br>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Eleventh Circuit Rule 26.1-1, Appellees file the following alphabetical list of the trial judge, attorneys, persons, firms, partnerships and corporations with any known interest in the outcome of this appeal:

1. Adkins, Gwendolyn P. (Counsel for Appellees)

2. Bell, Lynda (Appellee)

3. Coppins Monroe, P.A. (Counsel for Appellees)

4. Grice, Helen[1] (Appellee)

5. Griffin, Sherri (Appellee)

6. Johnson, Daryl (Appellee)

7. Marie A. Mattox (Counsel for Appellant)

8. Marie A. Mattox, P.A. (Counsel for Appellant)

9. McAlpin, John "Burt" (Appellant)

10. Owen, C. Todd (Counsel for Appellees)

11. Pettis, Danny (Appellee)

12. Town of Sneads, Florida (Appellee)

13. Wetherell, T. Kent, II (United States Magistrate Judge, Northern District of Florida)

---

[1] Deceased

C 1 of 1

## STATEMENT REGARDING ORAL ARGUMENT

Appellees do not request oral argument.  The issues raised by Appellant are adequately presented in the briefs, and oral argument would add little to these proceedings.

## CITATIONS TO THE RECORD AND THE PARTIES

This Brief uses the following terms for the parties and citations to the record:

1. Appellant, Plaintiff below, John "Burt" McAlpin shall be referred to as "Plaintiff" or "Appellant".

2. Appellee, Defendant below, Town of Sneads, Florida shall be called "the Town".

3. Appellee, Defendant below, Lynda Bell shall be called "Bell".

4. Appellee, Defendant below, Danny Pettis shall be called "Pettis".

5. Appellee, Defendant below, Daryl Johnson shall be called "Johnson".

6. Appellee, Defendant below, Helen Grice shall be called "Grice".

7. Appellee, Defendant below, Sherri Griffin shall be called "Griffin".

8. References to the Corrected Initial Brief filed by Plaintiff are in the following format: [In. Brief, p.____].

9. References to the record below shall be to the corresponding document and page number of the district court's electronic filing system in the following format: [Doc.____, p.____]. *See* 11th Cir. R. 28-5.

i

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE
STATEMENT .......................................................................................................1
STATEMENT REGARDING ORAL ARGUMENT ........................................ i
CITATIONS TO THE RECORD AND THE PARTIES ................................. i
TABLE OF CONTENTS.................................................................................. ii
TABLE OF CITATIONS ............................................................................... iv
STATEMENT OF JURISDICTION...............................................................1
STATEMENT OF THE ISSUES.....................................................................1
STATEMENT OF THE CASE AND FACTS ................................................1

I.      PROCEEDINGS AND DISPOSITION BELOW..............................1

II.     STATEMENT OF FACTS..................................................................2

        A.    The Town ..................................................................3
        B.    Plaintiff's Background ..............................................5
        C.    Plaintiff's Tenure as Chief ......................................6
        D.    Council changes in 2017 and 2018 ...........................7
        E.    Pettis/Brad Allen "Memorandum" Issue ...................9
        F.    August 9 "Whistleblower" Memorandum ...............11
        G.    Budget Crisis and Bell's Hiring..............................12
        H.    Plaintiff's "Sick" Notes and FMLA Form...............16
        I.    Plaintiff's Final Insubordination and Termination ..................19
        J.    Plaintiff's   Termination   and   Town's   "Progressive
              Discipline Policy" ..................................................22

III.    STANDARD OF REVIEW ..............................................................24

SUMMARY OF THE ARGUMENT ..............................................................25
ARGUMENT ..................................................................................................25

I.      Burden-shifting analysis.................................................................25

II.     No prima facie case ........................................................................26

        A.    FPWA (Count I)......................................................26

              1. Plaintiff did not engage in protected activity........................26

              2. Plaintiff fails to show causation ...........................................36

        B.    FMLA claim (Count II) ...........................................37

          1. FMLA interference.................................................37

          2. FMLA Retaliation .................................................38

    C.     No demonstration of cause.........................................39

III.    The Town's legitimate, non-retaliatory reasons...................................41

IV.    Plaintiff cannot demonstrate pretext. ...................................41

    A.     "Downward Spiral of Harassment" ...........................43
    B.     Bell and the Town "targeted" Plaintiff .....................43
    C.     Plaintiff's rebuttal to Insubordination.......................45
    D.     Councilmembers lack of agreement on reasons for termination ........................................................46
    E.     Failure to Apply Progressive Discipline Policy........................48

V.    Defendants did not retaliate against Plaintiff for exercising his free speech rights under the First Amendment (Counts III - IX)........49

    A.     Municipal liability...................................................51
    B.     Individual Defendants ..............................................54

          1. Defendants Grice, Johnson, and Pettis individually. ............54

          2. Defendants Bell and Griffin ...................................56

CONCLUSION ......................................................................58
CERTIFICATE OF COMPLIANCE....................................................58
CERTIFICATE OF TYPE SIZE AND STYLE .......................................58
CERTIFICATE OF SERVICE .......................................................58

## <u>TABLE OF CITATIONS</u>

**Cases**

*Alves v. Board of Regents of the University System of Georgia*,
  804 F.3d 1149 (11th Cir. 2016) ............................................................50

*Anterio v. City of High Springs, Florida,*
  762 Fed.Appx. 891 (11ᵗʰ Cir. 2019)............................................. 27, 30

*Bartels v. Southern Motors of Savannah, Inc.,*
  681 Fed. Appx. 8340 (11th Cir. 2017)..................................................38

*Bates v. Islamorada, Vill. of Islands*,
  243 Fed. Appx. 494 (11th Cir. 2007)....................................................52

*Battle v. Board of Regents for Georgia,*
  468 F.3d 755 (11ᵗʰ Cir. 2006)..............................................................51

*Bell v. Georgia-Pac. Corp.,*
  390 F. Supp. 2d 1182 (M.D. Fla. 2005),
  *aff'd sub nom. Bell v. Georgia-Pac. Corp,*
  153 Fed. Appx. 701 (11th Cir. 2005)....................................................48

*Bell v. Georgia-Pacific Corp.*,
  390 F.Supp.2d 1182 (M.D. Fla. 2005)..................................................39

*Blankenship v. Gulf Power Co.,*
  2014 WL 83889, at *4 (N.D. Fla. Jan. 9, 2014) ..................................47

*Bonini v. Florida Department of Corrections,*
  2019 WL 5112257, *7 (M.D. Fla. 2019)...............................................26

*Broberg v. Gerrard*,
  2010 WL 2869539, at *3 (S.D. Fla. 2010) .................................... 54, 56

*Brown v. Ala. Dep't of Transp.,*
  597 F.3d 1160 (11th Cir. 2010) ...........................................................36

*Burden v. City of Opa Locka,*
  2012 WL 4764592 at *2 (S.D.Fla. Oct. 7, 2012)..................................35

*Campbell v. Rainbow City, Ala.*,
  434 F.3d 1306 (11th Cir. 2006) ...........................................................52

*Carithers v. Mid-Continent Cas. Co.*,
  782 F.3d 1240 (11th Cir. 2015) ...........................................................24

*Carollo v. City of Doral, Florida*,
  2015 WL 13145804 *7 (S.D. Fla. 2015),
  *aff'd in part, rev'd in part and remanded on other grounds*
  *at* 833 F.3d 1322 (11th Cir. 2016) ............................................... 55, 56

*Castro v. Sch. Bd. of Manatee County, Fla.*,
  903 F. Supp. 2d 1290 (M.D. Fla. 2012).............................................41

*Chapman v. AI Transp.*,
  229 F.3d 1012 (11th Cir. 2000) ............................................ 42, 47, 48

*Conner v. Lafarge N. Am., Inc.*,
  343 Fed. Appx. 537 (11th Cir. 2009);................................................52

*Edenfield v. Martin County*,
  609 So.2d 279 (Fla. 1992)...................................................................28

*Garcetti v. Ceballos*,
  547 U.S. 410; 126 S.Ct. 1951;
  164 L.Ed.2d 689 (2006) ............................................................... 49, 50

*Geosyntec Consultants, Inc. v. United States*,
  776 F.3d 1330 (11th Cir. 2015) .........................................................25

*Hankins v. AirTran Airways, Inc.*,
  237 F. App'x 513 (11th Cir. 2007))....................................................39

*Hurlbert v. St. Mary's Health Care Sys.*,
  439 F.3d 1286 (11th Cir. 2006) .........................................................37

*Jones v. School Bd. of Orange County, Fla.*,
  2005 WL 1705504 (M.D. Fla. 2005) ..................................................35

*Kamensky v. Dean*,
  148 F. App'x. 878 (11th Cir. 2005). ...................................................57

*Krika v. City of Defuniak Springs*,
  2017 WL 6336081, *4 .......................................................................53

v

*Mason v. Village of El Portal,*
    240 F.3d 1337 (11th Cir. 2001) .................................................... 52, 53

*Nazzal v. Florida Department of Corrections*,
    267 So.3d 1094 (Fla. 1st DCA 2019) ...................................................33

*Nelson v. Americold Logistics, LLC*,
    2020 WL 1809744, at *3, and *4 (N.D. Ga. Feb. 11, 2020),
    *report and recommendation adopted,* 1:18-CV-04846-SCJ,
    2020 WL 1799945 (N.D. Ga. Mar. 4, 2020)................................. 39, 40

*O'Kelley v. Craig*,
    781 Fed. Appx. 888 (11th Cir. 2019).......................................... 55, 56

*Olmsted v. Taco Bell Corp.*,
    141 F.3d 1457 (11th Cir. 1998) .................................................. 36, 41

*Pecora v. ADP, LLC*,
    232 F.Supp.3d 1213 (M.D. Fla. 2017)...................................................38

*Quigg v. Thomas County Sch. Dist.*,
    814 F.3d 1227 (11th Cir. 2016) ...........................................................52

*Rainey v. Holder,*
    412 Fed. Appx. 235 (11th Cir. 2011)...................................................44

*Rice-Lamar,*
    853 So.2d 1125 (Fla. 4th DCA 2003). ..................................................33

*Rosa v. Dep't of Child. and Fam.,*
    915 So.2d 210 (Fla. 1st DCA 2005) ............................................ 32, 33

*Rustowicz v. North Broward Hosp. Dist.*,
    174 So.3d 414 (Fla. 4th DCA 2015) ............................................ 27, 35

*Schaaf v. Smithkline Beecham Corp.*,
    602 F.3d 1236 (11th Cir. 2010) .................................................. 38, 40

*Scheirich v. Town of Hillsboro Beach*,
    2008 WL 186621, at *5 (S.D. Fla. Jan. 18, 2008) ....................... 28, 32

*Scott v. Sarasota Doctors Hosp., Inc.,*
    688 Fed.Appx. 878 (11th Cir. 2017)...................................................36

*Shuck v. Clark*,
   2007 WL 676198 (M.D. Fla. 2007) ....................................................35

*Smith v. City of Tallahassee,*
   2018 WL 6714325, *3-4 (N.D. FL. 2018).................................. passim

*Smith v. City of Tallahassee*,
   789 Fed. Appx. 783 (11th Cir. 2019).................................... 25, 26, 48

*Strickland v. Water Works & Sewer Bd. of Birmingham*,
   239 F.3d 1199 (11th Cir.2001)) ..........................................................38

*Tipton v. Houston County Bd. of Educ.*,
   2019 WL 2176174, at *14 (M.D. Ala. 2019),
   *appeal dismissed,* 2019 WL 4621969 (11th Cir. 2019).......................52

*Tucker v. Talladega City Schools*,
   171 F. App'x 289, 299 (11th Cir. 2006) .............................................53

*Uhlig v. Darby Bank & Tr. Co.,*
   *556 Fed. Appx. 883 (11th Cir. 2014)* .................................................47

*Univ. of Tex. SW. Med. Ctr. v. Nassar*,
   133 S.Ct. 2517 (2013)).................................................................. 36, 37

*Walker v. Florida Department of Veterans' Affairs*,
   925 So.2d 1149 (Fla. 4th DCA 2006) .................................................28

*Worley v. City of Lilburn*,
   408 Fed. Appx. 2483 (11th Cir.2011)) ...............................................42

**Statutes**
29 C.F.R. § 825.300(b)(1)...........................................................................40

29 U.S.C. Ch. 28, Family and Medical Leave Act ...................................37

42 U.S.C. § 1983 .......................................................................................53

Fla. Stat. §112.3187(2)...............................................................................26

Fla. Stat. §112.3187(5)(a)–(b) ...................................................................32

Fla. Stat. §112.3187(6),..............................................................................27

Fla. Stat. §112.3187(7)................................................................ passim

**Rules**

Fed. R. App. P. 28(b) ...................................................................1

Fed. R. Civ. Pro. 56....................................................................25

## STATEMENT OF JURISDICTION

Defendants accept Plaintiff's Statement of Jurisdiction.  Fed. R. App. P. 28(b).

## STATEMENT OF THE ISSUES

I.     Whether Plaintiff failed to state a *prima facie* case of Whistleblower retaliation and to demonstrate pretext for the Town's legitimate nondiscriminatory business reasons for terminating him.

II.     Whether Plaintiff failed to state a *prima facie* case of interference or retaliation under the Family and Medical Leave Act and to demonstrate pretext for the Town's legitimate nondiscriminatory business reasons for terminating him.

III.     Whether Plaintiff failed to state a *prima facie* case of First Amendment retaliation against the Town or any individual defendant and failed to prove liability therefor.

## STATEMENT OF THE CASE AND FACTS

### I.    PROCEEDINGS AND DISPOSITION BELOW

Plaintiff filed an Amended Complaint [ECF.11]. Defendants moved for Summary Judgment and the District Court entered its Order Granting Summary Judgment in favor of the Town and individual defendants. [ECF.69]. Plaintiff appeals therefrom.

1

## II.    STATEMENT OF FACTS[2]

Plaintiff John "Burt" McAlpin served as Chief of Police for the Town of Sneads from 2006 until October 6, 2018, when he was terminated by a 4-to-1 vote of the Town Council. [ECF.53-1, p.12: 22-24; ECF.53-12, ¶5, Ex.M (minutes and audio)]. Then Council President Helen Grice led the motion to terminate outlining specific insubordinate actions by Plaintiff:

| Time stamp | Summary of Grice's Comments |
| --- | --- |
| 5:08–5:24 | Council has for years asked Burt to stop overtime and comp time and we have been ignored |
| 5:26–5:48 | Department has done excessive overspending and constantly over budget |
| 6:05–6:42 | Items of what was spent when we were trying so hard to find money: moth balls, bottles of bleach, coffee, etc. |
| 6:45–6:48 | In my eyesight it is definitely gross insubordination |
| 6:54 | Refusal to comply with Florida law concerning Public Records. Asked him to cooperate with Lynda and get the paperwork we needed, he has not. |
| 7:10–7:24 | Asked him to return the truck; he refused multiple times. When he did return the work truck, he kept the key. I feel this is gross insubordination. |
| 7:26–7:50 | There's emails, attempts, phone calls, we have sent police officers twice to his home to get the keys; both times he wasn't home. One time, his brother came to the door and said he wasn't home. Again, this is insubordination. |
| 7:55–8:14 | Burt asked our attorney if he had to follow my instructions. He absolutely defied my instructions again. |
| 8:26–8:40 | Because of his refusal to give the Town the property, we had to pay $239 to get inside the truck and had to change the locks to his office, which again is insubordination. |
| 8:42–9:08 | When returned, truck was filthy, engine dead, were anchors in the back, parked in front of "No Parking" sign; no key. |

---

[2] Defendants do not admit the facts herein but accept them for purposes of considering summary judgment which requires the light most favorable to Plaintiff.

| Time stamp | Summary of Grice's Comments |
|---|---|
|  | There were all kinds of stuff -including ammunition - in the back of the truck, unlocked. |
| 9:10–9:25 | I have had enough.<br>I move to terminate Burt McAlpin effective immediately for insubordination. |

*Id*. (audio file). Three other Councilmembers agreed as evidenced by their votes. [ECF.53-16, ¶19-20; ECF.53-17, ¶29; ECF.53-21, p.4].

Plaintiff contends his termination was retaliation by the Town for his exercise of his rights under the Florida Public Whistleblower's Act (FPWA), the Family and Medical Leave Act (FMLA), and the First Amendment. [ECF.11, ¶1]. It was not.

## A. The Town

The Town of Sneads is a municipality in Jackson County, Florida, with 25 employees serving approximately 1,800 residents. [ECF.53-12, ¶7, Ex.A]. Five councilmembers are elected for two-year terms and meet in regularly scheduled meetings once a month. [*Id*. at Section 14]. The Council annually elects one member as President[3] [*Id*.], who is charged with seeing "that the provisions of this charter, the ordinances, laws and rules of the town are complied with and enforced." [*Id*. at Section 12].

---

[3] The Charter references a "Mayor," which position was transferred to the Council President in 1982. [ECF.53-12, ¶8, Ex.B].

The Council elects the Police Chief who "shall hold his office *at the pleasure of the council.*" The President is charged with his general supervision and direction:

> Section 19. The council shall elect a chief of police who shall hold his office at the pleasure of the council. The chief of police shall be the executive peace officer of the town. He shall have control of the police force, subject to the general supervision and direction of the mayor, and shall

[*Id.* at Section 19 (emphasis added)]. The President and Council are empowered to enact policies and procedures intended to preserve peace and order in the Town and the Chief of Police must execute those commands. *Id*.

In 1994, Sneads established the position of Town Manager declaring him/her to be:

> the chief executive officer and the head of the administrative branch of the town government. He shall be responsible to the Town Council for the proper administration of *all affairs of the city*.

[ECF.53-12, ¶9, Ex.D, Section 3(b)(emphasis added)]. The Manager was explicitly given the powers and duties to:

1.  Appoint and, when necessary for the good of the Town, remove all officers and employees of the Town except the Town Clerk, Town Attorney, Fire Chief, and Police Chief. Appointment or removal of the Town Clerk, Town Attorney, Fire Clerk, and Police Chief must be approved by a majority vote of the Town Council.

2.  Prepare the budget annually and submit it to the Town Council and be responsible for its administration after adoption.

3.  Prepare and submit to the Town Council as of the end of the fiscal year a complete report on the finances and administrative activities of the Town for the preceding year.

4.  Keep the Town Council advised of the financial condition and future needs of the Town and make such recommendations as may seem to him desirable.

5.  Submit annually to the Town a list of recommended capital improvements which in the opinion of the manager are necessary or desirable to be constructed during the forthcoming one year period. Such list is to be arranged in order of preference, with recommendations as to which projects shall be constructed.

6.  Perform such other duties as may be prescribed by the charter or required of him by the commission, not inconsistent with the charter.

*Id*. As CEO, the Manager has explicit executive and administrative authority over *inter alia* the Chief of Police,[4] particularly in the realm of finance and budgeting, but appointments or removals require approval by the Council. [ECF.53-12, ¶10, Ex.F, Section 2(a)]. The Manager is expressly responsible for monitoring the Town's "financial condition" with direct report to the Council. *Id*.

**B. Plaintiff's Background**

Plaintiff was born and raised in Sneads and his parents served the Town as a councilman and deputy clerk. [ECF.53-1, p.3:14; ECF.53-12, ¶4]. His two brothers

---

[4] In *passim,* Plaintiff makes the unsubstantiated legal conclusion that the Council "improperly" made Bell Plaintiff's supervisor. [*In. Brief,* pp.38, 63].

are former law enforcement officers and are now local business owners. [*Id*. S*ee also* ECF.53-9, pp.2-4; ECF.53-10, p.3].

Plaintiff obtained his law enforcement certificate in 1994 and has worked for two law enforcement agencies, the Jackson County Sheriff's Office (JCSO) and the Sneads PD. [ECF.53-1, p.4]. Plaintiff voluntarily resigned from the JCSO in March 2006. [ECF.53-2, p.6]. Shortly before his resignation, Plaintiff was counseled by Captain Joey Rabon[5] for *insubordinate* actions, which were noted to be repetitive:

> Sgt. McAlpin has repeatedly proven that he works on his own agenda, with little or no concern of being insubordinate. His actions [ ] indicated that he has flagrant disregard for authority and leadership.

[ECF.53-2, pp.6-7].

## C. Plaintiff's Tenure as Chief

In March 2006, Plaintiff was appointed Chief of the Sneads PD, an agency of 5 officers and 4 dispatchers plus several part-time positions. [ECF.53-12, ¶12]. He kept this position for over 12 years, spanning multiple Town Managers. [ECF.53-1, p.4:22]. When hired, the Chief position reported directly to the Manager but in 2011, the Chief was removed from the direct report to the Manager. [ECF.53-12, ¶14].

---

[5] Rabon is Plaintiff's uncle. [*Id*. at 4].

Though Plaintiff's personnel file is devoid of any formal discipline, Plaintiff's tenure was storied[6] and a battle between the PD and City Hall was ongoing. [ECF.53-6, pp.2-3]. However, Plaintiff had an ally in Manager Connie Butts with whom he had a "good working rapport" and "regularly communicated." [ECF.53-1, p.60].

### D. Council changes in 2017 and 2018

In May 2017, Helen Grice, Greg Lewis, and Danny Pettis were sworn in as new Councilmembers. [ECF.53-12, ¶15, Ex.G]. In June 2017, then Council President Arnold made the customary annual appointments for liaisons with the Town departments and Councilman Donovan Weeks, a friend of Plaintiff's, was appointed Police liaison. [ECF.53-12, ¶18, Ex.I].

During Pettis' campaign, citizens voiced concerns about PD coverage when Plaintiff and the sergeant rode or ate together leaving no other officers on patrol. [ECF.53-16, ¶5]. Pettis was also concerned about the budget problems and wanted to use his management expertise (supervising and training approximately 100 employees) to offer solutions. [*Id*. at ¶6].

---

[6] Examples include a rift between Plaintiff and a former Manager https://www.wjhg.com/home/headlines/64454577.html (describing a hostile work environment created by McAlpin) ("There's no way to know it but to experience it."); and Plaintiff's nine-year legal battle with the Florida Dept. of Law Enforcement ("FDLE") over the misuse of his official position, [ECF.53-12, ¶13, Ex.N] resulting in a suspension and probation.

Upon taking office in 2017, Pettis made it known that the PD was not meeting standards and talked of changes in shifts, compensation time being too high, and the need to reduce overtime. [ECF.53-6, pp.23-24]. Pettis began addressing ways to make Town employees, including the PD, more accountable such as proposing vehicle logs for employees to bolster accountability and responsibility. [ECF.53-16, ¶¶6-7; ECF.53-12, Griffin Aff., ¶28, Ex.H]. "Rumors" circulated that Pettis wanted to "disband" the PD and "fire" Plaintiff and Manager Butts. [ECF.53-1, pp.6-9; ECF.53-6, pp.4-5; ECF.53-7, p.3; ECF.53-9, p.5; ECF.53-10, pp.4-5]. The tension between the PD and Town Hall intensified. [ECF.53-6, p.3].

The uncontrolled and excess accrual of comp time by the PD was a long-standing concern. [ECF.53-11, ¶10; ECF.53-12, ¶27; ECF.53-16, ¶9; ECF.53-17, ¶8; ECF.53-21, p.2]. In July 2017, Councilman Lewis observed that most of the comp time came from the PD and advised Plaintiff that he and the Council needed to develop a plan to reduce it. [ECF.53-21, p.2; ECF.53-12, ¶27, Ex.J; ECF.53-16, ¶9]. Concerns regarding the Town's financial condition increased throughout 2017. [ECF.53-12, ¶29]. During the August 16, 2017, Special Meeting/Budget Workshop, Manager Butts and Town Clerk Griffin pointed out that revenues were down, and expenditures were up. [ECF.53-12, ¶30, Ex.K].

In April 2018, Councilman Weeks was defeated by Darryl Johnson. [ECF.53-17, ¶7]. The Pettis rumors continued and were also attributed to new Councilman

8

Johnson and his desire to "get [Plaintiff] off" and "get rid" of Butts too. [ECF.53-8, p.2; ECF.53-7, p.4]. The persistent rumors led Butts to resign in June. [*Id*. at 2].

In May 2018, Grice was elected Council President [ECF.53-11, ¶6]. A life-long resident of Sneads, Grice had served on the Council since 2011 and was experienced in municipal governance. [ECF.53-12, ¶16]. Plaintiff heard rumors that Grice would appoint Pettis or Johnson as Police liaison [ECF.53-1, p.6], and unilaterally requested and received from FDLE criminal histories on the councilmen which revealed a 1991 arrest and subsequent convictions. [ECF.53-1, p.13; Ex.3, No.1; Ex.4]. Plaintiff gave Grice the unsolicited criminal histories on June 11, 2018,[7] "[t]o keep either one of those criminals from being a liaison of the police department." [ECF.53-1, p.6:19-20]. During the June 12, 2018, Council meeting, President Grice appointed Pettis as the liaison over the PD. [ECF.53-12, ¶21, Ex.Q].

### E. Pettis/Brad Allen "Memorandum" Issue

During the June 12, 2018, Council meeting, Pettis moved to remove a memo from employee Brad Allen's file. [ECF.53-12, ¶¶21, 25, and Exs.L&Q; ECF.53-16,

---

[7] Plaintiff documented his delivery of this information to Grice in a memorandum on PD letterhead, dated June 13, 2018, and kept in a manila folder on his desk. [ECF.53-1, Ex.4; *see also* ECF.53-13, ¶13, Ex.B]. He never provided it to Grice or other Councilmembers [ECF.53-1, p.14-16], it bears no case or investigation number, and does not exist in the Town's records. [ECF.53-13, ¶13]. It has only been produced by Plaintiff through discovery in this case. Plaintiff agrees the document was a public record, yet admits it was only accessible to him. [ECF.63-41, Ex.120, p.42-44].

¶15]. Plaintiff was present and addressed a PD issue but did not voice opposition to the Council's removal of the Allen memo. *Id*.  Also present was Town Attorney Guy Green who similarly stood mute on any concern with the Council's action.  *Id*.

Approximately three weeks later – on July 2 – Pettis went to the PD in his capacity as liaison [ECF.53-16, ¶11]; Plaintiff informed Pettis orally that the removal of the Allen memo was potentially violative of Chapter 119, Florida's public records laws.[8] [*Id*. at ¶13]. At the next Council meeting on July 10, 2018, Pettis raised the concern and solicited Green's opinion. [ECF.53-12, ¶25, Ex.L]. When Green advised it was "probably best" to keep the document in the file, the Council unanimously voted to return the memo to the employee's file. [*Id*.; *see also* ECF.53-16, ¶15; ].[9]

Plaintiff never provided Pettis or the Council with any written complaint about the Allen memo. [ECF.53-16; see also ECF.53-1, Ex.3, No.1].

---

[8] Unbeknownst to Pettis, Plaintiff secretly filmed their conversation with his PD body camera. [*See* ECF.53-13, ¶13, Ex.G]. Plaintiff again memorialized this meeting in a memorandum on PD letterhead also kept in the manila folder on his desk. [ECF.53-1, Ex.15; ECF.53-13, ¶13, Ex.C]. Like the June memo, neither the July memo nor video regarding Pettis can be found in the Town's public records. [See ECF.53-13, ¶15-16]. This lawsuit is Defendants' first knowledge of these recordings.

[9] The memo was never removed from the file. [ECF.53-12, ¶24; ECF.53-15, ¶8].

10

### F.  August 9 "Whistleblower" Memorandum

On August 9, 2018, before the regular Council meeting commenced, Plaintiff handed folded pieces of paper to each Councilmember. [ECF.53-17, ¶13; ECF.53-16, ¶16; ECF.53-21, p.3]. The unfolded document was a single page letter from Plaintiff on PD letterhead, dated August 9, 2018, and addressed to the Council, stating:

> Let this communication serve as official notice of the following. Within the past 30 days I, in good faith, have disclosed information of suspected criminal conduct by a Town of Sneads official to Special Agents of the Florida Department of Law Enforcement. I have requested the agency deemed appropriate to conduct an inquiry and investigation. I am enacting "Whistle-blower's Act" Protection. If any retaliatory action or "Adverse personnel action" occurs it will be immediately addressed with my Attorney.

[ECF.53-1, p.20, Ex.6]. The document was not raised by Plaintiff or otherwise discussed by the Council during the meeting. [ECF.53-17, ¶13].  Plaintiff claims this letter was itself a protected disclosure under Florida Statutes, 112.3187.

No Councilmember had any idea to what Plaintiff's letter referred.  [ECF.53-17, ¶13; ECF.53-16, ¶16-17; ECF.53-21, p.3]. Defendants learned through litigation that in August 2018, Plaintiff requested and met with FDLE Special Agents Travis Lawson and Chad Dickson in his office at the PD. [ECF.53-1, pp.32-35].  While speaking about unrelated matters, Plaintiff asserts he provided the agents with an unsworn statement prepared and signed by police dispatcher Connie Wright alleging that Griffin stole money collected at a baseball tournament earlier that summer.

11

[ECF.53-1, Ex.12, pp.23-24;33-34]. Wright prepared this statement of her own accord; Plaintiff had no part in authoring the statement. [*Id*. at 34-35]. Plaintiff had no further contact with FDLE regarding an investigation. [*Id*. at 40].

Despite his claims,[10] Plaintiff never provided FDLE with a written statement, sworn or unsworn. [ECF.53-18, ¶4; ECF.53-19, ¶4; ECF.53-1, p.40:12-15]. Nor did FDLE investigate Griffin or any other Town employee relating to alleged mishandling or misappropriation of funds. [ECF.53-18, 19, ¶¶5].

### G. Budget Crisis and Bell's Hiring

During the August 2, 2018, budget meeting, Clerk Griffin outlined for the Council the cash flow problems and the budget shortfall of approximately $20,742.00 and advised the Town would have to make cuts. [ECF.53-12, ¶¶33-34]. The Council decided that no further spending should occur without going through the Clerk. [ECF.53-12, ¶35, Ex.R].

Lewis asked Plaintiff to hear him out and again discussed giving the midnight police dispatch to the County and cutting a full-time employee. [*Id*.; see also ECF.53-21, pp.2-3]. In response, Plaintiff advised this was not a smart idea and

---

[10] Compare Plaintiff's First Amended Complaint [ECF.11, ¶¶25-26], with his sworn Answer to the Town's Interrogatory #20 [ECF.53-1, p.12, Ex.3] and, finally, with his deposition testimony which admits the only writing was the unsworn statement of Wright, which fabricates a second meeting with agents at an unknown date, and which contends Bowen was present for both meetings. [ECF.53-1, pp.37-40]. Bowen had already retired and denies he was present. [ECF.53-6, p.7].

could not possibly be the only way to save money. [ECF.53-12, ¶ 35, Ex.R]. Following the meeting, Plaintiff made a post on a social media platform (Facebook) stating he was "frustrated" and "aggravated" with Lewis' proposal to transfer the midnight dispatch and stated he would "not accept" it. [ECF.62-40].

At the Special Meeting on August 9, 2018, the Council interviewed candidates for the City Manager position, but held the vote until the next regular meeting. [ECF.53-12, ¶36, Ex.S]. President Grice again raised transferring midnight dispatch to the Sheriff. *Id*. Plaintiff spoke out and advised he was completely against it and would "fight it to the end." *Id*. Grice asked whether Plaintiff had considered 12-hour shifts and he did not respond. *Id*. Revisiting the Council's prior request for solutions, Johnson asked Plaintiff for his ideas. [ECF.53-17, ¶11-12]. Defiant, Plaintiff announced "the only solution he had was to not hire a city manager and for the council to forfeit their salaries each month."[11] [ECF.53-17, ¶12; ECF.53-12, ¶36, Ex.S].

The Council hired Lynda Bell as Town Manager on or about August 20, 2018. [ECF.53-11, ¶3]. Bell is from the Miami-Dade metropolitan area and knew no one

---

[11] This quote is to the meeting minutes. Plaintiff concedes his solutions to the Town's financial woes were "night and day" different from the Council's, and these disagreements preceded Lynda Bell. [ECF.53-1, pp.11-12, 14; pp.36-37, 39].

in Sneads before interviewing and accepting the position. [ECF.53-11, ¶4]. Citizens of the Town considered her an "outsider." *Id*.

Bell quickly became aware of the severe budget crisis facing the Town. She was provided Butts' June 12 memorandum which stated: "Last year was a nightmare trying to get a balanced budget that would work. *This year even tougher decisions will have to be made*." [ECF.53-11, ¶8, Ex.A]. One of the most substantial problems was the enormous accrual of comp time by PD employees, one employee exceeding 2,000 hours. [ECF.53-12, ¶31-32].

On her second day in the office, August 21, 2018, Bell emailed the department heads and stated that, effective immediately, "there will be no overtime without the express approval of the City Manager. Due to budget constraints, it is extremely important that all departments adhere to this policy." [ECF.53-1, Ex.22]. In a separate email the same date, Bell reminded: "In addition to the maximum time being accrued every effort must be made to effectively use that time. This guarantees that the city policy is adhered to and the town is kept solvent." [ECF.53-1, Ex.23].

During Plaintiff and Bell's initial meeting in Bell's office on or about August 22, 2018, Plaintiff's tone and demeanor quickly became hostile and threatening. [ECF.53-11, ¶13]. Bell suggested that measures needed to be taken to reduce expenditures within the PD, including reduction of overtime and comp time, and potential scheduling changes. *Id*. Bell also told Plaintiff they should work together.

14

*Id*. Plaintiff rose from his chair, placed his hands on Bell's desk, leaned forward and menacingly asked if she had ever "run a police department." *Id*. Plaintiff left Bell's office slamming the Town Hall door with such force it shook the building. [ECF.53-11, ¶13; ECF.53-12, ¶39; ECF.53-15, ¶12]. Later that day, Plaintiff contacted Griffin demanding to know his total "payout" amount from various accrued leave sources. [ECF.53-12, ¶40].

Approximately a week later, an inmate serving the Town on work release [ECF.53-11, ¶14; ECF.53-15, ¶13], advised the deputy clerk and Bell that, at Plaintiff's direction, he had burned 6-8 boxes of documents containing criminal "face sheets," files, and receipts from the PD in a barrel behind the PD. [ECF.53-20,¶¶13-15]. Several individuals had also arrived at the PD with a hearse belonging to Plaintiff's brother[12] and began "cleaning out" Plaintiff's office, removing items from drawers and shelves, and placing boxes of items and documents in the hearse. [ECF.53-20, ¶14-15].

On August 24, 2018, Bell emailed Plaintiff her review of the timecards which reflected continued accrual of comp and overtime among PD employees. [ECF.53-

---

[12] Then dispatcher Connie Wright confirmed the hearse was at the PD between the time of Bell's hiring and beginning her own sick leave on September 6. [ECF.53-5, pp.2-3].

[13] Howell names specific items removed from the walls, a door, and a corkboard including personal items such as family photographs. [ECF.53-13, ¶6].

15

1, Ex.24]. Bell stated: "That cannot happen." *Id*. On August 28, Bell emailed Plaintiff, copying Councilmembers, Griffin, and Guy, making them aware of the "extreme overtime used this past weekend in the PD," despite her contrary instructions. [ECF.53-1, Ex.25]. Bell explained to Plaintiff it was much more cost effective to use part-time dispatchers than to pay employees overtime and reminded him that the situation was at a "crisis point." *Id*.

On August 30, 2018, Bell again emailed Plaintiff regarding the possibility of transferring dispatch to the Sheriff "instead of paying extreme overtime," and encouraging him: "Burt, please know that we are in this together, I am not your enemy. I'm simply trying to benefit this city and keep it from drowning in financial debt." [ECF. 53-1, Ex.26].

### H. Plaintiff's "Sick" Notes and FMLA Form

Following the Plaintiff-Bell meeting and Plaintiff's office purge, none of the Town's administrative staff observed Plaintiff or his work truck at the PD until the vehicle was returned in late September. [ECF.53-11, ¶15; ECF.53-12, ¶41; ECF.53-15, ¶14]. Nor did dispatcher Shannon Howell see Plaintiff at the PD between early September and his termination on October 9. [ECF.53-13, ¶6]. Howell understood through then-dispatcher Wright that Plaintiff was out on "sick leave." *Id*. Plaintiff's

door was always locked but Howell saw through the blinds that his office was "cleaned out."[13] *Id.*

On September 5, 2018, approximately two weeks after his meeting with Bell, Plaintiff had a "Return to Work/School" note from Chipola Clinic delivered to Town Hall which stated:

> John B. McAlpin is excused from work on 09/06/18 – 09/20/18. He may return to work on 09/21/18 with the following restrictions: none.

[ECF. 53-1, Ex.8]. The note was signed by receptionist Carolyn Odom. *Id*. Bell emailed Plaintiff on September 10, 2018, stating the note was medically insufficient as it provided no medical reason. [ECF. 53-1, Ex.42]. The same day, Plaintiff had a second note delivered which was the same as the first but signed by Abby Strickland, ARNP. [ECF. 53-1, Ex.18]. Nine days later, Plaintiff had a third note delivered from the same clinic stating he was excused for another two weeks from 9/19/2018 -- 10/3/2018. [ECF. 53-1, Ex.19]. Still, no medical reason was indicated. *Id*.

Late Friday, October 5, 2018, Plaintiff had former Sgt. Bowen deliver to Town Hall an FMLA form signed by him and completed by ARNP Strickland. [ECF.53-11, ¶15; ECF.53-12, ¶42; ECF.53-15, ¶15]; *see also* FMLA form[14] (ECF. 53-1,

---

[13] Howell names specific items removed from the walls, a door, and a corkboard including personal items such as family photographs. [ECF.53-13, ¶6].

[14] The form itself is dated October 4, 2018. ARNP Strickland documented treating Plaintiff for an unspecified "condition" and identified the dates of incapacity as "10/03/18 to 11/03/18." [ECF.53-1, Ex.21].

Ex.21)]. Plaintiff did not request or receive the FMLA form from Town Hall and never communicated with Bell or any Councilmember regarding the FMLA form. [ECF.53-11, ¶26; ECF.53-12, ¶¶42, 45,48-49; ECF.53-15, ¶17]. Griffin did not have time to review and process the request before Plaintiff's termination on Tuesday, October 9.[15] [ECF.53-12, ¶47]. Plaintiff never communicated in-person and/or orally to Bell that he was suffering from any medical condition, much less a "serious," qualifying medical condition under FMLA. [ECF.53-11, ¶27]. Pettis and Johnson never saw, or received, Plaintiff's FMLA form until litigation commenced. [ECF.53-16, ¶18; ECF.53-17, ¶21].

The Town's Personnel Policy has a specific provision for FMLA benefits. [ECF.53-12, ¶46, Ex.P, pp. 2-13]. FMLA leave can be taken, *inter alia*, for a " serious health condition rendering the employee unable to perform his or her job." *Id*. As set forth therein, Town-specific procedural steps to obtain FMLA require:

> [A]dvance, written notice of leave request and medical certification as far in advance as possible of your anticipated leave date. Taking leave may be denied if requirements are not met. In addition, you may be required to provide the Town with additional physician statements periodically during your leave.

Plaintiff himself does not believe his termination was because of his request for FMLA leave:

---

[15] On Monday and Tuesday, October 8 and 9, Town administrators were dealing with pressing matters related to the pending Hurricane Michael. [ECF.53-12, ¶47].

```
 7        Q.   Do you have any evidence to suggest that the
 8   town council would not have terminated you if you had
 9   not made that request?
10        A.   I don't think this is completely the reason
11   they terminated me.  I think there's things leading up
12   to this that we discussed earlier.
13        Q.   Okay.
14        A.   I don't think this is significant more so
15   than the other things, but I think it all plays a part.
```

[ECF.63-41, p.166].

## I. Plaintiff's Final Insubordination and Termination

After Plaintiff's office purge, his more than three-week absence, and receipt of his third (09/19/18) note still void of a medical basis for "sick" leave,[16] on September 20 Bell emailed Plaintiff requesting he ready his PD truck for pick up. [ECF.53-1, Ex.31, ECF.53-11, ¶15]. Plaintiff responded he was "out of town" and commanded Bell to not "authorize anyone to enter my property in my absence." *Id*.

On September 24, 2018, Bell again emailed Plaintiff and communicated her understanding from Sgt. Brett Preston that Plaintiff was refusing to return his Town vehicle. [ECF 53-1, Ex.32]. Bell also informed him that the Town needed the key to his office so the sergeant and the corporal could evaluate documents for response to

---

[16] While on "sick" leave, Plaintiff worked at his brother's funeral home [ECF.53-11, ¶24] and went to Biloxi, Mississippi, in order "to get away." [ECF.53-10, p.6].

a public records request. *Id*. Plaintiff answered: "You should be aware I work for and answer to the town council and the citizens of Sneads, you are not my supervisor and cannot direct me to do anything improper." *Id*.

Grice was troubled by Plaintiff's refusal to return his truck and office key. [ECF.53-11, ¶19]. On September 25, 2018, Grice sent correspondence to Plaintiff reminding him that, per the Charter, the "Chief of Police, Town Attorney and Clerk work at the pleasure of the Council." [ECF.53-1, Ex.9]. Grice requested that Plaintiff return the Town's truck to the PD until he returned to work, citing examples of other employees asked to do the same, and noting Plaintiff had "ignored" her previous request. *Id*. Grice also requested that Plaintiff return the "Town's key to the Chief's office back to the PD until Plaintiff was able to return to work." *Id*.

On September 27, 2018, Grice sent additional correspondence to Plaintiff addressing a September 26, 2018, letter received on his behalf from Town Attorney Green. [ECF.53-1, Ex.10]. Green's letter resulted from Plaintiff contacting him regarding Bell and Grice's request. [ECF.53-3, p. 5:25, 6:1-5]. Green could not recall another time in his lengthy representation of the Town he wrote a letter for an employee. [*Id*. at p. 10: 25, 11:1-12]. In her September 27 correspondence, Grice quoted the Charter and reminded Plaintiff: "In reference to the Chief of Police: 'He shall have control of the police force subject to the general supervision and direction of the Mayor' (President)." [ECF.53-1, Ex.10]. Grice further reiterated her previous

20

request to return the Town's vehicle and demanded he allow it to be retrieved. *Id*.

She concluded: "This has become just absurd and your *insubordination* is stunning."

*Id*. (emphasis added).

On September 28, 2018, per Grice's instructions, Bell emailed Plaintiff in follow-up inquiring when Plaintiff would return the truck. [ECF.53-1, Ex.33]. Plaintiff again replied that he was "out of town," but would have the truck delivered and secured at the PD upon returning to Town. *Id*.

Plaintiff returned the vehicle on or about September 29, 2018, by parking in front of a "no parking" sign and locking the truck without providing the keys to anyone at the Town. [17] [ECF.53-11, ¶15]. Bell had respectfully requested Plaintiff not to park here numerous times. [ECF.53-11,¶16, Ex.B].

On October 1, 2018, Bell emailed Plaintiff on Grice's behalf:

> It was brought to my attention you returned the truck on Saturday but you kept the keys. Again, I'm stunned by your insubordination. You clearly know the truck is unusable without the keys. You need to bring the keys to City Hall immediately. This behavior must stop.

[ECF.53-1, Ex.11].

Similarly, Plaintiff repeatedly refused to return his office key requiring Town officials to forcibly enter the office on October 4, 2018, finding it empty, indicating

---

[17] Plaintiff admits he instructed Officer Stewart to return the truck and return the keys to him. [ECF.63-41, p.171]. The Town spent $240 to make a new key. [ECF.53-12, ¶41]. Upon cleaning, unsecured ammunition and a riot control grenade were found. [ECF.53-20, ¶¶20-21].

to them Plaintiff's intentions to not return. [ECF.53-11, ¶17; ECF.53-13, ¶7-8; ECF 53-15, ¶16]. Plaintiff left firearms and case evidence, including drugs and rape kits, in an unlocked filing cabinet requiring an evidence audit. [ECF.53-11, ¶¶17-18].

### J. Plaintiff's Termination and Town's "Progressive Discipline Policy"

The Council terminated Plaintiff for insubordination on October 9, 2018:

> Mrs. Grice discussed the Police Department. She stated there was very poor management of the department by the Chief. She stated that he has been insubordinate multiple times. After stating several times of this insubordination, Mrs. Grice made a motion to terminate Chief McAlpin's services with the Town effective immediately. Daryl Johnson seconded. The motion passed 4-1 with Tim Arnold voting nay.

[ECF.53-12, ¶5, Ex.M].

President Grice articulated her litany of reasons for moving to terminate Plaintiff's employment. *See* Section I, *supra*, for specifics from audio recording. [ECF.53-12, ¶5, Ex.M (minutes and audio)]. Pettis, Johnson, and Lewis agreed with the motion to terminate, echoing Grice's sentiments but having their own specific examples [ECF.53-16, ¶¶19-20; ECF.53-17, ¶29; ECF.53-21, p.4]:

Pettis' reasons for voting to terminate Plaintiff included:

- Insubordination [ECF.53-16, p.5, ¶19; ECF.63-45, Ex.124, p. 74-75] (for saying he didn't have to give things to him that he requested);

- Failure to perform or provide solutions regarding scheduling and comp time since July 2017 [ECF.53-16, p.3, ¶¶9,11];

- Plaintiff did not want Pettis as his supervisor [ECF.63-45, p.74]; their relationship had reached the point they could not talk [ECF.63-45, p.34, Ex.124];

- The reasons stated by President Grice [ECF.53-16, p. 5, ¶19; ECF.63-45, p.32, Ex.124];

- Poor management of the PD, especially regarding overtime and comp time. [ECF.63-45, p.71:4-8, Ex.124; ECF.53-16, ¶¶9,19];

- Plaintiff's multiple incidents of insubordination including openly defying the Council and refusing to cooperate in budget efforts [ECF.53-16, ¶¶9,19];

- Plaintiff had cleaned out his office and had no intention of returning to work [ECF.63-45, Ex.124, p. 31-32, 34];

- Refusal to cooperate with Pettis as police liaison and ignored his requests to perform certain actions including return the truck and turn over papers [ECF.53-16, ¶20];

- Plaintiff clarified he would not make the relationship work and that he would be Police Chief as long as *he* wanted to be [ECF.53-16, p.6, Pettis Aff., ¶20], an attitude inappropriate from a subordinate to a supervisor. [ECF.63-45, p.74:17-24, Ex.124].

Councilman Johnson's reasons were similar:

- Plaintiff was insubordinate multiple times telling superiors he would not follow their directives:  specifically citing a Council meeting wherein Plaintiff responded, "**I don't care what y'all do about the budget and the -- of Sneads. All I care about is the police department," and "I haven't done anything [regarding the budget]**." "I can tell you what to do, y'all give up y'all checks and that will help the budget." [ECF.63-51, pp.24, Ex.130; ECF.53-17, ¶11; ECF.53-12; Ex.S].

- Plaintiff's tone and demeanor were openly defiant, flippant, and disrespectful [ECF.53-17, p.3, ¶12];

- The bases stated by President Grice; Johnson provided the second for her motion to terminate [ECF.53-17, p.3, ¶19]; and

- Plaintiff managed the PD very poorly [ECF.53-17, pp.5-6, ¶19].

23

The fourth vote for terminating Plaintiff came from Councilman Greg Lewis.

Lewis too formed his decision based on:

- Plaintiff's poor management of the PD [ECF.53-21, p.4];

- Plaintiff's multiple acts of insubordination including openly defying the Council and refusing to cooperate in developing cost saving and budget balancing measures [ECF.53-21, p.4];

- Plaintiff's failure to cooperate with the Council and administration as evidenced by the email exchanges [ECF.63-46, pp.55-57]; and

- The reasons articulated by Grice at the October 2018 meeting with which he agreed [ECF.63-46, p.54-55].

Sneads' Policies and Procedures contain "Disciplinary Procedures" providing for "progressive discipline" in some circumstances. [ECF.53-12, ¶51, Ex.P (pg. 19)]. The Policy authorizes immediate dismissal for "insubordination." *Id*. at pp.15-16. PD Policy 008.1 also provides that "insubordination" shall not be tolerated and is subject to discipline, including dismissal.[18] [ECF.53-13, ¶17, Ex.H].

### III.    <u>STANDARD OF REVIEW</u>

A trial court's order granting final summary judgment is reviewed *de novo*. *Carithers v. Mid-Continent Cas. Co.*, 782 F.3d 1240, 1245 (11th Cir. 2015). The lower court's orders may be upheld "on any basis supported by the record."

---

[18] Following Plaintiff's termination, Dispatcher Howell completed the ATMS form required by FDLE to record an officer's separation from an agency checking the only box which fit the circumstances, "Terminated for violation of agency policy" (Insubordination). [ECF.53-22, Ex.110; ECF.53-13, ¶18].

*Geosyntec Consultants, Inc. v. United States*, 776 F.3d 1330, 1343, n.15 (11th Cir. 2015). Summary judgment is appropriate if, based on materials in the record, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56.

## SUMMARY OF THE ARGUMENT

Plaintiff failed to prove facts which established, by a preponderance of the evidence, a *prima facie* case of FMLA interference or a *prima facie* case of Whistleblower or FMLA retaliation. Plaintiff failed to prove facts which established that the Town's legitimate nondiscriminatory reasons for terminating him were pretext for unlawful acts. Plaintiff failed to prove a *prima facie* case of or liability for First Amendment retaliation against the Town or the individual Defendants.

The District Court properly entered summary judgment in favor of all Defendants based on the facts and law. This Court should affirm.

## ARGUMENT

### I.     Burden-shifting analysis

Having no direct evidence of FPWA or FMLA retaliation, Plaintiff must rely on circumstantial evidence which applies the *McDonnell-Douglas* burden-shifting analysis. This requires Plaintiff to demonstrate a *prima facie* case, the employer to present its legitimate non-discriminatory reasons, and Plaintiff to ultimately show those reasons are pretext. *Smith v. City of Tallahassee*, 789 Fed. Appx. 783, 787 (11th Cir. 2019) ("We analyze FWA claims under the burden-shifting framework

applicable in cases brought under Title VII." (internal citations omitted)); *see also See also Bonini v. Florida Department of Corrections*, 2019 WL 5112257, *7 (M.D. Fla. 2019)

## II.    <u>No prima facie case</u>

### A. FPWA (Count I)

The FPWA prohibits an employer from taking a retaliatory action against an employee "who reports, to an appropriate agency, violations of law on the part of a public employer ... that create a substantial and specific danger to the public's health, safety, or welfare." § 112.3187(2), Fla. Stat. To establish an FPWA violation, an employee must show: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) there existed a causal connection between the two events. *Smith,* 789 Fed.Appx. at 787.

### 1.  Plaintiff did not engage in protected activity.

To be protected, the <u>nature</u> of the information disclosed must include:

(a) **Any violation or suspected violation** of any federal, state, or local law, rule, or regulation committed by an employee or agent of an agency or independent contractor **which creates and presents a substantial and specific danger to the public's health, safety, or welfare**;

(b) Any act or suspected act of gross mismanagement, malfeasance, misfeasance, gross waste of public funds, suspected or actual Medicaid fraud or abuse, or gross neglect of duty committed by an employee or agent of an agency or independent contractor.

§112.3187(5), Fla. Stat.

26

Plaintiff focuses on the nature of the information arguing all disclosures at minimum address "any other abuse."[19] But, to whom the information is disclosed is also critical. [F]or disclosures concerning a local governmental entity, . . . the information must be disclosed to a chief executive officer [ ] or other appropriate *local* official," i.e., one having "the authority to investigate, police, manage, or otherwise remedy the violation." §112.3187(6), Fla. Stat. *See also Anterio v. City of High Springs, Florida,* 762 Fed.Appx. 891, 896 (11th Cir. 2019) ("The FDLE, a state agency, [ ] is not an 'appropriate local official.'")

Finally, the *form* of a disclosure matters: "This section protects employees and persons who disclose information on their own initiative *in a written and signed complaint*." Fla. Stat. §112.3187(7) (emphasis added). *See also Anterio*, 762 Fed.Appx. at 896-897 ("employee is protected only if a complaint to a supervisory official is made *in writing*.") (emphasis added); and *Smith v. City of Tallahassee,* 2018 WL 6714325, *3-4 (N.D. FL. 2018). An exception to the writing requirement exists for employees "who are requested to participate in an investigation, hearing, or other inquiry conducted by any agency or federal government entity." §112.3187(7), Fla. Stat. *See also Rustowicz v. North Broward Hosp. Dist.*, 174 So.3d 414, 421-22 (Fla. 4th DCA 2015). This circumstance is inapplicable here.

---

[19] This phrase derives from the legislative intent in (2), not the requirements outlined in (5).

Plaintiff contends these disclosures are protected[20]:

|     | **2018 Date**          | **Activity**                                                                                                                                                                                                                                                                         |
| --- | ---------------------- | ------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
| 1.  | June 11                | Disclosure of Pettis & Johnson's criminal histories to Grice [*In. Brief*, p.35]; [ECF.64, p.38];                                                                                                                                                                                     |
| 2.  | Late July & August 2   | Report to FDLE that Griffin had likely stolen money. [*In. Brief*, p.35-36]; [ECF.64, p.38];                                                                                                                                                                                          |
| 3.  | Numerous               | Disclosed concerns about eliminating midnight dispatch and other department matters in "numerous meetings"[21] [*In. Brief*, p. 36]; [ECF.64, p.39]; and in his August 31, response to Bell's August 30 email titled "Issues and Solutions" [ECF.53-1, Exs.26& 27, p. 202]            |
| 4.  | July 2                 | Verbally advised Pettis on July 2, 2018 that removing document from Allen's personnel file was unlawful [*In. Brief*, pp.15-16, 36-37]*;* [ECF.64, p.39];                                                                                                                              |

---

[20] Plaintiff contends his verbal disclosures qualify because the Florida Supreme Court has accepted discussions with Commissioners as protected activity. [*In. Brief*, p. 41-42, citing to *Edenfield v. Martin County,* 609 So.2d 27, 29 (Fla. 1992). This is simply untrue. The *Edenfield* court – interpreting the 1989 statute which did not require a writing – did not address verbal v. written complaints at all. *See also Walker v. Florida Department of Veterans' Affairs*, 925 So.2d 1149, 1150 (Fla. 4th DCA 2006) (explaining that, in cases where a Plaintiff has not participated in a "investigation" under Section 112.3187(7), Fla. Stat., a "writing" is required.)

[21] Plaintiff's oral discussions at council meetings concerning police operational matters do not meet the definition of complaints protected under 112.3187(5) – not written, not reporting a violation of law or act of misfeasance or deficient performance, and not participating in an investigation or inquiry. *See, Smith*, 2018 WL at *3-4. *See also Scheirich v. Town of Hillsboro Beach*, 2008 WL 186621, at *5 (S.D. Fla. Jan. 18, 2008): "It is clear to the Court that allegations of personal epiphanies, phone conversations, and verbal discussions do not amount to protected disclosures under § 112.3187(7). (internal citations omitted).

| 5. | August 9 | Hand-delivered "Whistleblower" letter to Councilmembers before meeting. [*In. Brief*, p.41]; [ECF.64, p.39]; |
| 6. | September 13 | Emails around this date informing Bell she was improperly accounting for his leave. [*In. Brief*, p. 38]; [ECF.64, p.40]; |
| 7. | Late September | Verbal report to Attorney Green that Council "illegally" placed Bell over him as supervisor. [*In. Brief*, p. 38]; [ECF.64, p.40]. |

The first allegedly protected activity – a public records request for criminal histories, verbal disclosure of their contents to President Grice, and Plaintiff's documentation in a memorandum to himself – is not a violation committed by an agent of the City, reported in writing to a local official having "authority to investigate [ ] or otherwise remedy the violation." Any criminal violations of Pettis and Johnson (occurring more than 25 years before the councilmembers took office) had already been addressed through prosecution and no one could have "remedied" these violations.[22]  Nor would such convictions disqualify them from serving as Councilmen or departmental liaisons. This is insufficient to qualify as a "whistleblower" disclosure under Section 112.3187(5), Fla. Stat.; as recognized by the district court, Plaintiff's actions appear more consistent with a personal vendetta

---

[22] Plaintiff's sole remedy sought was to declare his bosses "criminals" and to tell Grice *not* to give them oversight over his Department. [ECF.63-41, Ex.120, p.31:9-20].

against Pettis and Johnson. Last, per Plaintiff's own testimony, his June 13, 2018, memorandum regarding his conversation with Grice was not "disclosed" but kept in a secret file on his desk or in his password protected computer. [*See* p. 9, n. 6, *supra*].

Second, Plaintiff's report(s) to FDLE in July and August 2018 were not reported to an appropriate local official with authority to remedy any alleged violation and were not in writing. Plaintiff never provided Agents Dickson and Lawson with an "affidavit" and FDLE conducted no investigation of Griffin. [See ECF.53-18, ¶4; and ECF.53-19, ¶4]. FDLE is not a local official. *See Anterio*, 762 Fed.Appx. at 896-897 ("The FDLE [ ] is not an 'appropriate local official,'" and complaint must be made *in writing.")* (Emphasis added); and *Smith*, 2018 WL at *3-4 (N.D. FL. 2018). They are not protected disclosures.

Plaintiff's third allegedly protected activity – multiple discussions at Council meetings about proposed changes to the midnight dispatch and other PD services – did not address violations committed by an agent of the City and were not reported in writing to a local official. Plaintiff attempts to breathe whistleblower life into these vaporous actions by pointing to an August 31, 2018, email response to Bell in which he addressed public safety concerns and asked whether he alone was being targeted. [*In. Brief*, p. 36; *see also* ECF.53-1, Ex.27]. The content merely demonstrates Plaintiff was angered because Bell:  1) Inquired of the Sheriff's capacity to handle some of the PD's dispatch duties; and 2) Requested dispatch logs, police activity

reports and PD Policies and Procedures. It does not complain of a violation of law or Town policy, gross negligence, or any other type of activity protected under the FPWA. It was not illegal for Bell to criticize the PD's overtime/comp time structure, it was prudent for her to find ways to remedy it.

Fourth, Plaintiff's July 2 conversation with Pettis about the requirements of Chapter 119 was just that, a conversation (albeit recorded clandestinely). There was neither a written nor signed complaint and it meets no other statutory provision to qualify as protected under the FPWA.[23]  The alleged "troubleshooting" meeting in which Green was "involved" was a regular, monthly Town Council meeting which he was required to attend as Town Attorney, not an "investigation" under §112.3187(7), Fla. Stat.

Plaintiff identifies his fifth allegedly protected activity as his August 9 "whistleblower" letter hand-delivered prior to the Council meeting advising of his contact with FDLE. Plaintiff contends the letter satisfies the basic requirements of the FPWA because it is a written and signed complaint, choosing to ignore the statutory requirements for the nature of the disclosure. The letter is a writing, signed by Plaintiff, but itself is not disclosing any category of protected activity under §

---

[23] Plaintiff boasts of his surreptitious recording and memorandum to himself on PD letterhead. Secret, unknown files authored by a public official and kept for perpetuity on their desk is the antithesis of a disclosure protected under the FPWA.  *See* n.6, *supra*.

112.3187(5)(a)–(b), Fla. Stat. The document fails to inform the reader of the "suspected" criminal conduct, the laws purportedly broken, or the identity of the accused such that an investigation could be conducted. Nor is there any authority for the proposition that simply labeling oneself a "whistleblower" and using the words "suspected criminal conduct" without identifying the conduct or the official, qualifies as a protected disclosure.

Plaintiff further casts aspersions on the district court's reliance on the *Scheirich* case (2008 WL 186621, *supra*) and randomly cites *Rosa v. Dep't of Child. and Fam.,* 915 So.2d 210 (Fla. 1st DCA 2005), for the proposition that the sufficiency of a plaintiff's written letter is a matter for the jury. [In. Brief, p. 37, 39-40]. *Rosa* supports no such conclusion. While *Rosa* does observe that the FPWA is a remedial act that should be construed broadly [*Id*. at 211-12], it does not stand for Plaintiff's suggested proposition that the sufficiency as protected activity of a plaintiff's written letter is always a matter for the jury. [*See In. Brief*, 37].

The same Florida appellate court recently clarified the limitations of its holding in *Rosa*:

> That case does not [ ] stand for the broad proposition that any letter to a supervisor complaining about personal conflicts with another employee or the allocation of duties and responsibilities within the agency is sufficient to create a triable issue of misfeasance. Rather, the opinion merely held that the specific letter in that case was susceptible to raising a claim of misfeasance.

32

*Nazzal v. Florida Department of Corrections*, 267 So.3d 1094, 1097 (Fla. 1st DCA 2019) (citing *Rosa* at 212). The *Rosa* plaintiff made specific complaints regarding the "allocation of duties and responsibilities within the department." *Id*. at 211. Here, the contents of Plaintiff's superficially labeled "whistleblower" letter are non-substantive. That correspondence does not allow local authorities to identify the alleged nature of the "suspected criminal conduct," much less "investigate or remedy the impropriety." While the FPWA is to be broadly construed, it does not protect a plaintiff's amorphous, vague, and scandalous allegations of criminal conduct by an unnamed Town official.[24]

Nor does *Rice-Lamar v. City of Fort Lauderdale* [*see In. Brief* at p. 43], hold that the nature of information disclosed is always a question of fact for the jury. The court merely recognized the existence, in that case, of disputed issues of fact which precluded summary judgment. *Rice-Lamar,* 853 So.2d 1125, 1133 (Fla. 4th DCA 2003).

Plaintiff alleges his sixth protected action occurred in mid-September 2018 through a series of emails with Bell. While emails can be considered the appropriate

---

[24] *See Smith*, 2018 WL 6714325 at *3 ("The thrust of his [Plaintiff's] position, though not articulated so brazenly, seems to be that a public employee is protected from adverse action if the employee has complained to any manager about almost anything in almost any way. *The statute is broad, but it is not nearly that broad.*") (emphasis added).

form for a written and signed complaint, *see, e.g., Smith*, 2018 WL at *3-4, Plaintiff must still satisfy the nature component of the statute.

The Town's "Sick Leave Policy" stated: "A doctor's excuse shall be required for any sick leave absence in excess of three days." [53-12, Ex.P]. While Plaintiff's subject emails certainly indicate he is unhappy with Bell's view that his sick notes state an insufficient excuse for sick leave under the policy, Plaintiff does not report or disclose a violation of law or internal policy. The Charter, and subsequent ordinance(s), gave Bell the authority as CEO to interpret the Town's sick leave policy and to evaluate the "sick note(s)" received from Plaintiff.

There is absolutely no indication that her decision violated the Town's Policies and Procedures or any state or federal law. Plaintiff's emails do not suggest she was violating Town policies or any state or federal law but simply inquire as to the rationale behind her decision and, if viewed most favorably for Plaintiff, reassert the sufficiency of his sick notes. These emails are not FPWA protected disclosures.

As his seventh and final protected activity, Plaintiff points to his verbal report to Attorney Green in late September that the Council "illegally" placed the Manager over him as his supervisor. He labels Green's letter to the Council as him "investigating" the matter and preparing a report "siding with McAlpin," to thereby characterize it as though Plaintiff participated "in an investigation" and satisfy the requirements of §112.3187(7), Fla. Stat. Though Green may have conducted legal

34

research and given an unsolicited opinion, there is no evidence an "investigation" was authorized or conducted.

The Town recognizes that §112.3187(7), Fla. Stat., protects employees "*requested* to participate in an investigation, hearing, or other inquiry" conducted by a state or local agency or official or federal entity. The operative word here is "requested." Actual protected disclosures for "participation in investigation" are the rare exception to the rule: "Our research has revealed only one case which discusses disclosures by employees asked to participate in an investigation as protected Whistleblower activity." *Rustowicz*, 174 So.3d at 421-22 (citing *Burden v. City of Opa Locka*, 2012 WL 4764592 at *2 (S.D.Fla. Oct. 7, 2012) (Deputy Chief of police for the Opa Locka police department, was asked to participate in a "Confidential Inquiry" of the department initiated by the city manager). The federal cases cited by Plaintiff for the proposition that FPWA protections extend to employees who participate in "investigations" or "troubleshooting" do not aid his claim. *See Shuck v. Clark*, 2007 WL 676198 (M.D. Fla. 2007) (the city's employee relations department interviewed plaintiff in investigation of wrongdoing by another employee); *Jones v. School Bd. of Orange County, Fla.,* 2005 WL 1705504 (M.D. Fla. 2005) (employee relations department requested plaintiff attend meeting described as "troubleshooting"). These cases highlight that Plaintiff was never

*requested*, nor participated, in any investigation sufficient to qualify for FPWA protection.

Plaintiff fails to evince a disclosure protected under the FPWA and his *prima facie* case must fail.

### 2. Plaintiff fails to show causation

Plaintiff's termination satisfies the second element of the *prima facie* case, an adverse action. To establish the third element, a causal link, a plaintiff must only "prove that the protected activity and the negative employment action are not completely unrelated." *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998). A close temporal proximity of three months or less can establish a presumption, *see, e.g., Brown v. Ala. Dep't of Transp.,* 597 F.3d 1160, 1182 (11th Cir. 2010); however, such an inference can be rebutted. Plaintiff must demonstrate any protected activity was the "but-for" cause of the adverse action. *See, Scott v. Sarasota Doctors Hosp., Inc.,* 688 Fed.Appx. 878, 884 (11th Cir. 2017) (citing *Univ. of Tex. SW. Med. Ctr. v. Nassar,* 133 S.Ct. 2517, 2534 (2013)).

Assuming Plaintiff's disclosures were protected, he is unable to show causation to complete the prima facie case. Though he points to disclosures within three months of his termination to establish a temporal proximity, that is the extent of his evidence. Any presumption due to timing is eliminated by Plaintiff's acts of

defiance which increased each month culminating with blatantly belligerent actions in September.

The Councilmembers articulated their well-documented individual reasons for their vote which do not include any disclosure. They further affirm that any protected disclosure did not serve as the basis for terminating Plaintiff. Plaintiff fails to provide any evidence to demonstrate any protected disclosure was the "but-for" causation, "i.e., that the employer would not have taken the adverse employment action but for a design to retaliate." *Nassar*, 570 U.S. at 364 (2013) (dissent).

### B. FMLA claim (Count II)

Plaintiff brings both an interference and a retaliation claim under the Family and Medical Leave Act, 29 U.S.C. Ch. 28.

### 1. FMLA interference

The FMLA creates a private right of action to seek equitable relief and money damages against employers who "interfere with, restrain, or deny the exercise of or the attempt to exercise" FMLA rights, i.e., an "interference" claim. *Hurlbert v. St. Mary's Health Care Sys.,* 439 F.3d 1286, 1293 (11th Cir. 2006) (internal citations omitted). To establish an interference claim, "an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied." *Id. Arguendo,* the Town assumes Plaintiff's request for leave submitted October 5,

2018, entitled him to FMLA benefits, and acknowledges that his termination effectively denied the leave. Nonetheless, his claim fails:

> Where the employer can show, however, that it would have dismissed the employee regardless of the employee's request for FMLA benefits, the employer is not liable for FMLA interference. Thus, the employer is only liable for FMLA interference where the employee's need for FMLA leave was the proximate cause of the termination.

*Bartels v. Southern Motors of Savannah, Inc.*, 681 Fed. Appx. 834, 840 (11th Cir. 2017) (internal citations omitted).

## 2. FMLA Retaliation

"A retaliation claim asserts that an employer discriminated against an employee for engaging in FMLA protected activity." *Pecora v. ADP, LLC*, 232 F.Supp.3d 1213, 1220 (M.D. Fla. 2017). It too uses the *McDonnell Douglas* burden-shifting framework. *Id.* 232 F.Supp.3d at 1221. Under the FMLA, Plaintiff must show that (1) he engaged in an activity protected by the FMLA; (2) he suffered an adverse employment action; and (3) the employer's decision was causally related to the protected activity. *Id*. at 1221. To succeed, Plaintiff must demonstrate the Town intentionally "discriminated against [him] because [-]he engaged in activity protected by the Act," essentially, that the adverse action was "motivated by an impermissible retaliatory animus." *Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1243 (11th Cir. 2010) (quoting *Strickland v. Water Works & Sewer Bd. of Birmingham*, 239 F.3d 1199, 1206-08 (11th Cir.2001)).

Plaintiff requested leave protected by the FMLA and his termination meets the definition of an adverse employment action. *See Bell v. Georgia-Pacific Corp.*, 390 F.Supp.2d 1182, 1188 (M.D. Fla. 2005). Nonetheless, Plaintiff cannot establish the final element, a causal connection.

### C. No demonstration of cause

FMLA cases also follow the *McDonnell-Douglas* framework and a "close temporal proximity between two events, standing alone, is not a panacea, absent any other evidence that the employment decision was causally related to the protected activity." *Nelson v. Americold Logistics, LLC*, 2020 WL 1809744, at *3, and *4 (N.D. Ga. Feb. 11, 2020), *report and recommendation adopted,* 1:18-CV-04846-SCJ, 2020 WL 1799945 (N.D. Ga. Mar. 4, 2020) (citing *Hankins v. AirTran Airways, Inc.,* 237 F. App'x 513, 520 (11th Cir. 2007)). Sgt. Bowen delivered Plaintiff's FMLA form on October 5, Plaintiff was terminated on October 9. Despite the temporal proximity between the two events, there is no evidence of a causal connection between them.

When Plaintiff's FMLA request was delivered, the multiple acts of insubordination causing his termination had already occurred and the next Council meeting was two business days away.

> "[FMLA's] purpose is not to aid an employee in covering up her work-related deficiencies. . . In such a situation, the employer is motivated not by the taking of the leave itself, but rather by prior deficiencies."

*Schaaf v. Smithkline Beecham Corp.,* 602 F.3d 1236, 1242 (11th Cir. 2010). The Town terminated Plaintiff's employment for unrelated reasons before its time expired to ascertain whether the leave qualified as FMLA.[25] Plaintiff's deficiencies were ongoing and his insubordination had intensified since the September 11 meeting. That the Council waited until a regularly scheduled meeting on October 9 to terminate Plaintiff instead of calling a special meeting for that purpose does not render his termination retaliatory because he made a request for leave days before. *See Nelson,* 2020 WL 1809744, at *4 ("[I]t simply does not matter if Plaintiff engaged in protected conduct the day before or the day after his alleged misconduct. Either way, the misconduct defeats the inference of causation created by the temporal proximity between the protected conduct and Plaintiff's termination…temporal proximity cannot establish causation when an employee engaged in protected conduct *after* engaging in misconduct."). The Town did not terminate Plaintiff *because of* his request for leave. It terminated him *in spite of* his request.

Without proximate cause connecting his FMLA form submission and his termination, Plaintiff's *prima facie* case fails under both FMLA claims.

---

[25] The employer has five business days. 29 C.F.R. § 825.300(b)(1).

### III.    The Town's legitimate, non-retaliatory reasons

Even if Plaintiff established a *prima facie* case of his FPWA or FMLA claims, "[o]nce the *prima facie* case is established, the employer must proffer a legitimate, non-retaliatory reason for the adverse employment action." *Olmsted*, 141 F.3d at 1460. The Town's reasons for terminating Plaintiff are the same regardless of what claim is being considered. [26]

President Grice moved to terminate Plaintiff and in doing so recited her list of reasons all of which were acts of insubordination. Pettis, Johnson, and Lewis agreed with President Grice's reasons though each had his own additional examples of Plaintiff continually operating as he saw fit on his own agenda. Grice, Pettis, Johnson, and Lewis voted to terminate Plaintiff because of his insubordination, and for no other reason.

### IV.    Plaintiff cannot demonstrate pretext.

The Town articulated legitimate, non-retaliatory reasons for its decision and any presumption of retaliation is eliminated. *Castro v. Sch. Bd. of Manatee County, Fla.*, 903 F. Supp. 2d 1290, 1302 (M.D. Fla. 2012). Thereafter, the burden shifts back to Plaintiff to prove, by a preponderance of the evidence, that the Town's cited reasons for the adverse action were pretext. *Olmsted*, 141 F.3d at 1461. "[A]

---

[26] Because both FPWA and FMLA claims are analyzed under the *McDonnell-Douglas* standard (*see*, n. 21, *supra*), the Town herein combines its legitimate, non-retaliatory reasons and pretext analyses for both claims.

legitimate nondiscriminatory reason proffered by the employer is not a pretext for prohibited conduct unless it is shown that the reason was false and that the real reason was impermissible retaliation or discrimination." *Worley v. City of Lilburn*, 408 Fed. Appx. 248, 253 (11th Cir.2011)). Plaintiff must show pretext by meeting the Council's reasons "head on and rebut[ting]" them. He cannot simply argue with the wisdom of the reasons.[27] *Chapman v. AI Transp.,* 229 F.3d 1012, 1030 (11th Cir. 2000).

Plaintiff's proffer for pretext is five-fold: 1) A "downward spiral of harassment, hostile treatment, and retaliation," following his delivery of Pettis and Johnson criminal histories to Grice that continued to his termination [*In. Brief*, p.36]; 2) Bell's targeting of Plaintiff regarding comp time, overtime, and leave requests, and the Town sought to change its ordinance to place her over Plaintiff [*Id.* at p. 47-48]; 3) Town's claim of insubordination is belied by the facts that Plaintiff *did* return his work vehicle and the expenditures were *small* and *inexpensive* [*Id*. at p. 49-50]; 4) the Councilmembers could not agree on the reasons for Plaintiff's termination. [*Id*. at p. 50-51]; and 5) the Town's "deviation" from its own standard procedures

---

[27] Plaintiff's argues the Council's ideas were not the wisest choices, the Council's ideas for returning to the former system of the Fire and Police Chiefs directly reporting to the Town Manager were not a good idea, he was in a better position to run a PD, etc.

by failure to follow its "progressive discipline" policy." [*Id*. at p. 51]. Defendants address each.

## A. "Downward Spiral of Harassment"

Despite Plaintiff's perception these events were harassing, adverse, and retaliatory, there is no support for such a conclusion. Plaintiff admitted the reason he initially sought information about Pettis and Johnson is because he heard a rumor that Grice was going to appoint one of them as police liaison. [ECF.63-41, Ex.120, pp.31-33]. That Grice followed through on her intentions and was not bullied by Plaintiff into changing her mind is not retaliatory.

The Council's rescission of Pettis' action regarding the Allen personnel file is anything but retaliatory; it demonstrates good faith on the part of the Council when a potential impropriety was brought to its attention.

No action was taken against Plaintiff immediately following this self-serving pronouncement as a whistleblower. Instead, Plaintiff continued acting on his own agenda belligerently telling the Council at the August 9 meeting he would "fight it to the end" referring to any proposed changes to the PD. [ECF.53-12, Ex.S, ¶36, p.113].

## B. Bell and the Town "targeted" Plaintiff

Plaintiff contends that upon hiring, Bell "immediately began to target Plaintiff – and only Plaintiff – insisting that he not allow the department to accrue

43

compensatory time." [*In. Brief*, p. 47].  This statement is untrue.  On Bell's second day in office, she sent correspondence to _all_ Department heads regarding overtime, comp time, and the budget crisis. [ECF.53-1, Ex.22]. There is no evidence that any department, other than the PD, continued to work overtime and accrue comp time. [ECF.53-12, p.9, ¶37].

Bell, the "outsider," had been on the job mere days when she met Plaintiff for the first (and only ) time in her office. [ECF.53-11, ¶13].   Despite her plea that they work together, Plaintiff continued on his own agenda [*See* Sections VIII through X, *supra*, and ECF.53-12, ¶5, Ex.M (minutes and audio)] culminating with Town officials forcibly entering his office with a Sawzall.  [ECF. 53-1, Exh.29; ECF.53-11, ¶17; ECF.53-13, ¶7-8; ECF 53-15, ¶16;]. Plaintiff was terminated two business days later at the next Council meeting.

Plaintiff attributes the vast majority of the Town's directives he defied to Bell – describing them as "harassment and hostility"[28] [*In. Brief*, p.26] even contending that President Grice did not write the emails, and these were purely the work of

---

[28] To the extent Plaintiff contends the continuing requests for communication and for compliance with its rules were harassing, especially while he was trying "to recover," an employer requiring an employee to comply with the rules cannot reasonably be considered to sufficiently dissuade an employee from complaining so as to constitute an adverse action. *See, e.g., Rainey v. Holder,* 412 Fed. Appx. 235, 238 (11th Cir. 2011).

Manager Bell. This theory is nothing more than rank speculation with no evidentiary support.[29]

### C. Plaintiff's rebuttal to Insubordination

Plaintiff attempts to negate and/or excuse his insubordinate behavior, arguing he had every intention of returning following his medical leave which he expressed to the Town, he actually returned the vehicle as requested, and the cited unnecessary expenditures were "small and inexpensive." [*In. Brief*, p. 50] To support his contention that insubordination was concocted by Defendants, Plaintiff points out that he was never disciplined. *Id*. He was disciplined – it was called termination.

Though no definition should be needed, Town PD Policies and Procedure 008.3 defines insubordination:

> 008.3 **DEFINITION**
>
> For the purposes of this manual, insubordination is any act of defiance, disobedience, dissension or resistance to authority.

Plaintiff's conduct and rank refusal to follow the basic directives of Grice and Bell, in particular, could not more squarely meet the definitions of insubordination under this policy. Policy 008.1 provides: "Any form of insubordination [ ] will not be

---

[29] Regardless of who *sent* the emails, President Grice owned the directives: "He refused to return the work truck when I asked him multiple times;" "There's email attempts, phone calls, we have sent police officers twice to his home to get the keys." [ECF.53-12, ¶5, Ex.M (minutes and audio, 7:10-7:24, 7:26–7:50)].

tolerated and will be subject to disciplinary action up to and including dismissal."
[ECF.53-13, pp.6-7, 19-20, ¶17, and Ex.H].

### D. Councilmembers lack of agreement on reasons for termination

Plaintiff contends that "[p]erhaps most important [to the issue of pretext], the individual Council members could not agree on the reasons for Plaintiff's termination." [*In. Brief*, p. 50]. This statement mispresents the record evidence in this matter.

Each Councilmember had his or her own experiences which formed their opinions and bases for voting to terminate Plaintiff and none was influenced by or relied upon the recommendations of others. Neither any individual Councilmember, nor the Council, "rubber stamped" any illicit motive of another.

Although a decisionmaker's differing recitations of its reasons can be evidence of pretext, that is not the case where the reasons have never changed. The Defendant Councilmembers have not changed their reasons with time. The only differences are the specific examples personal to or observed by each Councilmember which supported his or her opinion and led each to the same overlapping conclusions: Plaintiff poorly managed the PD, was uncooperative with the Council, and was repeatedly insubordinate to the Council.

Plaintiff next contends the Councilmembers' stated reasons for determining he was insubordinate were either too "vague," simply reasons they "disliked"

Plaintiff, or have been "proven false." [*In. Brief*, p. 49]. No matter the intensity of his proclamations of retaliation, Plaintiff's belief in a theory does not make his assertions true. *See, e.g., Uhlig v. Darby Bank & Tr. Co., 556 Fed. Appx. 883, 889 (11th Cir. 2014); and Blankenship v. Gulf Power Co.,* 2014 WL 83889, at *4 (N.D. Fla. Jan. 9, 2014) ("Plaintiff's assertion . . . does not make it so.").

Plaintiff offers no authority stating that the Councilmembers were required to agree on *every single basis* for Plaintiff's termination; indeed, given his array of defiant and unprofessional acts during the final months of his employment, it is not surprising that the Councilmembers could not individually recount, or have an identical recollection, of every single insubordinate act. As noted by the District Court, what is critical is that the majority agreed that Plaintiff was insubordinate and so voted to terminate his employment with the Town. [ECF.69, p.21].

Nor can Plaintiff succeed on his claim by disputing the wisdom of the Council's reason:

> A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.

*Chapman v. AI Transp.,* 229 F.3d 1012, 1030 (11th Cir. 2000). Plaintiff's own judgments regarding the Council's wisdom and/or qualifications – such as Bell and the councilmembers had never run a police department, were not in the best position

to know department needs, were not trained in law enforcement, or were themselves criminals – are irrelevant. "To show pretext, the employee must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Smith,* 789 Fed. Appx. at 787 (internal citations and quotations omitted).

Courts do not act as super-personnel boards to review employment decisions. *Chapman,* 229 F.3d at 1030. This Court should affirm the District Court's granting of summary judgment for the Town on Plaintiff's FPWA and FMLA claims.

### E. Failure to Apply Progressive Discipline Policy

The Town's failure to impose progressive discipline is insufficient to show pretext. *See Bell v. Georgia-Pac. Corp.,* 390 F. Supp. 2d 1182, 1193 (M.D. Fla. 2005), *aff'd sub nom. Bell v. Georgia-Pac. Corp,* 153 Fed. Appx. 701 (11th Cir. 2005) ("There is nothing in the record to suggest that [ ] the discipline scheme had to be followed in every instance. Moreover, common sense tells us that progressive discipline of the Plaintiff in this situation would be pointless. [ ] Thus, that the Defendant did not impose progressive discipline on the Plaintiff [ ] is insufficient to permit a reasonable factfinder to conclude that pretext exists.")

The Town's Policy Manual governs employee conduct and identifies "insubordination" amongst the types of offenses for which immediate termination is

justified. [ECF.53-12, ¶¶51, 52 and Ex. P, p. 97-98]. Even mere "unsatisfactory"

conduct is grounds for termination.

> Should at any time your performance, work habits, overall attitude, conduct, or demeanor become unsatisfactory in the judgment of the Town officials, based on violations of the above or any other Town policy, rule or regulation, you will be subject to disciplinary action up to and including termination.

"Progressive discipline" was not required. [*Id*. at ECF.53-12, ¶¶51, 52 and Ex. P, p.

97-98, 101].

## V.     **Defendants did not retaliate against Plaintiff for exercising his free speech rights under the First Amendment (Counts III - IX)**

In Counts III - VIII, Plaintiff brings First Amendment retaliation claims against

the Town and individual defendants. [ECF.11]. Plaintiff's allegations of First

Amendment protected activity and adverse actions are the same as his protected

disclosures for his FPWA claim with the addition of his Facebook post. *See In. Brief,*

pp.53, 57-58; ECF.53-1, Exs.2; 3, #1 and #9; 5; 13; 16 and 17, #1. See also ECF.63-

41, pp.50-51; 63-65; 142-143.

"[P]ublic employees do not surrender all their First Amendment rights by

reason of their employment. Rather, the First Amendment protects a public

employee's right, in certain circumstances, to speak as a citizen addressing matters of

public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). The First

Amendment safeguards a public employee's right, as a citizen, to participate in

discussions involving public affairs, but "'it [will] not empower [her] to

'constitutionalize the employee grievance.'" *Alves v. Board of Regents of the University System of Georgia*, 804 F.3d 1149, 1160 (11th Cir. 2016) (quoting *Garcetti*, 547 U.S. 410 at 420)).

Only Plaintiff's Facebook post was off-duty. The remainder of his activities occurred at the PD on duty, at a Council meeting, or on Town email regarding matters specific to his employment, and is speech which arguably "owes its existence" to his employment. *Alves,* 804 F.3d at 1161. The evidence is overwhelming, however, that Plaintiff's motivation with any of the disclosures was purely personal – to not have a liaison appointed that he did not want, to accuse Pettis of criminal conduct, to have the PD schedule, or other Town administrative matters, operate as he saw fit and not his superiors and/or to deem himself a whistleblower to protect his own job. These are employee grievances which Plaintiff should not be allowed to blanket with the Constitution. Nevertheless, Defendants will assume[30] the activities to be protected speech under the first two prongs of the Eleventh Circuit's four-part test for analyzing First Amendment retaliation claims and will address parts three and four: 3) whether Plaintiff's speech played a "substantial part" in the Town's decision to terminate his employment and 4) the affirmative defense of whether the Town would have reached the same decision

---

[30] Contrary to Plaintiff's statement, Defendants do not concede Plaintiff's activities are protected. They merely accept the proposition here for the sake of argument to allow an analysis of the ultimate issues.

regardless of any protected speech. *See, Battle v. Board of Regents for Georgia,* 468 F.3d 755, 760 (11th Cir. 2006) (internal citations omitted).

The Town has addressed above its legitimate, non-retaliatory reasons for terminating Plaintiff demonstrating both that any protected speech played no part in its decision and that it would have made the same decision regardless of any protected speech. No evidence exists which would prove the Town terminated Plaintiff because of any First Amendment speech. The reasons were plain and simple: Plaintiff was repeatedly insubordinate and it was no longer the pleasure of the Council for him to serve as Chief. Even if Plaintiff met the first two prongs, he fails to prove elements three and four and cannot establish a First Amendment retaliation claim. *Battle,* 468 F.3d at 760.

## A. Municipal liability

Assuming Plaintiff offered *some* evidence of a retaliatory motive, this Court has explicitly held that proof of a discriminatory motive by at least three members of a five-member council is required before liability may be imposed:

> The critical issue on appeal is whether the alleged racially discriminatory motive of only one member of a three-member majority of a five-member council can give rise to municipal liability. We agree with the trial court that it does not. . . .
>
> [T]here can be no municipal liability unless all three members of the [five-member] council who voted against reappointing [p]laintiff shared the illegal motive.

*Mason v. Village of El Portal,* 240 F.3d 1337, 1339 (11th Cir. 2001) (affirming summary judgment and explaining: "Since there is no evidence that [other] council members . . . even knew of [the plaintiff's protected statements], we cannot find that all three council members' votes not to reappoint Plaintiff were based on those statements.").

This rule "recognizes that because [a municipal] Board can act only by majority vote, it would be incongruous to let a minority subject the Board to liability." *Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1313 (11th Cir. 2006) (reversing a district court's denial of summary judgment when there was no evidence "that a majority of the members [of the board]. . . acted with an unconstitutional motive"). The rule has been consistently applied. *See, e.g., Conner v. Lafarge N. Am., Inc.*, 343 Fed. Appx. 537, 544 (11th Cir. 2009); *Bates v. Islamorada, Vill. of Islands*, 243 Fed. Appx. 494, 496 (11th Cir. 2007);[31]

---

[31] Although the court in *Quigg v. Thomas County Sch. Dist.*, 814 F.3d 1227 (11th Cir. 2016) did not require proof that a majority of the school board committed gender discrimination, *Quigg* is not controlling. As recently  and thoroughly explained by the Court in *Tipton v. Houston County Bd. of Educ.*, 2019 WL 2176174, at *14 (M.D. Ala. 2019), *appeal dismissed,* 2019 WL 4621969 (11th Cir. 2019): "*Quigg* did not cite any of the cases above or discuss municipal liability; it instead looked at a Title VII case . . . . [W]here there are inconsistent panel decisions, the earliest panel opinion resolving the issue in question binds this circuit until the court resolves the issue *en banc. . . . So, Campbell, Matthews, Mason,* and *Church* control."

Because the Town of Sneads is governed by a five-member council, Plaintiff must prove that at least three members of the council who voted to terminate him shared an illegal motive." *Mason,* 240 F.3d at 1339. Plaintiff cannot meet this burden.

There is no evidence that even one Councilmember harbored a retaliatory motive and, likewise, zero evidence from which a reasonable jury could find that the other Councilmembers shared this same motive. The evidence is overwhelming that the Councilmembers were each concerned with the Town's budget and with Plaintiff's lack of cooperation, disrespectful attitude, and ultimately his acts of insubordination. The public should hope all its elected officials had such true motives. [32] Importantly, as to the subject Facebook place post on which Plaintiff's hinges the majority of his argument, Pettis does not use Facebook and has no idea about the post. [ECF.63-45, p.26:11-15]. Pettis then, could not have harbored any retaliatory motive related to the post and, absent such a motive, the post cannot serve to attach First Amendment retaliation liability to the Town.

---

[32] Below, the parties addressed alternative theories such as cat's paw and ratification. Neither applies. The "cat's paw" theory does not apply in the Section 1983 context. *Krika v. City of Defuniak Springs*, 2017 WL 6336081, *4 (internal citations omitted). Even if Plaintiff could prove Bell had an ulterior motive, and that she conveyed it to the Councilmembers, mere knowledge of unconstitutional motive is insufficient for ratification. *See, e.g., Tucker v. Talladega City Schools*, 171 F. App'x 289, 299 (11th Cir. 2006).

Summary judgment should be granted as to Plaintiff's First Amendment retaliation claims against Defendant Town of Sneads.

## B. Individual Defendants

### 1. Defendants Grice, Johnson, and Pettis individually.

The claims against the individual defendant Councilmembers Pettis[33] (Count V), Johnson[34] (Count VI), and Grice (Count VII) fail because they cannot be liable for the act of the Council. Where an individual member of a public body lacks decision-making authority to act on their own, he/she may not be held individually liable for an act of the entire body. *See Broberg v. Gerrard*, 2010 WL 2869539, at *3 (S.D. Fla. 2010) ("Gerrard did not have [individual] decision-making authority [ ]. Gerrard was only one member of the Commission, and thus, as a matter of law, cannot be individually liable for the actions of the Commission.").

---

[33] Plaintiff also contends Arnold told him that after the departure of Bowen and Manager Butts, Pettis remarked, "two down and one to go" referring to Plaintiff as the one. [ECF.53-1, pp.104-105]. Arnold denies that statement ever being made. [ECF.53-14, ¶6]. This too would have occurred prior to any protected activity.

[34] Plaintiff also attributes this to Johnson: On August 18, 2017, Defendant Johnson reportedly asked Plaintiff to "take care of" a traffic ticket his son received a few days earlier. [ECF.53-1, Ex.13 No.1]; ECF.53-13, Ex.A]. Such conversation would have occurred before Johnson became a Councilmember and would have been in Plaintiff's capacity as a law enforcement officer and not speech as a "citizen" on a matter of public concern. It is neither protected speech, temporally close, nor the basis for Johnson's vote for termination.

An exception to this rule has been recognized when a plaintiff: (a) sues a majority of the members of the body individually, and (b) proves that each acted out of a shared retaliatory animus. *See Carollo v. City of Doral, Florida*, 2015 WL 13145804 *7 (S.D. Fla. 2015), *aff'd in part, rev'd in part and remanded on other grounds at* 833 F.3d 1322 (11th Cir. 2016):

Plaintiff has sued a majority of the members (three of the four councilmembers who voted to terminate him[35]), but he fails to produce evidence of a retaliatory motive on the part of any one of the three, much less a retaliatory motive that was shared by all three. The individual councilmembers Pettis, Johnson, and Grice cannot be liable in their individual capacities as a matter of law.

Pettis, Johnson, and Grice would also be entitled to summary judgment on the basis of qualified immunity because, at the very least, it was not clearly established that an individual member of a public body violated the First Amendment in these circumstances. Qualified immunity shields government officials from individual liability for job-related conduct unless they violate clearly established law of which a reasonable person would have known. *O'Kelley v. Craig*, 781 Fed. Appx. 888, 893 (11th Cir. 2019). "It serves the purpose of allowing government officials to carry out their discretionary duties without the fear of personal liability or harassing

---

[35] It is unknown why Plaintiff does not believe that Greg Lewis' vote was for improper reasons if the other ones were.

litigation." *Id*. Here, as demonstrated by *Broberg* and *Carollo*, it was not clearly established in 2017 (or any time since) that a member of a public body lacking individual authority to act could be liable under the First Amendment when neither the individual had, nor a majority of the public body shared, an alleged retaliatory motive.

Furthermore, that the Council would have reached the same decision even in the absence of any protected conduct proves Defendants' affirmative defense and causes Plaintiff's claim to fail. Pettis and Johnson were direct and unequivocal on this point. Grice's letters speak for themselves as to her exasperation with Plaintiff and incredulousness that he was acting in such an unprofessional, unbecoming, and insubordinate manner.

### 2. Defendants Bell and Griffin

Defendants Bell and Griffin were not even members of the Council with a right to vote. Bell was explicitly barred, by every iteration of the Town Manager Ordinance from 1994 until Plaintiff's termination, from removing Plaintiff from his position as Police Chief. Sherri Griffin, as Town Clerk, had no supervisory responsibility over any Town employee, nor the ability to take adverse employment action, much less terminate Plaintiff. Indeed, there is no evidence of *any* action by Griffin towards Plaintiff. [ECF. 53-12]. Plaintiff cannot demonstrate the necessary

elements to prove the *Carollo* exception allowing the imposition of individual liability.

Plaintiff contends that Bell made false accusations at the October 9 meeting informing the Council that Plaintiff would not work with her. Bell made the statement, but it is not false. In Plaintiff's own writing: ""I work for the Council, not for you…". [*See* p. 21, *supra*]. Plaintiff then contends that because some of his protected expressions were about Griffin (a fact unknown to any defendant until this lawsuit), "Griffin aided Bell in retaliating." [*In. Brief*, p.65]. This argument is not even specious, it is simply nonsensical. Last, as correctly noted the District Court [ECF.69, p. 25], Bell and Griffin cannot be individually liable for First Amendment retaliation because they were not "official-decisionmakers" with the power to terminate Plaintiff:

> Thus, the evidence indisputably shows [the supervisor] had no power to terminate [the plaintiff], but rather only had the power to *recommend* her termination. [The supervisor] was not the "official decisionmaker," and thus cannot be held individually liable.

*Kamensky v. Dean*, 148 F. App'x. 878, 880 (11th Cir. 2005). Bell and Griffin not only never recommended Plaintiff's termination to Councilmembers, but also clearly had no decision-making authority to effect his termination, thus foreclosing their individual liability herein.

## CONCLUSION

Times change. And so do councils. In 2017 and 2018, the Sneads Council changed. Plaintiff lost his job simply because his grossly insubordinate acts no longer pleased the Council. In the words of President Grice, "I have had enough."

Plaintiff has failed to prove his claims for Whistleblower, FMLA, or First Amendment retaliation, or FMLA interference. Summary judgment in favor of all Defendants should be affirmed.

## CERTIFICATE OF COMPLIANCE

This Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,947 words, excluding the parts exempted by Fed. R. App. P. 32(f).

## CERTIFICATE OF TYPE SIZE AND STYLE

The type used is 14-point Times New Roman.

## CERTIFICATE OF SERVICE

Pursuant to 11th Cir. R. 25-3 and General Order 38, this document is being filed electronically and service shall be through the Court's transmission facilities on all persons appearing before this Court; the original plus six hard copies have been furnished via Federal Express to the Court; and a copy is being served via electronic and this 25th day of January 2021 to:

Marie A. Mattox, Esq.
Ashley N. Richardson, Esq.
MARIE A. MATTOX, P.A.
marie@mattoxlaw.com
ashley@mattoxlaw.com
marlene@mattoxlaw.com
michelle@mattoxlaw.com
susan@mattoxlaw.com

ATTORNEYS FOR APPELLANT

COPPINS MONROE, P.A.

BY:  */s/ Gwendolyn P. Adkins*
Gwendolyn P. Adkins
FBN: 0949566
1319 Thomaswood Drive
Tallahassee, Florida 32308
Telephone: (850) 422-2420
Facsimile:  (850) 422-2730
gadkins@coppinsmonroe.com
bmiller@coppinsmonroe.com
cmarchena@coppinsmonroe.com

ATTORNEYS FOR APPELLEES
