[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-13278

_____

JOHN "BURT" MCALPIN,

Plaintiff-Appellant,

*versus*

TOWN OF SNEADS, FLORIDA,
LYNDA BELL,
DANNY PETTIS,
DARYL JOHNSON,
HELEN GRICE,
SHERRI GRIFFIN,

Defendants-Appellees.

_____

2                    Opinion of the Court                    20-13278

Appeal from the United States District Court
for the Northern District of Florida

D.C. Docket No. 5:19-cv-00292-TKW-MJF

———————————

Before WILLIAM PRYOR, Chief Judge, LAGOA, Circuit Judge, and
WATKINS,* District Judge.

LAGOA, Circuit Judge:

The Town of Sneads, Florida—nestled on the Florida-Georgia border, about fifty miles northwest of Tallahassee—is a small municipality of fewer than 2,000 people. John "Burt" McAlpin served as the Chief of Police for the Sneads Police Department from March 2006 until October 2018. From all indications in the record, McAlpin had a pleasant working relationship with the Town Council for much of these twelve years. However, this relationship rapidly devolved with the election of new Councilmembers in the 2017 and 2018 municipal elections. On October 9, 2018, the five-member Town Council terminated McAlpin's employment by a 4-to-1 vote. The Town Council did so under the charge that McAlpin was disrespectful at best and insubordinate at worst. McAlpin, on the other hand, claims his firing was in retaliation for things he said, disclosed, and reported, all regarding various

_____

* Honorable W. Keith Watkins, United States District Judge for the Middle District of Alabama, sitting by designation.

matters related to the newer Councilmembers with whom he had a contentious relationship.

McAlpin filed this eight-count action against the Town of Sneads, Town Manager Lynda Bell, Town Councilmembers Danny Pettis and Daryl Johnson, Town Council President Helen Grice, and Town Clerk Sherri Griffin (collectively, "Defendants"). He brought unlawful-retaliation claims against the Town of Sneads under the Florida Whistle-blower's Act ("FWA"), *see* Fla. Stat. §§ 112.3187–.31895 (2002), the Family and Medical Leave Act ("FMLA"), *see* 29 U.S.C. § 2601, and the First Amendment to the United States Constitution. And he brought identical retaliation claims under the First Amendment against each of the five individual defendants. The district court granted summary judgment in favor of Defendants on all eight counts, and McAlpin appealed. For the reasons explained below, we affirm.

## I.     FACTUAL AND PROCEDURAL HISTORY

### A.  The Town of Sneads, Florida, and McAlpin's Public Service

The governing body of the Town of Sneads is the Town Council, composed of five members elected by the people of the Town of Sneads. Among the five members of the Town Council is the President of the Town Council, an individual charged with presiding over Town Council meetings, enforcing Town Council rules, and performing other duties prescribed by statute or ordinance. Distinct from the Town Council is the unelected Town Manager, who serves as "the chief executive officer and the head

of the administrative branch of the town government." The Town
Manager is "responsible to the Town Council for the proper ad-
ministration of all affairs of the city."

The Town of Sneads has a relatively small police depart-
ment; it has five full-time officers, four full-time dispatchers, and
several part-time employees. The Town Council appoints the
Chief of Police, who "hold[s] his office at the pleasure of the coun-
cil."

McAlpin has generational connections to the Town of
Sneads. He was born there, his two brothers are former law en-
forcement officers there, his father served as a Councilmember,
and his mother served as a deputy clerk. He also has a longstanding
commitment to public service. He became a certified police officer
in 1994, first serving in the Jackson County Sheriff's Office. McAl-
pin joined the Sneads Police Department in March 2006, when the
Town Council appointed him Chief of Police.

The record shows that McAlpin was somewhat insubordi-
nate toward his supervisors while serving at the Jackson County
Sherriff's Office. Shortly before McAlpin resigned from the Sher-
iff's Office, Captain Joey Rabon noted in a report that "McAlpin has
repeatedly proven that he works on his own agenda, with little or
no concern of being insubordinate. His actions . . . indicate[] he has
flagrant disregard for authority and leadership." However, the rec-
ord also shows that McAlpin had a pleasant and well-functioning
relationship with the Sneads Town Council from the time of his

appointment in 2006 as Chief of Police until the 2017 local elections and the election of several new Councilmembers.

### B. Election of New Councilmembers

Beginning in 2017, two local elections resulted in changes to the five-member Town Council. In April 2017, Danny Pettis, who campaigned on the platform of reforming the Sneads Police Department, was elected to the Town Council. Upon taking office, Pettis talked of changes in shifts, compensation, and overtime practices in the police department. Rumors began to spread that Councilman Pettis wanted to disband the police department and outsource its services to the Jackson County Sheriff's Office. In April 2018, Daryl Johnson was elected to the Town Council, defeating one of McAlpin's Council allies. Johnson was perceived as aligning with Councilman Pettis on law enforcement issues. With Pettis and Johnson on the Town Council, rumors intensified that the police department was going to be disbanded, McAlpin fired, and the Jackson County Sheriff's Office retained to provide law-enforcement services to the Town of Sneads.

With this new composition of the Town Council, the Councilmembers elected Helen Grice, who had served on the Town Council since 2011, as Town President in April 2018. Upon her election as Town President, Grice immediately began to consider the appointment of either Pettis or Johnson to the position of "police liaison."

## C. Deteriorating Relationship Between McAlpin and the Town Council

The election of Councilmen Pettis and Johnson, the elevation of Councilwoman Grice to Town Council President, and the impending appointment of Councilman Pettis to the position of police liaison caused the relationship between McAlpin and members of the Town Council to deteriorate.

### 1. Disclosure of Councilmen Pettis's and Johnson's Arrests

After McAlpin heard President Grice was considering either Councilman Pettis or Councilman Johnson for the position of police liaison, he filed a public-records request with the Florida Department of Law Enforcement ("FDLE") as to the two Councilmen because he and a sergeant at the police department, Adam Bowen, were familiar with the activities of Pettis and Johnson prior to both of them becoming Councilmembers and knew that Pettis and Johnson both had criminal histories in their backgrounds. Indeed, the public-records request revealed that Pettis and Johnson had prior criminal convictions from 1991 for the battery of a mentally handicapped inmate when they worked together at the Florida Department of Corrections. In his attempt to, in his words, "keep either one of those criminals from being a liaison of the police department," McAlpin forwarded the public records to President Grice on June 11, 2018. Despite this information and McAlpin's plea not to appoint either Pettis or Johnson, President Grice appointed Councilman Pettis to the police liaison position at a Town Council meeting the next day.

### 2. *Voicing Concern Over Councilman Pettis's Request to Remove an Employee's Disciplinary Memorandum from Personnel File*

During that June 12, 2018, Town Council meeting, Councilman Pettis made a motion to remove a disciplinary memorandum from an employee's personnel file. Although McAlpin sat quietly at the public meeting, he confronted Pettis about three weeks later, voicing his concern that the removal of anything from a personnel file was potentially a violation of Florida's public-records laws. Acting on this concern, the Town Council decided to keep the memorandum in the employee's personnel file. Of relevance discussed below, McAlpin never provided any written complaint about this incident.

### 3. *Facebook Post on Proposed Changes to the Sneads Police Department*

Less than a month later, at the August 2, 2018, Town Council meeting, the Town Clerk, Sherri Griffin, reported a budget deficit in excess of $20,000. In response, Councilman Greg Lewis suggested the Sneads Police Department turn over its midnight-dispatch position to the Jackson County Sheriff's Office and cut one employee. McAlpin spoke up during the public-comments session, voicing concern and insisting there were other ways to save money. When asked by Councilmembers for ideas on alternative ways to save money at another Town Council meeting a week later, he responded that "the only solution . . . was to not hire a city manager and for the council to forfeit their salaries each month."

McAlpin later took his advocacy to social media, posting on his Facebook page a message "[t]o the citizens, residents, voters, and taxpayers who live in the City limits of Sneads" of his "resistance and total disagreement" with the idea put forward by Councilman Lewis.  He implored his readers to "[c]all or visit the elected officials because remember they work for you and let your voice be heard."

### 4. The August 9, 2018, Memorandum

Immediately before a special Town Council meeting on August 9, 2018, McAlpin hand-delivered a note to all the Town Councilmembers on official letterhead from the Sneads Police Department, dated August 9, 2018.  The August 9, 2018, Memorandum, signed by McAlpin as Chief of Police, stated:

> Town of Sneads Council members,
>
> Let this communication serve as official notice of the following.  Within the past 30 days I, in good faith, have disclosed information of suspected criminal conduct by a Town of Sneads official to Special Agents of the Florida Department of Law Enforcement.  I have requested the agency deemed appropriate to conduct an inquiry and investigation.  I am enacting "Whistleblower's Act" Protection.  If any retaliatory action or "Adverse personnel action" occurs it will be immediately addressed with my Attorney.

None of the Councilmembers understood the nature or content of this note when McAlpin delivered it to them.  It was through

discovery in this litigation that they later learned Clerk Griffin was allegedly involved in a theft, which was detailed in an undated, unsworn statement prepared by the police department's dispatcher, Connie Wright, and forwarded to the FDLE by McAlpin. From the record evidence, it appears the FDLE never opened any investigation into Clerk Griffin or any other employee relating to mishandling or misappropriation of any moneys.

### 5.  Sick Leave

McAlpin's deteriorating relationship with the Town Council only accelerated when the Town Council hired Lynda Bell as Town Manager on August 20, 2018. Described as an "outsider," Manager Bell was originally from Miami-Dade County, and no one in the Town of Sneads knew her before she applied and interviewed for the position. She quickly became aware of the Town of Sneads's budget crisis and identified the significant accrual of "comp time" by employees of the police department as one of the most substantial problems. On August 21, 2018, Manager Bell emailed the several department heads and stated that, "Please note, effective immediately[,] there will be no overtime without the express approval of the City Manager. Due to budget constraints[,] it is extremely important that all departments adhere to this policy." She followed up with a second email, which stated: "In addition to the maximum time being accrued every effort must be made to effectively use that time. This guarantees that the city policy is adhered to, and the town is kept solvent."

McAlpin met with Manager Bell the next day. She asked McAlpin to reduce the police department's expenses and overtime and to have his employees work off their excess comp time. McAlpin and Bell have different recollections of the nature and tone of the meeting. According to McAlpin, "Bell was extremely hostile towards [him] from the outset . . . . [S]he was rude and demeaning." Bell recounted McAlpin's "tone and demeanor" as "hostile and threatening." According to Bell, McAlpin stood up, "placed his hands on Bell's desk, leaned towards [her], and menacingly asked if [she] had ever 'run a police department[]'" before "slamm[ing] the door with such force that [it] shook the building."

The following week, Bell emailed McAlpin to inform him that she was aware of "extreme overtime" used over the previous weekend, despite her instructions to the contrary. She explained again to McAlpin it was more cost effective to use part-time dispatchers than to pay employees overtime and reminded him that the situation was at a "crisis point." Two days later, she emailed McAlpin again regarding the possibility of transferring the dispatch services to the Jackson County's Sheriff's Office "instead of paying the extreme overtime." In the email, she included a plea: "Burt, [p]lease know that we are in this together, I am not your enemy. I'm simply trying to benefit this city and keep it from drowning in financial debt." Of note, in several of these emails from Manager Bell to McAlpin, she asked him to provide her with dispatch logs, police-activity reports, and the police department's policy and procedures manual. At this point, McAlpin had not responded to any

of these emails, as evidenced by Bell's copying Councilman Pettis and asking him to instruct McAlpin "to do what [she] asked since [he did] not respond to [her] emails."

Within two weeks of Bell's hiring, McAlpin took sick leave due to what he described as physical symptoms of anxiety and stress. On September 5, 2018, he visited a medical clinic with chest pain, cardiac issues, and generalized stress. According to McAlpin, he was medically excused from work for two weeks, although he never disclosed "the actual underlying cause of the need for leave . . . , as that would violate HIPAA." The clinic provided McAlpin with a "Return to Work/School" note, which stated that he was cleared to return to work on September 21, 2018. The note did not indicate why he went to the clinic or why he was excused from work, and it was signed by the clinic receptionist. After Bell emailed McAlpin on September 10, 2018, advising the note was insufficient because it did not contain a "statement of medical necessity" and was not signed by a doctor, McAlpin submitted a second note that was functionally identical to the first but signed by a nurse practitioner rather than a receptionist. He submitted a third note from the same clinic extending his excused time out of work to October 3, 2018, but that note still did not provide a medical reason. On October 5, 2018, a former sergeant hand delivered a FMLA form signed by McAlpin to Town Hall that indicated what his medical conditions were and the probable duration of those conditions.

Prior to receiving the signed FMLA form from McAlpin, an issue arose regarding McAlpin's police-department truck. On

September 20, 2018, Bell asked McAlpin to "ready" his police-department truck for pick up.  McAlpin advised Bell that he was out of town and told her that no one was authorized to enter his property.  Bell sent a follow-up email again requesting that McAlpin return his truck, which was the Town of Sneads's property, indicating that she had been advised that he was "refusing to allow" the truck to be picked up.  McAlpin again responded in a confrontational manner: "you should be aware I work for and answer to the town council and the citizens of Sneads, you are not my supervisor and cannot direct me to do anything improper."  Then, in a subsequent September 28, 2018, email to Bell, McAlpin asked her to explain why she had taken his "vacation time instead of sick leave."

McAlpin's defiance prompted Town President Grice to intervene.  Grice sent McAlpin a reminder that stated, "the Chief of Police, Town Attorney, and Clerk work at the 'Pleasure of the Council.'"  Grice requested that McAlpin return the Town's truck to the Police Department until he returned to work, citing an example of another employee who asked to do the same and noting that he had "ignored" her previous request.  Grice also requested that McAlpin return the "'Town[']s' key to the Chief[']s office back to the Police Department until [he was] able to return to work."

### 6.    Contacting the Town Attorney

McAlpin contacted Town Attorney Guy Green.  He contends he did so in response to the Town Council's action at its September 11, 2018, meeting, where the Council proposed placing McAlpin under the direct supervision of Bell.  The Town Council

did so later that year.  McAlpin believed this personnel decision violated the Town Charter.  Green agreed with McAlpin and sent a letter to the Town Council advising it that its action was improper.  President Grice responded to the letter from Green, stating that it was "reprehensible" for McAlpin to contact Green.  Green was ultimately terminated at the same meeting at which McAlpin was terminated.

### D. McAlpin's Termination from the Sneads Police Department

McAlpin returned the police-department truck on September 29, 2018, after another follow-up email from Bell, by parking in front of a "no parking" sign, locking the truck, and keeping the keys.  McAlpin admitted that he instructed a colleague to return the truck but to keep the keys and return them to him.

At an October 9, 2018, meeting, the Town Council voted 4-to-1 to terminate McAlpin from the Sneads Police Department.  McAlpin's formal termination form identified the reason for his separation as "violating agency policy."  President Grice led the motion to terminate McAlpin and gave the following reasons, among others, in support of the motion: McAlpin's refusal to stop overtime and comp time; his "excessive" overspending by Police Department and constant budget shortfalls; under his leadership, questionable department purchases when the town has experienced extreme budget shortfalls; consistent gross insubordination, including asking the town's attorney if he was required to follow President Grice's instructions; his refusal to comply with public-

records law; and his dilatory behavior in refusing to return the truck and, upon finally returning the truck, but refusing to return the key.  McAlpin, however, was not in attendance at the October 9 meeting.

Joining President Grice, Councilmen Pettis, Johnson, and Lewis voted "yes" on the motion.  In an affidavit filed during the litigation, Councilman Pettis explained he voted "yes" because McAlpin showed constant insubordination, refused to cooperate with Manager Bell's new overtime and comp time rules, and showed no interest in having a working relationship with Pettis.  In a separate affidavit, Councilman Johnson offered similar reasons for his "yes" vote as Councilman Pettis, adding that McAlpin had shown no interest in working with the Town Council or accepting the members as his superiors.  For example, Johnson stated during his deposition that McAlpin, in a discussion about the Town of Sneads's budget, told him, "I don't care what y'all do about the budget . . . . All I care about is the police department . . . . I haven't done anything [regarding the budget]. . . . I can tell you what to do, y'all give up y'all checks and that will help the budget."

### E.  McAlpin's Lawsuit Against Defendants

McAlpin initially filed a two-count complaint in state court against the Town of Sneads for retaliation under the FWA and for retaliation and interference under the FMLA.  McAlpin later amended his complaint, adding the individual defendants and bringing First Amendment retaliation claims against them and the Town of Sneads under 42 U.S.C. § 1983.  In total, McAlpin's

amended complaint alleged eight counts against Defendants: (1) one count of FWA retaliation against the Town of Sneads; (2) one count of FMLA retaliation and interference against the Town of Sneads; and (3) six separate counts of First Amendment retaliation under § 1983 against the Town of Sneads and the individual defendants, Manager Bell, Councilman Pettis, Councilman Johnson, President Grice, and Clerk Griffin. The Town of Sneads removed the action to the Northern District of Florida, and the district court denied McAlpin's motion to remand.

Defendants moved for summary judgment, and the district court granted their motion as to all of McAlpin's claims. The district court summarized McAlpin's FWA claim, noting that McAlpin claimed he engaged in seven "protected activities":

> (1) he told Grice about Pettis's and Johnson's criminal history and provided her supporting documents; (2) he passed along Wright's statement reporting Griffin's alleged theft to the FDLE; (3) he voiced concerns about the midnight dispatch position at Town Council meetings and on Facebook; (4) he told Pettis that removal of a disciplinary memo violated the Public Records Act; (5) he delivered a "whistleblower" letter to the Town Council; (6) he emailed Bell about her alleged improper accounting for his leave time; and (7) he verbally complained to Town Attorney Green that the Town Council "illegally" placed Bell over him as his supervisor.

The district court found, however, that none of these activities were protected under the FWA "because most were oral (and not in a signed written complaint) and the ones that were in writing were not made to an appropriate local official and/or did not report the type of information described in" Florida Statute § 112.3187(5). And, as to the "whistleblower" letter, the district court explained that it was not protected "because it did not identify the substance of the suspected criminal conduct, there is no evidence that the Town Council knew what conduct the letter was referring to, and the underlying statement provided to the FDLE was written by someone else."

As to his FMLA claims, the district court granted summary judgment on McAlpin's claims of FMLA interference and retaliation. The district court found that the "Return to Work/School" notes McAlpin submitted from the medical clinic were insufficient to trigger FMLA protection because he was required to specify the medical reason for his absence. However, the district court found that the Town of Sneads was given sufficient notice that McAlpin's leave was potentially FMLA-qualifying when he submitted a completed FMLA form several days before his termination. Turning to whether the Town of Sneads had articulated a legitimate, nondiscriminatory reason for the termination, the district court found that the Town of Sneads had done so, i.e., that McAlpin was terminated for being insubordinate and unhelpful to the Town of Sneads's efforts to address budgetary issues before he took his leave. The district court further found that McAlpin's argument

that the Town of Sneads's proffered reason was pretextual was refuted by the record evidence.

Finally, on his First Amendment retaliation claims, the district court found "most of the speech . . . [was] not constitutionally protected because it involved matters of private concern, not public interest; it was communicated to private individuals, not the public at large; or it was motivated by [McAlpin's] self-interest or was part of his official duties." The district court did find two instances of protected speech: (1) McAlpin's Facebook post and (2) his concerns raised at the Town Council meetings about the midnight dispatch position. However, the district court determined that McAlpin could not meet his burden of proving that either of these two instances of speech played a "substantial part" in Defendants' decision to terminate his employment. Specifically, as to the Facebook post, it was undisputed that only one Councilmember—Lewis, who was not a defendant—and possibly Manager Bell, who was not a decisionmaker, were aware of the post at the time of the termination. And as to the concerns raised by McAlpin about the midnight dispatch position, the district court concluded that "the undisputed evidence establishes that the Town would have made the same [termination] decision" even if McAlpin had not spoken up. Further, the district court ruled that his claims against Manager Bell and Clerk Griffin failed because "(1) it is undisputed that the Town Council (and not Bell or Griffin) made the decision to terminate [McAlpin] . . . and (2) . . . there is no evidence that Bell ever

even recommended that the Councilmembers remove [McAlpin] from his position."

McAlpin timely appealed.

## II.     STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo*. *Carithers v. Mid-Continent Cas. Co.*, 782 F.3d 1240, 1245 (11th Cir. 2015). Summary judgment is appropriate if, based on materials in the record, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We view all the facts and reasonable inferences in the light most favorable to the nonmoving party. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009).

## III.     ANALYSIS

### A.  Applicable Legal Standards

McAlpin presents no direct evidence of retaliatory and discriminatory animus. Because he bases his claims on circumstantial evidence, we must analyze his three substantive claims under the applicable burden-shifting framework.

We analyze McAlpin's FWA claim and FMLA retaliation claim under the same burden-shifting framework set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801–05 (1973). *See Sierminski v. Transouth Fin. Corp.*, 216 F.3d 945, 950 (11th Cir. 2000) (applying the burden-

shifting framework of Title VII retaliation claims to FPWA claims); *Matamoros v. Broward Sheriff's Office*, 2 F.4th 1329, 1337 (11th Cir. 2021) (applying *McDonnell Douglas* to FMLA claims). Under this framework, the plaintiff bears the initial burden of proving his prima facie case. *Sierminski*, 216 F.3d at 950. If the plaintiff successfully establishes a prima facie case, "the burden shifts to the defendant to proffer a legitimate reason for the adverse action." *Id.* If the defendant can do so, "[t]he burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the 'legitimate' reason is merely pretext for prohibited, retaliatory conduct." *Id.* (quoting *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998)); *accord Matamoros*, 2 F.4th at 1337.

In order to establish a prima facie case for either a FWA claim or a FMLA retaliation claim, the plaintiff must show that: "(1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is some causal relation between the two events." *Rice-Lamar v. City of Fort Lauderdale*, 853 So. 2d 1125, 1132–33 (Fla. Dist. Ct. App. 2003) (FWA claims); *Sierminski*, 216 F.3d at 950 (same); *Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1243 (11th Cir. 2010) (FMLA retaliation claims).

In a FMLA interference claim, the plaintiff must prove that he was "denied a benefit to which [he] was entitled under the FMLA." *Schaaf*, 602 F.3d at 1241 (quoting *Martin v. Brevard Cnty. Pub. Schs.*, 543 F.3d 1261, 1266-67 (11th Cir. 2008)). The ordinary rule is that the employer's "motives are irrelevant to an

interference claim," but in employment termination suits, an employer may defend against a FMLA interference claim by establishing that the employee would have been terminated anyway. *Batson v. Salvation Army*, 897 F.3d 1320, 1331 (11th Cir. 2018) (quoting *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1208 (11th Cir. 2001)),

First Amendment retaliation claims are also assessed under a burden-shifting framework, albeit a modified one, as set forth by this Court in *Bryson v. City of Waycross*, 888 F.2d 1562, 1565–66 (11th Cir. 1989). First, the plaintiff must make a prima facie case by showing, by a preponderance of the evidence, that:

> (1) the employee's speech is on a matter of public concern; (2) the employee's First Amendment interest in engaging in the speech outweighs the employer's interest in prohibiting the speech to promote the efficiency of the public services it performs through its employees; and (3) the employee's speech played a "substantial part" in the employer's decision to demote or discharge the employee.

*Anderson v. Burke County*, 239 F.3d 1216, 1219 (11th Cir. 2001) (quoting *Bryson*, 888 F.2d at 1565); *Battle v. Bd. of Regents*, 468 F.3d 755, 759–60 (11th Cir. 2006). If he or she can make a prima facie showing, the burden shifts to the employer to show, by a preponderance of the evidence, that it would have reached the same decision in the absence of the protected speech. *Bryson*, 888 F.2d at 1566.

### B. McAlpin's FWA Claim Against the Town of Sneads

The FWA prohibits a public employer from taking an adverse personnel action against an employee "who reports to an appropriate agency violations of law on the part of a public employer . . . that create a substantial and specific danger to the public's health, safety, or welfare." Fla. Stat. § 112.3187(2); *accord id.* § 112.3187(4)(a) ("An agency or independent contractor shall not dismiss, discipline, or take any other adverse personnel action against an employee for disclosing information pursuant to the provisions of this section."). Here, it is undisputed that McAlpin has established the second prong of his prima facie case, i.e., that he suffered an adverse employment action. *See id.* § 112.3187(3)(c) (stating that discharge of employment is an adverse personnel action under the FWA). Turning to the first prong of his prima facie case, McAlpin must show that his speech and conduct were "statutorily protected." Under the FWA, for the disclosure of information to be a "statutorily protected activity," the burden is on the plaintiff to show that he disclosed (1) protected information (2) to an individual or entity identified in the statute (3) in a protected manner. *See id.* § 112.3187(5)–(7); *Rice-Lamar*, 853 So. 2d at 1133. As discussed below, McAlpin has not established that he satisfied all three of these requirements for each instance of his speech that he claims was protected under the FWA.

#### 1. Protected Information

Whether the FPWA protections apply in a given case depends on the nature of the information disclosed. § 112.3187(5).

Both the text and structure of the FWA make clear that protected information is narrow in scope.  The nature of the information disclosed *"must* include" the content enumerated in either Florida Statute § 112.3187(5)(a) or (b):

> (a) Any violation or suspected violation of any federal, state, or local law, rule, or regulation committed by an employee or agent of an agency or independent contractor which creates and presents a substantial and specific danger to the public's health, safety, or welfare.

> (b) Any act or suspected act of gross mismanagement, malfeasance, misfeasance, gross waste of public funds, suspected or actual Medicaid fraud or abuse, or gross neglect of duty committed by an employee or agent of an agency or independent contractor.

(Emphasis added).

McAlpin claims that he made the following protected reports and disclosures under subsection (5).  He contends that his report about Clerk Griffin's alleged theft constituted a disclosure of a suspected violation of law and a suspected act of gross misfeasance and malfeasance and that his public opposition statements to budget cuts in the police department were disclosures of gross mismanagement.  Additionally, he asserts that he notified Pettis that removing a disciplinary memorandum from an employee's personnel file violated Florida's public records laws and that his whistle-blowing note to the Town Council referenced "criminal conduct." Further, he contends that his emails to Bell about his sick leave

disclosed gross mismanagement and misfeasance and that his report to Green that the Town Council had improperly and illegally placed Bell over him are protected under subsection (5).

McAlpin additionally asks us to read the statute expansively and argues that, in addition to these express enumerations in subsections (5)(a) and (5)(b), the FWA's broad wording provides for something like a catch-all provision that includes "any other abuse" as information that would be protected under the law. McAlpin bases his argument on Florida Statute § 112.3187(2), claiming that the FWA protects the disclosure of "improper use of governmental office, gross waste of funds, *or any other abuse* or gross neglect of duty on the part of an agency, public officer, or employee." (emphasis added). And, based on subsection (2), he asserts that his disclosure of the criminal records of Pettis and Johnson, his report of Griffin's alleged involvement in a theft, his stated concerns about cutting the midnight dispatch position, and his emails to Bell about his sick leave were regarding "any other abuse" and, thus, were protected information under the FWA.

We first address McAlpin's subsection (2) argument. The polestar of statutory interpretation is to begin (and end) with the plain language of the statute. *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014). Nonetheless, relying on Florida state court descriptions of the FWA as "remedial in nature" and thus to be given "a liberal construction," *Nazzal v. Fla. Dep't of Corr.*, 267 So. 3d 1094, 1096 (Fla. Dist. Ct. App. 2019); *accord Irven v. Dep't of Health & Rehab. Servs.*, 790 So. 2d 403, 405–06

(Fla. 2001), McAlpin argues that we should read subsection (2) as a catch-all provision to subsection (5)'s definition of protected information under the FWA.

We conclude that McAlpin's interpretation of the statute is an illogical and atextual one. As the Town of Sneads correctly point out, the phrase "any other abuse" derives from a subsection clearly titled "Legislative Intent," not from the subsection expressly delineating the statutorily provided requirements for information covered by the statute. *Compare* Fla. Stat. § 112.3187(2) ("It is further the intent of the Legislature . . . to prevent agencies or independent contractors from taking retaliatory action against any person who discloses information . . . alleging improper use of governmental office, gross waste of funds, or any other abuse . . . ."), *with id.* § 112.3187(5) ("The information disclosed under this section *must* include . . . ." (emphasis added)). When choosing whether to follow the general statement of legislative intent in subsection (2) or the specific directive about the content of the disclosure in subsection (5), we must follow the latter. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 28, at 183 (2012) ("If there is a conflict between a general provision and a specific provision, the specific provision prevails."). The alternative approach would require us to ignore the mandatory language in subsection (5). *See id.* § 26, at 174 ("If possible, every word and every provision is to be given effect."). And although the Florida Supreme Court in *Irven* stated that the FWA "establishes a wide scope of activity that may give rise to its protections," *see* 790 So.

2d at 406, and referred to subsection (2) as one example of the broad statutory language used by the Florida Legislature, nothing in *Irven* requires (or even suggests) that we ignore subsection (5)'s specific directive about the content of the disclosure. The plain meaning of "must include" is clear, and McAlpin's request that we resort to liberal construction of that language as an interpretive aid does not permit us to disregard this legislative mandate and substitute "may include" in its place. And McAlpin has not identified case law from Florida courts reading subsection (2) as a category of protected information under subsection (5) of section 112.3187.

Accordingly, based on the unambiguous language and structure of the statute, McAlpin's disclosures constitute "statutorily protected activity" *only* if they satisfy either of the two enumerated requirements of subsection (5). Reviewing the disclosures McAlpin identifies, we hold that they do not satisfy subsection (5). Based on the record evidence, the disclosures that McAlpin identifies did not implicate either "[a]ny violation or suspected violation of any federal, state, or local law, rule, or regulation . . . which creates and presents *a substantial and specific danger to the public's health, safety or welfare*," *id.* § 112.3187(5)(a) (emphasis added), or "[a]ny act or suspected act of gross mismanagement, malfeasance, misfeasance, gross waste of public funds, suspected or actual Medicaid fraud or abuse, or gross neglect of duty," *id.* § 112.3187(5)(b). McAlpin's most colorable argument relates to his disclosure of Councilmen Pettis's and Johnson's 1991 arrests. There is nothing in the record, however, to suggest that arrests which occurred over

twenty-five years ago "create[] or present[] a substantial and specific danger to the public's health, safety, or welfare." *See id.* § 112.3187(5)(a).

### 2. *Disclosure to an Individual or Entity Identified in § 112.3187(6)*

Protected information must be disclosed to one of the individuals or entities identified in the statute. *Id.* § 112.3187(6). When the disclosure concerns a local governmental entity, the plaintiff must have disclosed the information "to a chief executive officer as defined in [section] 447.203(9) or other appropriate local official." *Id.* Section 447.203(9) provides that "'Chief executive officer' for the state shall mean the Governor and for other public employers shall mean the person, whether elected or appointed, who is responsible to the legislative body of the public employer for the administration of the governmental affairs of the public employer."

Here, there is no dispute that the disclosure McAlpin made to the FDLE does not satisfy the subsection (6) requirement ,because the FDLE is not "an appropriate local official" as contemplated by the statute. *See Quintini v. Panama City Hous. Auth.*, 102 So. 3d 688, 690 (Fla. Dist. Ct. App. 2012) (concluding that "FDLE is a state agency, not a local official" for purposes of section 112.3187(6)). However, we do not address or determine whether the recipients of McAlpin's other disclosures qualify as "other appropriate local official[s]" under subsection (6) of the statute since McAlpin's FWA claim fails for other reasons under the statute.

### 3. *Protected Manner*

Finally, the FWA requires the plaintiff, when disclosing information on his own initiative, to have disclosed the information "in a written and signed complaint." Fla. Stat. § 112.3187(7). However, under subsection (7), the signed-writing requirement does not apply to individuals "who are requested to participate in an investigation, hearing, or other inquiry conducted by any agency or federal government entity."

McAlpin argues that it does not matter that many of his disclosures were oral, claiming that he made those disclosures in an "investigation" or "other inquiry" under subsection (7). We find this argument without merit. There is no evidence suggesting that the oral disclosures to FDLE, Grice, the Town Council, Pettis, or Green were "requested" as part of "an investigation, hearing, or other inquiry conducted by any agency or federal government entity." *Id.*

Additionally, as the district court found, while McAlpin's August 9, 2018, Memorandum was in writing and signed, the underlying statement provided to the FDLE was not written by McAlpin himself. But even assuming that Memorandum met subsection (7)'s requirements, the disclosure failed to satisfy the requirements of subsections 112.3187(5) and (6). Specifically, not only was it not made to an individual or entity identified in the FWA, but it did not contain protected information. As discussed, the record establishes that none of the Councilmembers understood what the Memorandum was referring to when McAlpin delivered it to them and the

information that it involved an allegation of theft against Clerk Griffin was only learned during discovery in the litigation.[1]

Because the record evidence does not establish a prima facie case for retaliation under the FWA, we affirm the district court's grant of summary judgment on that claim.

### C. McAlpin's FMLA Claims Against the Town of Sneads

McAlpin also contends that the district court erred in granting summary judgment on his claims of FMLA interference and retaliation. We disagree.

Absent direct evidence of retaliatory intent, to establish a prima facie case of a FMLA retaliation claim, the plaintiff must prove: (1) he engaged in a "statutorily protected activity"; (2) he suffered an adverse employment action; and (3) there is some causal relation between the two events. *Schaaf*, 602 F.3d at 1243. Defendants concede that McAlpin's medical leave for alleged physical ailments from stress and anxiety qualifies as protected activity under the FMLA. And, as with the FWA claim, there is no dispute that McAlpin's termination satisfies the second prong of an FMLA

---

[1] McAlpin also contends that the emails he sent to Bell, including one email in which he complained about Bell taking his vacation time instead of allowing him to use sick leave satisfied subsection (7) as he ended the email with the signature, "Chief of Police, Burt McAlpin." Even assuming those emails satisfied the FWA's signed-writing requirement, those emails, as explained above, were not protected because they did not disclose the types of wrongdoing listed in section 112.3187(5).

prima facie case. *See Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006) ("[T]ermination is certainly an adverse employment action"). Therefore, we limit our analysis to the third prong—the causal connection between the two. The parties agree that, for the causal connection requirement, the plaintiff must prove only "that the protected activity and the negative employment action are not completely unrelated." *Olmsted*, 141 F.3d at 1460 (quoting *EEOC v. Reichhold Chem., Inc.*, 988 F.2d 1564, 1571–72 (11th Cir. 1993)). While "[t]he burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action[,] . . . mere temporal proximity, without more, must be 'very close.'" *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).

We first address the FMLA retaliation claim. Here, the district court determined that "[t]he close temporal proximity between [the October 5, 2018,] FMLA request and his termination on October 9, 2018, is sufficient to create a genuine issue of material fact of causal connection." The Town of Sneads, however, insists McAlpin cannot make this showing because the extent of his evidence is limited "only" to the temporal proximity of his protected activity and his termination. We note that this is not entirely accurate. McAlpin also points to Green's firing as additional evidence, contending that Green's "siding with McAlpin in his interpretation of the governing law" resulted in the Town Council terminating Green's employment at the same meeting as his own termination.

Given McAlpin's showing of temporal proximity, coupled with his showing that the Town Council terminated Green around the same time for related reasons, we will assume McAlpin established a prima facie case for FMLA retaliation for purposes of summary judgment.

As a result, the burden now shifts to the Town of Sneads to "proffer a legitimate, non-retaliatory reason for the adverse employment action." *Olmsted*, 141 F.3d at 1460. The record evidence establishes that the Town of Sneads did so. According to the Town Council's and Manager Bell's well-documented grievances against McAlpin, the Town Council viewed McAlpin as insubordinate and obstinate. For example, McAlpin refused to "work with" the Town Council in addressing the Town of Sneads's budget crisis.

Because the Town of Sneads has met its burden to proffer a legitimate, nonretaliatory reason for McAlpin's termination, the burden shifts back to McAlpin to establish that the reasons proffered by the Town of Sneads were false and merely a pretext for his termination. *Matamoros*, 2 F.4th at 1337. A plaintiff can show pretext by demonstrating "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Id.* (quoting *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010)).

McAlpin argues that the record evidence shows "immediate cause and effect" following his initial disclosure of Councilmen Pettis's and Johnson's arrests up until his termination. He offers

several arguments as to why the Town of Sneads stated reason for terminating him is actually a pretext. First, McAlpin argues the Town Council showed a "downward spiral of harassment, hostile treatment, and retaliation" after his initial disclosure of Councilmen Pettis's and Johnson's arrests. He further contends that after Bell's hire, she "immediately began to target" him regarding comp time, overtime, and leave requests. We find no support for this in the record evidence. Indeed, Bell was hired as the "outsider" and began tightening comp time and overtime policies in *all* departments on her second day in office.

Second, McAlpin argues that any claims by the Town of Sneads that he was "insubordinate" are rebutted by the fact that he ultimately returned his truck and that he intended to return to work after his medical leave. However, the Sneads Police Department's Policy and Procedures define the term "insubordination" as "any act of defiance, disobedience, dissension or resistance to authority" and provide that "[a]ny form of insubordination . . . will be subject to disciplinary action up to and including dismissal. And, as detailed above, the record establishes that McAlpin took multiple acts that the Town Council viewed as insubordinate, e.g., refusing to follow Grice's and Bell's directives.

Third, McAlpin argues that the individual Councilmembers "could not agree on the reasons for [his] termination" and that this can be evidence of pretext. *See Hurlbert*, 439 F.3d at 1298 (stating that "an employer's failure to articulate clearly and consistently the reason for an employee's discharge may serve as evidence of

pretext"). While it is true that the Councilmembers offered differing, nondiscriminatory examples as to how McAlpin was insubordinate based on their own observations and experiences with McAlpin, we hold that it is not evidence of pretext for an employer to supply more than one "non-discriminatory basis for [McAlpin's] termination" where the reasons are not necessarily inconsistent. *Cf. Tidwell v. Carter Prods.*, 135 F.3d 1422, 1428 (11th Cir. 1998). The record shows that a majority of the Town Council agreed that McAlpin was insubordinate and should be terminated from his position. Those differing examples of insubordination do not establish that the nondiscriminatory reason the Town of Sneads provided for McAlpin's termination—insubordination—was pretextual. *See id.*

Finally, McAlpin contends that the fact that the Town Council did not follow its "progressive discipline policy" in its Policy Manual and instead moved directly to terminate him shows pretext. We disagree. The Town of Sneads's discipline policy states that "the most flagrant and serious acts of gross misconduct" can provide grounds for "[i]mmediate termination" and provides a nonexclusive list of such acts. The discipline policy further explicitly lists "[i]nsubordination" as a ground for immediate termination. Thus, we conclude that McAlpin's termination was not evidence of pretext, as it did not violate the Town of Sneads's standard procedure to fire an employee, such as McAlpin, on the basis of insubordination."

Because McAlpin did not meet his burden in establishing that the Town of Sneads's proffered legitimate, nondiscriminatory reason for his termination was pretextual, we affirm the district court's grant of summary judgment as to the FMLA retaliation claim.

We turn next to McAlpin's interference claim under the FMLA. To succeed under a FMLA interference claim, the plaintiff must show only that he was "denied a benefit to which [he] was entitled under the FMLA." *Schaaf*, 602 F.3d at 1241 (quoting *Martin v. Brevard Cnty. Pub. Schs.*, 543 F.3d 1261, 1266–67 (11th Cir. 2008)). Generally, "'the employer's motives are irrelevant' to an interference claim." *Batson*, 897 F.3d 1320, 1331 (11th Cir. 2018) (quoting *Strickland*, 239 F.3d at 1208). But "[w]here the claim is based on an employee's termination, . . . an employer may affirmatively defend against the claim by establishing that it would have terminated the employee regardless of [his] request for or use of FMLA leave." *Id.* Because, as we have already explained, the record evidence shows that the Town of Sneads terminated McAlpin for insubordination, not his invocation of the FMLA, we conclude that the district court's grant of summary judgment as to McAlpin's FMLA interference claim was also proper and affirm.

### D. McAlpin's First Amendment Claims

McAlpin's remaining claims are for First Amendment retaliation filed pursuant to § 1983. As a general principle, "public employees do not surrender all their First Amendment rights by reason of their employment." *Garcetti v. Ceballos*, 547 U.S. 410, 417

(2006). Rather, they have a constitutional right, "in certain circumstances, to speak as a citizen addressing matters of public concern." *Id.* Stated plainly, the First Amendment safeguards a public employee's right, as a citizen, to participate in discussions involving public affairs; it does not empower public employees to "constitutionalize" any grievances they have with their employers. *Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1160 (11th Cir. 2015) (quoting *Garcetti*, 547 U.S. at 420).

Again, McAlpin must first make a prima facie showing, by a preponderance of the evidence, that:

> (1) the employee's speech is on a matter of public concern; (2) the employee's First Amendment interest in engaging in the speech outweighs the employer's interest in prohibiting the speech to promote the efficiency of the public services it performs through its employees; and (3) the employee's speech played a "substantial part" in the employer's decision to demote or discharge the employee.

*Anderson*, 239 F.3d at 1219 (quoting *Bryson*, 888 F.2d at 1565); *accord Moss v. City of Pembroke Pines*, 782 F.3d 613, 617–18 (11th Cir. 2015). Here, we need only address the third prong of the analysis because, based on the record evidence, McAlpin cannot show, as a matter of law, that his speech played a substantial part in the Town Council's termination decision. *See Moss*, 782 F.3d at 618 (noting a court can resolve the issue of whether speech was a substantial motivating factor in a plaintiff's termination where "the evidence is undisputed"). Indeed, there is no evidence in the record

that even suggests the Town Council terminated McAlpin because of any First Amendment protected speech.  Just as the record evidence established Defendants' legitimate, nonretaliatory reasons for terminating McAlpin as to his FWA and FMLA claims, i.e., insubordinate actions, that evidence establishes that McAlpin's speech was not a substantial reason for his firing.

Accordingly, we conclude that McAlpin cannot make a prima facie case as to his First Amendment retaliation claims against Defendants and affirm the grant of summary judgment as to those claims.

## IV.    CONCLUSION

For the reasons stated, summary judgment in favor of Defendants was proper, and we affirm the district court's entry of judgment for the Defendants.

**AFFIRMED.**